**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| **ACTION NC,** | |
| **DEMOCRACY NORTH CAROLINA,** | |
| **NORTH CAROLINA A. PHILIP** | |
| **RANDOLPH INSTITUTE,** | |
| **SHERRY DENISE HOLVERSON,** | |
| **ISABEL NAJERA,** and | |
| **ALEXANDRIA MARIE LANE,** | |
| Plaintiffs, | |
| v. | |
| **KIM WESTBROOK STRACH,** | CIVIL ACTION NO. 1:15-cv-1063 |
| *in her official capacity as Executive Director of the North Carolina State Board of Elections,* | |
| **RICK BRAJER,** | **COMPLAINT** |
| *in his official capacity as Secretary of the North Carolina Department of Health and Human Services*, | |
| **KELLY THOMAS,** | |
| *in his official capacity as Commissioner of the North Carolina Division of Motor Vehicles*, and | |
| **NICK TENNYSON,** | |
| *in his official capacity as Secretary of the North Carolina Department of Transportation*, | |
| Defendants. | |

1

Plaintiffs, by and through their undersigned counsel, for their complaint against Defendants, allege as follows:

1.      This action concerns the widespread and ongoing failure of the defendant officials of the State of North Carolina to comply with the "Motor Voter" and agency-based voter registration requirements of the National Voter Registration Act of 1993, 52 U.S.C. § 20501 *et seq*. ("NVRA"). The Defendants' actions and/or inactions have caused, and continue to cause, eligible citizens of North Carolina to be deprived of the federally-mandated opportunity to register to vote and to update their voter registration on a regular basis when they conduct business with specific state entities. As a result of these violations, many North Carolinians have been disenfranchised in recent federal elections and many more face the threat of disenfranchisement.

2.      In 1993, Congress passed the NVRA in part to "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(b)(1). As one important way of achieving this goal, the NVRA requires certain state entities to provide voter registration services to the individuals whom they serve. These requirements reflect Congress' findings that "the right of citizens of the United States to vote is a fundamental right" and that "it is the duty of the Federal, State, and local governments to promote the exercise of that right." *Id.* § 20501(a)(1)-(2).

3.      Sections 5 and 7 of the NVRA, 52 U.S.C. § 20504 and 52 U.S.C. § 20506, require that motor vehicle offices and public assistance offices, respectively, must

provide voter registration services to citizens who engage in certain types of interactions. Specifically, voter registration services must be provided whenever an individual applies for, renews, or recertifies public assistance benefits, a driver's license, or a state-issued identification card, as well as when an individual notifies a public assistance agency or the Division of Motor Vehicles of a change of address. (The interactions during which voter registration services must be provided are commonly known as "covered transactions.")

4.     The voter registration obligations on public assistance transactions (Section 7) or DMV transactions (Section 5) apply to all covered transactions, whether performed in a public assistance agency or DMV office or by remote means, *i.e.*, through the Internet, telephone, mail or any other process in which the client does not appear in person at a North Carolina office of the DMV or public assistance agency office.

5.     Among other things, Section 7 of the NVRA, 52 U.S.C. § 20506 *et seq.*, requires North Carolina public assistance agencies to be designated to provide voter registration services with each application for services, and with each recertification, renewal, or change of address transaction. *See id.* § 20506(a)(6)(A).

6.     Pursuant N.C. Gen. Stat. § 163-82.20, North Carolina designated the agencies that administer the Supplemental Nutrition Assistance Program ("SNAP"), the Supplemental Nutrition Program for Women, Infants, and Children ("WIC"), Temporary Assistance for Needy Families ("TANF" or, as the program is known in North Carolina, "Work First"), Medicaid, and the Children's Health Insurance Program ("CHIP") as voter

registration agencies—*i.e.*, those that are obligated to provide voter registration services pursuant to Section 7. *See* Department of Justice, The National Voter Registration Act of 1993 (NVRA), http://www.justice.gov/crt/national-voter-registration-act-1993-nvra (last visited Nov. 30, 2015) (question 13).

7.     Data provided by the North Carolina State Board of Elections ("SBE") show that after many years of stability—punctuated by spikes around presidential elections—the number of voter registration applications originating from North Carolina public assistance agencies decreased dramatically in the last two reported years (2013 and 2014).  This decrease cannot be attributed to a reduced caseload.  For example, although the number of applications for Food and Nutrition Services, Work First, and Medicaid (including Work First and Medicaid recertifications) submitted to the North Carolina Department of Health and Human Services ("DHHS") dropped by approximately 13.8 percent between 2011 and 2013, the decline in DHHS-generated voter registration applications fell by more than 56 percent over the same period.  This far exceeds the decrease that reasonably could be attributed to the reduced number of applications for public assistance.

8.     Public assistance agencies are not providing the required services during in-office covered transactions.  Field investigations conducted in October 2014 at nineteen DHHS offices in eleven counties (including, *inter alia*, Durham, Forsyth, Guilford, Orange, and Rowan Counties) confirmed that frontline staff at DHHS offices are consistently failing to offer voter registration services as required by law.

4

9.      Section 5 of the NVRA, 52 U.S.C. § 20504 *et seq.* ("Section 5"), requires

North Carolina's Division of Motor Vehicles ("DMV") to treat applications for driver's

licenses or non-operator's licenses "as . . . application[s] for voter registration," *id.*

§ 20504(a)(1), and that changes of address submitted to the DMV must update voter

registration information unless an individual affirmatively states that the change of

address is not for voter registration purposes. *Id.* § 20504(d). North Carolina's DMV

offices must also ensure that the voter registration information they collect and process is

timely transmitted to the Board of Elections within ten days of acceptance (and less in

some circumstances). *Id.* § 20504(e).

10.     The transmittal deadline established by Section 5 of the NVRA was

reduced by the North Carolina state law implementing that section. North Carolina law

requires in part that any voter registration applications or updates to voter information

that DMV receives must "be forwarded . . . to the appropriate board of elections no[] later

than *five* business days after the date of acceptance." N.C. Gen. Stat. § 163-82.19(a)

(2015) (emphasis added).

11.     Data obtained from County Boards of Elections, as well as the experiences

of numerous individuals who attempted to register or update their voter registration

information in person at a DMV office, demonstrate that DMV officials are failing to

ensure that voter registration applications are properly forwarded and transmitted to

elections officials as required by Section 5.

12.    Over and over again, voter-eligible citizens of North Carolina who have attempted to register or to update their voter registration information at North Carolina DMV offices later present themselves to vote only to be informed by election officials that their names are not on the voter rolls.  Such individuals are singled out, told they are unregistered and, in order to vote, are forced to devote additional time and energy to manually completing a provisional ballot.

13.    Moreover, provisional ballots are not counted if the Board of Elections cannot confirm their voter registration.  When that happens, citizens are left out of the election through no fault of their own, and despite their efforts to register.  Upon information and belief, this disenfranchisement is attributable to the failure of the Defendants to ensure that DMV offices process and transmit voter registration applications and changes of address as required by Section 5.

14.    In addition, DHHS and the DMV are entirely failing to offer the NVRA-mandated voter registration services to individuals who conduct transactions through remote means, including when (a) applying for SNAP or Medicaid benefits by mail or online, or (b) renewing their driver's licenses or state-issued identification cards or submitting address changes to the DMV by mail or online.

15.    These failures, separately and collectively, deprive the people of North Carolina of the full opportunity to register to vote that they are guaranteed by State and Federal Law.

16.     Plaintiffs notified the Defendants of their violations of Section 5 and

Section 7 by letters dated, respectively, June 1, 2015 and May 8, 2015, as required by 52

U.S.C. § 20510(b).  Upon information and belief, Defendants to date have failed to

correct those violations.

17.     To remedy these violations, Plaintiffs respectfully bring this action for

declaratory and injunctive relief, asking this Court to declare that the Defendants are in

violation of Section 5 and Section 7 of the NVRA, and to order such injunctive relief as is

required to ensure that Defendants promptly and fully correct those violations by North

Carolina's Division of Motor Vehicles and public assistance agencies, and to order such

additional relief as may be appropriate.

## JURISDICTION AND VENUE

18.     This action is brought pursuant to Section 11(b) of the NVRA, 52 U.S.C.

§ 20510(b).

19.     This Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1331 and 28 U.S.C. § 1343(a).

20.     This court has personal jurisdiction over each Defendant because each is a

citizen of the State of North Carolina.

21.      Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a

substantial part of the events giving rise to the claims occurred in this district, and each

Defendant conducts business in this district.

7

## PARTIES

22.     Plaintiff ACTION NC is a non-profit organization focused on reducing the root causes of poverty, underdevelopment, and social and economic inequality in North Carolina. ACTION NC operates through three regional offices in Charlotte, Durham, and Raleigh. Issues that Action NC works on include voter participation, education, immigration, health care, fair and affordable housing, and neighborhood organizing. As part of its mission of community engagement and empowerment, Action NC is committed to increasing voter participation in North Carolina's low-income communities, by, among other activities, conducting voter registration drives in neighborhoods and at public sites, generating and distributing issue-based materials in low-income neighborhoods, and hosting public presentations on issues related to elections and voting in these neighborhoods.

23.     ACTION NC has registered voters and conducted issue-based outreach throughout North Carolina, including in this Judicial District. On information and belief, a substantial proportion of the unregistered individuals reached by ACTION NC have contact with the DMV and/or public assistance agencies, and could have registered to vote without ACTION NC's assistance had Defendants complied with their obligations under the NVRA.

24.     As a direct result of Defendants' Section 7 and Section 5 NVRA violations, ACTION NC has had to divert time and resources to voter registration efforts,

which it otherwise would have directed toward its other voter education and outreach activities.

25.     Plaintiff DEMOCRACY NORTH CAROLINA is a nonpartisan organization based in Durham that is dedicated to reducing barriers to voting and increasing voter participation in North Carolina. Democracy North Carolina's work is focused on three areas: money in politics, voting and elections, and good governance.

26.     Democracy North Carolina conducts year-round voter registration drives and trainings across the state. It provides voter registration services at numerous community gatherings and events.  For example, Democracy North Carolina recently held voter registration drives and voter registration trainings in Winston-Salem and Greensboro, among other locations.  On information and belief, a substantial proportion of the unregistered individuals reached by Democracy North Carolina have contact with the DMV and/or public assistance agencies, and could have registered to vote without Democracy North Carolina's assistance had Defendants complied with their obligations under the NVRA.

27.     As a direct result of Defendants' Section 7 and Section 5 NVRA violations, Democracy North Carolina has had to divert time and resources to voter registration efforts, which it would have directed toward other voter education and engagement activities.

28.     Plaintiff NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE ("APRI") is a state chapter of the A. Philip Randolph Institute, a national organization for

African-American trade unionists and community activists, established in 1965 to forge an alliance between the civil rights and labor movements. APRI is a senior constituency group of the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO"), and has thirteen chapters across North Carolina, including in Durham, Greensboro, and Winston-Salem. While APRI devotes considerable time and resources to efforts supporting charitable ventures, such as feeding the hungry and providing clothing to those in need, the bulk of APRI's work is focused on voter education, registration, and outreach efforts.

29.     Among its recent voter registration activities, APRI has participated in door-to-door canvassing, been present at community events, and placed phone calls to unregistered voters. APRI's voter registration efforts have traditionally focused on underserved communities and geographies where a high number of unregistered individuals reside.  On information and belief, a substantial proportion of the unregistered individuals reached by APRI have contact with the DMV and/or public assistance agencies, and could have  registered to vote without APRI's assistance had Defendants complied with their obligations under the NVRA.

30.     As a direct result of Defendants' Section 7 and Section 5 NVRA violations, APRI has had to divert time and resources to voter registration efforts, which it would have directed toward voter education efforts.

31.     Action NC, Democracy North Carolina, and APRI (collectively the "Organization Plaintiffs") have individually and collectively suffered and will continue to

suffer direct harm from the Defendants' non-compliance with Sections 5 and 7 of the NVRA. By forcing these institutions to divert limited resources to assist voters with registration that could have or should have been accomplished through the DMV or the public assistance agencies, these institutions have been unable to conduct other activities important to their respective missions.

32. Plaintiff SHERRY DENISE HOLVERSON is a 50-year-old U.S. citizen who was born in North Carolina. She served in the U.S. Army for about 5 years before being honorably discharged in 2004. After being discharged from the Army, Ms. Holverson attended community college in Beaver Falls, New York. Ms. Holverson moved back to North Carolina in 2009 and resided in Cumberland County, where she was registered to vote. In April 2014, Ms. Holverson moved from Cumberland County to neighboring Harnett County. Shortly after her move, in June 2014, Ms. Holverson, who meets all of North Carolina's voter qualifications, visited the DMV office in Raeford, North Carolina (Hoke County) to update the address on her driver's license. Ms. Holverson explicitly asked for her voter registration information to be updated. When she left the DMV, she assumed she would be able to participate in the November 2014 General Election. On October 31, when Ms. Holverson went to cast an early ballot in Harnett County, she was told that she was not on the registration rolls. She was given a provisional ballot and was informed that her vote may or may not be counted.

33. Unfortunately, according to the SBE, Ms. Holverson's 2014 ballot was not counted. On information and belief, her vote was not counted because the Harnett County Board of Elections could not confirm she had changed her address at the DMV.

34. In October 2015, Ms. Holverson again moved—this time from Harnett County to Cumberland County—and again visited the Hoke County DMV to update her voter registration information. After her prior encounter with the DMV, she wanted to be sure her registration was properly processed, which was confirmed when she received information confirming that her voter information had been updated.

35. Plaintiff ISABEL NAJERA is a 44-year-old U.S. citizen who has lived in Sampson County, North Carolina for over 20 years. Ms. Najera was born in Durango, Mexico and moved to the U.S. in 1994. On July 30, 2014, Ms. Najera became a naturalized U.S. citizen. In early October 2014, Ms. Najera visited the Sampson County DMV to obtain a commercial driver's license. While applying for a driver's license, Ms. Najera was asked whether she wanted to register to vote. Ms. Najera, who meets all voter registration prerequisites, said "yes" and was told she would be able to vote in the upcoming General Election because the registration deadline of October 10, 2014, was still several days away. Ms. Najera was asked if she would like to register as a member of any particular party. Because it was her first time voting, Ms. Najera did not know which party she wanted to affiliate with and was told she would be listed as unaffiliated. She was then given a paper voter registration application to sign. When Ms. Najera, who was excited to participate in her first election, went to cast her early ballot, she was told

12

her name was not on the registration rolls. She was taken to a separate line and made to wait for over an hour. Eventually, she was given a provisional ballot.

36. Unfortunately, according to the SBE, Ms. Najera's 2014 ballot was not counted. On information and belief, her vote was not counted because the DMV had no record of Ms. Najera's voter registration transaction, and because the County Board of Elections was unable to verify that Ms. Najera had registered at the DMV.

37. Plaintiff ALEXANDRIA MARIE LANE is a 27-year-old U.S. citizen who was born and raised in North Carolina. In March 2012, Ms. Lane moved to Virginia for work and registered to vote in that state. Two years later—missing her family, friends, and home state—Ms. Lane moved back to North Carolina. In late May 2014, after moving to Wake County, North Carolina, Ms. Lane went to the DMV to get a state driver's license. While she was at the DMV, a worker asked Ms. Lane if she would like to register to vote, and she said "yes." When Ms. Lane went to an early voting site in Cary on October 27, 2014, she was told that her name did not appear on the registration rolls. Ms. Lane was forced to cast a provisional ballot.

38. Unfortunately, according to the SBE, Ms. Lane's 2014 ballot was not counted. On information and belief, her vote was not counted because the County Board of Elections was unable to verify that Ms. Lane had registered at the DMV.

39. Ms. Holverson, Ms. Najera, and Ms. Lane (collectively the "Individual Plaintiffs") have individually and collectively suffered direct injury from Defendants' failure to comply with the NVRA. Specifically, they have irreparably lost the time spent

13

attempting to vote, were forced to cast provisional ballots, and have been irreparably injured by the fact that their provisional ballots were not counted in the 2014 elections.

40. Furthermore, because each of the Individual Plaintiffs resides in the State and may relocate within the State at some time in the future, each Individual Plaintiff is reasonably likely to have need of the DMV's licensing, change of address, and voter registration services in the future and therefore is at substantial risk of suffering from the Defendants' non-compliance with the NVRA in the future as well.

41. Defendant KIM WESTBROOK STRACH is the Executive Director of the North Carolina State Board of Elections. Pursuant to N.C. Gen. Stat. § 163-82.2 (2015), Ms. Strach is the Chief State Election Official in North Carolina and is responsible for overseeing the administration of the elections process throughout the State, including in this Judicial District. In her official capacity, Ms. Strach oversees the conduct of local elections, the operation of voting sites, and the maintenance of voter registration lists. She is responsible for the coordination of North Carolina's responsibilities under the NVRA, including but not limited to the receipt of and proper processing of voter registration information from the DMV and North Carolina's public assistance agencies. *Id*. Among other things, Defendant Strach is responsible for ensuring that voter registration agencies, including offices through which persons apply for, recertify, renew, or change their addresses for such public assistance benefits as SNAP, Work First, Medicaid, CHIP, and WIC, provide the voter registration services mandated by Section 7 of the NVRA. In addition, Defendant Strach, is the election official responsible for

14

ensuring the North Carolina DMV's compliance with Section 5 of the NVRA. *See* 52 U.S.C. § 20509; *see also* N.C. Gen. Stat. § 163.82.2 (2015).

42.     Defendant RICK BRAJER (together with Defendant Strach, the "Section 7 Defendants") is the Secretary of the North Carolina DHHS. DHHS administers the SNAP, Work First, Medicaid, CHIP, and WIC programs, which are implemented through public assistance offices and organizations throughout the state. DHHS and its offices are also a designated voter registration agency under both federal law and the North Carolina General Statutes. *See* 52 U.S.C. § 20506; N.C. Gen. Stat. § 163-82.20 (2015). In his official capacity, Mr. Brajer is responsible for overseeing the compliance of North Carolina's public assistance agencies with the NVRA. This includes ensuring that voter registration materials and services mandated by Section 7 of the NVRA are made available through DHHS.

43.     Defendant KELLY THOMAS is North Carolina's Commissioner of Motor Vehicles. In this capacity, Mr. Thomas oversees the daily operations of the North Carolina DMV, which has offices throughout the state, including 32 locations within this Judicial District, and two mobile units that operate on certain days of the year in Davidson and Moore counties. In North Carolina, the DMV is the state entity responsible for accepting and processing all applications for, renewals of, and changes of address on a state-issued driver's license or identification card. As such, the DMV is required to provide voter registration services under Section 5 of the NVRA and the North Carolina General Statutes. 52 U.S.C. § 20504(a)(1), (d); N.C. Gen. Stat. § 163.82.19 (2015). In

15

his official capacity as North Carolina's Commissioner of Motor Vehicles, Defendant Thomas is responsible for ensuring that North Carolina's DMV offices are in compliance with Section 5 of the NVRA and North Carolina law. Defendant Thomas is also responsible for ensuring that all DMV voter registration materials are timely forwarded to the appropriate County Board of Elections. N.C. Gen. Stat. § 163-82.19 (2015).

44. Defendant NICK TENNYSON (together with Defendants Strach and Thomas, the "Section 5 Defendants") is North Carolina's Secretary of Transportation. The North Carolina Department of Transportation is the state agency that is responsible for all of the State's transportation-related activities, including those conducted by the DMV, and the Secretary of Transportation is responsible for overseeing the agencies within the Department of Transportation. In his official capacity as Secretary of Transportation, Defendant Tennyson supervises the operations of the DMV, including its voter registration obligations, and shares responsibility with Defendant Thomas for ensuring that North Carolina's DMV offices are in compliance with Section 5 of the NVRA and North Carolina law (*i.e.*, that the offices provide the requisite services, process materials, and timely forward them to the appropriate County Board of Elections).

## FACTUAL ALLEGATIONS

### The Failure of North Carolina Public Assistance Agencies to Meet their Voter Registration Obligations Under Section 7 of the NVRA and State Law

45. On information and belief, the Section 7 Defendants, by and through their conduct, their policies, practices and procedures, their failures to establish appropriate

16

systems and protocols, and their failures to train, supervise and monitor their employees, have violated Section 7 of the NVRA.

46.    North Carolina's failure to fulfill its NVRA Section 7 obligations has a direct, negative impact on the ability of low-income individuals to register to vote and participate in the democratic process, undermining the underlying purpose of Section 7, which is to ensure that voter registration "will be convenient and readily available [for] the poor . . . who do not have driver's licenses and will not come into contact with the other principle place to register under this Act" (namely, motor vehicle departments). H.R. REP. NO. 103-66, at 15 (1993), *reprinted in* 1993 U.S.C.C.A.N. 140, 144 (Conf. Rep.).

47.    Under Section 7, the public assistance programs that must provide voter registration services include, at a minimum, SNAP, TANF, WIC, Medicaid, and CHIP. In North Carolina, DHHS operates each of these programs.

48.    Section 7 of the NVRA requires public assistance offices, under the supervision of the Section 7 Defendants, to provide voter registration services with each covered transaction (*i.e.*, an application, recertification, renewal, or change of address transaction).  52 U.S.C. § 20506(a)(6)(A).

49.    In providing such services, public assistance offices must, among other things: (i) ask each applicant whether they would like to register to vote or change their voter registration address; (ii) distribute a voter registration application form with each covered transaction, unless the individual applicant or client affirmatively opts out of

17

voter registration by declining in writing to register to vote; (iii) inform each applicant that the decision to register or decline to register to vote will not affect the amount of public assistance provided by the agency; and (iv) provide assistance in completing the voter registration forms to the same degree the agency provides assistance in completing its own forms. *See* 52 U.S.C. § 20506(a).

50.     The NVRA requires states to provide voter registration services with each covered public assistance transaction regardless of whether the transaction is conducted in person, *i.e.*, in a public assistance office, or by remote means such as through the Internet, by mail, or by telephone. This requirement also applies regardless of whether the transaction is conducted by a state public assistance agency or by a nongovernmental entity with which the state agency has contracted. *See* 52 U.S.C. § 20506(a)(2).

51.     Completed voter registration applications must be "transmitted to the appropriate State election official not later than 10 days after the date of acceptance," *id.* § 20506(d)(1), or within five days, if accepted "5 days before the last day for registration to vote in an election." *Id.* § 20506(d)(2).

52.     North Carolina has adopted laws to implement Section 7 of the NVRA. *See* N.C.G.S. § 163-82.20. Section 163-82.20 of the North Carolina General Statutes requires the State to provide voter registration services at public assistance agencies. *Id.* Under this provision, public assistance agencies are required to distribute a voter registration form that is compliant with Section 7 of the NVRA with each covered transaction and ensure each applicant who registers to vote through the agency receives

18

the same degree of assistance with the voter registration application as is provided by the office with regard to its own forms. *Id.*

53. Data provided by the SBE and information collected during field investigations indicate that DHHS offices are failing to provide the voter registration services required by the NVRA.

54. On information and belief, DHHS offices, among other things, routinely fail to (i) provide forms that invite DHHS clients engaging in covered transaction to register to vote; (ii) provide voter registration forms to DHHS clients who do not decline in writing to register to vote; (iii) provide the required assistance to clients in completing the voter registration forms; and (iv) make the disclosures mandated by 52 U.S.C. § 20506(a)(6)(B).

55. These omissions represent a systematic failure of the Section 7 Defendants to ensure compliance with Section 7 and reflect a systematic failure to train, supervise, and monitor individuals responsible for administering voter registration activities at DHHS offices.

56. Since 2011, the number of voter registration applications originating from public assistance agencies has dramatically fallen to disturbing levels. As illustrated in Figure 1 and Table 1, below at paragraph 68, from 2011 to 2014, the most recent full year for which data are available, the number of applications dropped by nearly 69 percent, from 42,988 to 13,340.

19

57.     These reductions cannot be explained by a corresponding reduction in public assistance applications submitted to DHHS. Between 2011 and 2013, for example, applications for Food and Nutrition Services, Work First, and Medicaid (including Work First and Medicaid recertifications)[1] dropped by approximately 13.8 percent while DHHS-generated voter registration applications dropped by more than 56 percent in just two years.

58.     Field investigations further confirm that North Carolina's public assistance agencies are failing to meet their NVRA obligations.

59.     In October 2014, field investigators visited nineteen DHHS offices in eleven North Carolina counties, including, among others, Durham, Forsyth, Guilford, Orange, and Rowan Counties.  They interviewed 196 DHHS clients who reported they were eligible to vote and had engaged in a covered transaction. In addition, they interviewed DHHS personnel in each of the offices visited.  These interviews confirmed widespread violations of Section 7 of the NVRA.

60.     Of the 196 DHHS clients interviewed, 146 (74.5%) did not see or respond in writing to a voter registration question on their forms, were not verbally asked whether they wanted to receive a voter registration application, and did not receive a voter registration application.

61.     Although DHHS employees in seven offices claimed that office employees in those offices ask each client whether he or she would like a voter registration

_____

[1] Food and Nutrition Services recertification data was not available for 2013.

application, clients report otherwise.  Of the clients interviewed at these offices, 92 percent stated they had not seen or responded to a voter registration question on their forms and 93 percent stated that no one had verbally offered them a registration application.

62.    Likewise, employees in two additional DHHS offices claimed that employees in their offices distribute voter registration applications to every client. However, 74 percent of individuals interviewed at these offices stated that they had neither received an application nor declined the opportunity to register to vote either verbally or in writing.

63.    In addition, of the nineteen offices visited, employees in four offices conceded that their offices did not have voter registration applications onsite, an employee in one office stated that the office does not collect voter registration applications, and an employee in another office indicated that the office provides voter registration applications to clients *only upon the clients' request*.

64.    On information and belief, DHHS is further violating Section 7 because it does not ensure that voter registration services are provided to individuals engaged in covered transactions with third-party contractors.  Regardless of whether a public assistance transaction is conducted by DHHS or by a nongovernmental entity with which the state agency has contracted, the NVRA requires DHHS to provide voter registration with each covered transaction.  To enroll individuals in SNAP, DHHS has contracted with community-based organizations, providing them funding to facilitate the SNAP

application process. On information and belief, these third-party contractors do not provide any of the required NVRA voter registration services, because DHHS has not directed or equipped them to do so, nor does DHHS itself provide voter registration services to clients who conduct transactions with third-party contractors at any point in the application process.

65. DHHS is also failing to comply with its Section 7 obligations because it does not provide the required voter registration services to each client conducting a covered transaction through remote means, *i.e.* through the Internet, telephone, mail or any other process in which the client does not appear in person at the office of DHHS or a DHHS grantee.

66. Had the Section 7 Defendants instituted the necessary policies, practices and procedures, established appropriate systems and protocols, and sufficiently trained, supervised and monitored their employees, the foregoing violations of Section 7 of the NVRA and the resulting harm to the Plaintiffs could have been avoided. Injunctive relief requiring Defendants to take specific affirmative measures to attain compliance with Section 7 of the NVRA is necessary to avoid future injury.

67. Moreover, this is not the first time North Carolina has had to reform its public assistance agency programs to remedy noncompliance with Section 7. In 2006, voting rights advocates contacted the Executive Director of the SBE since 1993, to convey that North Carolina had a serious compliance problem. This led to a cooperatively developed NVRA Implementation Plan that dramatically improved the

22

state's compliance with Section 7 for several years. *See* Dēmos, Expanding Voter Registration for Low-Income Citizens: How North Carolina is Realizing the Promise of the National Voter Registration Act, April 2008, *available at* http://www.demos.org/sites/default/files/publications/NVRA_North_Carolina_Demos.pdf.

68.    This history shows that compliance with the NVRA is achievable and results in a substantial increase in public assistance voter registration applications.  The previous interventions increased voter registration applications from public assistance agencies over 250 percent from 2006 to 2011.  But voter registration applications have now fallen back to levels that existed before any corrective measures were implemented. The client and agency employee interviews as well as the voter registration data available today, summarized in Figure 1 and Table 1 below, confirm that the Section 7 Defendants are no longer in compliance, and that injunctive relief to remedy these violations is required.



**Figure 1**

| Year | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Number of Applications Submitted by Public Assistance Agencies[2]** | 5006 | 14,395 | 12,689 | 8448 | 9001 | 33,101 | 42,672 | 33,705 | 36,824 | 42,988 | 41,162 | 18,758 | 13,340 |
| **Change Year-Over-Year[3]** | - | 188% | -12% | -33% | 6.5% | 268% | 29% | -21% | 9% | 17% | -4% | -54% | -29% |

**Table 1**

---

[2] Information in Table 1 and Figure 1 is from the North Carolina State Board of Elections, available at
ftp://alt.ncsbe.gov/NVRA/NVRA%20Reports/Year%20End%20Summary%20Reports/ and
ftp://alt.ncsbe.gov/NVRA/NVRA%20Reports/ (PublicAssistanceActivity2008-14.xlsx).
[3] Using the following percentage change equation:

$$\text{Percentage Difference} = \frac{\text{Year} - \text{Previous Year}}{|\text{Previous Year}|}(100\%)$$

Case 1:15-cv-01063-LCB-JEP   Document 1   Filed 12/15/15   Page 24 of 38

**The Failure of North Carolina Motor Vehicle Offices to Meet their Voter Registration Obligations Under Section 5 of the NVRA and State Law**

69.     On information and belief, the Section 5 Defendants, by and through their conduct, their policies, practices and procedures, their failures to establish appropriate systems and protocols, and their failures to train, supervise and monitor their employees, are violating Section 5 of the NVRA.

70.     The purpose of Section 5 of the NVRA is to facilitate Congress' goal of streamlining the federal voter registration process and increasing voter registration accessibility.  "[I]ncorporating voter registration into the drivers licensing process provides a secure and convenient method for registering voters; an effective means of reaching groups of individuals generally considered hard-to-reach for voting purposes . . .; and a procedure for keeping rolls current through contact with licensees who change addresses." S. REP. 103-6, at 5 (1993).

71.     Section 5 requires state DMV offices to provide individuals with voter registration services whenever they apply for, renew, or change their address on a driver's license or state-issued identification card.  *See* 52 U.S.C. §§ 20504(a)(1), (d).

72.     Under the NVRA, when an individual applies for or renews a driver's license or state-issued identification card (known as a non-operator's license in North Carolina), the driver's license or ID card application or renewal form must also "serve as an application for voter registration . . . ." *Id.* § 20504(a)(1).  This voter registration portion of a driver's license or identification card application or renewal "may not require any information that duplicates information required in the driver's license portion of the

25

form" other than a second signature and an attestation of eligibility. *Id.* § 20504(c)(2). The application "may require only the minimum amount of information necessary to (i) prevent duplicate voter registrations; and (ii) enable State officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process[.]" *Id.* § 20504(c)(2)(B).

73.    Section 5 further requires that when an individual submits a change of address notification to the DMV, the State must update the individual's voting address "unless the [individual submitting the form] states . . . that the change of address is not for voter registration purposes." *Id.* § 20504(d).

74.    Section 5 requires the DMV, under the supervision of the Section 5 Defendants, to transmit voter registration applications and updates "to the appropriate State election official" within 10 days of acceptance. *Id*. § 20504(e)(1).  Voter registration applications and updates that the DMV "accept[s] within 5 days before the last day for registration to vote in an election [must] be transmitted to the appropriate State election official not later than 5 days after the date of acceptance." *Id*. § 20504(e)(2).

75.    North Carolina has adopted a state statute to implement Section 5 of the NVRA.  *See* N.C. Gen. Stat. § 163-82.19.  Specifically, North Carolina law requires the DMV to provide voter registration services.  *Id.* § 163-82.19(a) (requiring the North Carolina DMV to "modify its forms so that any eligible person who applies for original issuance, renewal or correction of a driver's license, or special identification

26

card . . . may, on a part of the form, complete an application to register to vote, or to update the voter's registration"). Any voter registration applications or updates to voter information that state DMVs receive must "be forwarded by the Department of Transportation to the appropriate board of elections not later than five business days after the date of acceptance." *Id.*

76.     The North Carolina DMV systematically fails to meet its voter registration responsibilities. Information provided by North Carolina's 100 counties, pursuant to public records requests, indicates that a significant number of individuals who were forced to vote provisionally in the most recent election—because their names were not on the voter registration list at the polling place—had registered to vote, updated their registration information, or requested to do so through the DMV.

77.     Several counties provided more detailed information on a limited number of provisional ballots that were cast within their geographic boundaries. This information indicates:

a.   Problems with the DMV's entry and transmission of voter registration applications and changes of address are not limited to certain geographic areas, but constitute a systemic problem across the state. Voters affected by the DMV's non-compliance came from at least 55 different counties.

b.   In the 2014 General Election, hundreds of voters whom precinct officials could not find on the rolls had previously registered through a DMV office. Among the counties studied, including nine in the Middle District, a sampling of

27

provisional ballots shows that 15 percent of provisional votes that counted were from voters who had registered or updated their voter information at DMV, but were forced to vote provisionally at their polling place because they were not on the voter rolls due to the noncompliance of the Section 5 Defendants with the NVRA.

c. In six counties in the Middle District, 50 percent or more of the sampled provisional ballots that counted were from voters who had registered or updated their voter information at DMV.

d. In Mecklenburg County, 18 percent of all provisional ballots cast in the 2014 General Election were cast by individuals who indicated that they had completed a voter registration application through a North Carolina DMV office.

78.    Moreover, upon information and belief, the data cited above understate the harm caused by the DMV's NVRA violations.  Unlike the provisional ballots summarized in paragraph 77.b) and (c), the provisional ballots cast by Individual Plaintiffs and, on information and belief, many other North Carolina voters, were not counted because the DMV not only failed to transmit their voter registration applications and updates, it kept no record of them.  These voters not only had their right to vote burdened by being required to cast a provisional ballot, they were wholly deprived of their right to vote.

79. North Carolina DMV's systematic failure to transmit voter registration applications and changes of address harms those who, like the Individual Plaintiffs, are deprived of their right to cast a regular ballot simply because they chose to register through the DMV.

80. To cast a provisional ballot, an individual must spend additional time completing an affidavit, and casting a provisional ballot oftentimes requires the individual to wait a significant amount of time in a separate line.

81. Because of the substantial amount of time that can be required to be given a provisional ballot and/or the embarrassment of being pulled aside because of voter registration deficiencies, the Section 5 Defendants' non-compliance created and will continue to create the risk that potential voters were and will be unable to cast such ballots or will be deterred from doing so.

82. Even individuals who were able to take the time to cast provisional ballots were negatively affected by the DMV's NVRA violations because they left the polling location without the confidence that their vote would be counted and their voices heard.

83. This fear was not misplaced as, for example, the Individual Plaintiffs later learned that their votes were not counted as a result of the Section 5 Defendants' non-compliance with the NVRA.

84. On information and belief, the Section 5 Defendants' non-compliance includes but is not limited to the failure to keep complete and accurate records of the voter registration applications and change of address information they collect, failure to

29

timely transmit voter registration and change of address information to the Board of Elections, and/or failure to properly train employees on their obligation to provide voter registration services.

85.    In North Carolina, an individual can also submit a change of address application or a driver's license or identification card renewal to the DMV remotely through the DMV's website.

86.    Individuals submitting a change of address form or renewal through the North Carolina DMV online driver's license and identification card services portal are not provided with the voter registration services required by the NVRA.

87.    On information and belief, individuals who submit a change of address or renewal through the North Carolina DMV online portal do not have their voter registration address automatically updated.  Such individuals are merely offered a link to the SBE website.  Offering such a link and requiring the voter to separately submit an address change to the SBE or local board of elections does not satisfy the DMV's obligations under Section 5.

88.    Moreover, the DMV is required to, but does not, offer individuals submitting a change of address or renewal through the North Carolina DMV online portal the option to affirmatively opt out of updating their voter registration information, in violation of the DMV's obligations under Section 5.  The Section 5 Defendants are failing to provide both automatic updating and the option to "opt-out" of that process that are required by Section 5.

89.    Furthermore, individuals who submit a driver's license or identification card renewal form through the website are not offered a simultaneous opportunity to register to vote as Section 5 requires, but are instead directed to the SBE website, where they must download and separately complete a blank voter registration application, providing much of the same information, such as name, birthdate, address, and driver's license number, that was included in the renewal form, in violation of Section 5's non-duplication requirement.  Moreover, once it is completed, the client must then either print and deliver, fax, or e-mail the voter registration application to the SBE, violating Section 5's command that the driver's license application process must itself simultaneously serve to register the applicant to vote.

90.    Had the Section 5 Defendants instituted the necessary policies, practices and procedures, established appropriate systems and protocols, and sufficiently trained, supervised and monitored their employees, the foregoing violations of Section 5 of the NVRA and the resulting harm to the Plaintiffs could have been avoided.  Injunctive relief directing compliance with Section 5 of the NVRA is necessary to avoid future injury.

<u>**Plaintiffs Notified Defendants of Their NVRA Violations**</u>

91.    On May 8, 2015, Plaintiffs Action NC, Democracy North Carolina, and the North Carolina A. Philip Randolph Institute, through their counsel, sent a letter by mail and e-mail to Defendant Strach, notifying her that the State of North Carolina was failing to meet its obligations under Section 7 of the NVRA.  Then-Secretary of DHHS Aldona Wos was sent a copy of the notice letter on the same day.

92. The May 2015 notice letter stated that Plaintiffs were providing notice of their intent to sue for the violations of Section 7 of the NVRA described herein unless the violations were corrected within the 90-day notice period prescribed by the NVRA.

93. On June 1, 2015, Plaintiffs Action NC, Democracy North Carolina, the North Carolina A. Philip Randolph Institute, and Individual Plaintiffs Holverson, Najera, and Lane sent a letter to Defendant Strach via mail and e-mail notifying her that the State was failing to meet its voter registration obligations under Section 5 of the NVRA. Defendant Thomas and then-Secretary of Transportation Anthony Tata were each sent a copy of the notice on the same day.

94. The June 1, 2015 letter stated that, unless Defendants remedied the violations of Section 5 of the NVRA within the statutory 90-day notice period, litigation would commence.

95. Upon information and belief, the Defendants have not taken the steps necessary to remedy their noncompliance with Sections 7 or 5 of the NVRA.

**<u>FIRST CAUSE OF ACTION</u>**
**<u>Violation of Section 7 of the National Voter Registration Act of 1993</u>**
**<u>(against the Section 7 Defendants)</u>**

96. Plaintiffs rely herein upon all the paragraphs of this Complaint.

97. As a consequence of their past and continuing failure to provide required voter registration services to individuals engaged in covered public assistance transactions, the Section 7 Defendants have violated, and continue to violate, Section 7 of the NVRA. 52 U.S.C. § 20506.

32

98. More than one million North Carolinians receive public assistance. The Section 7 Defendants' failure to comply with the NVRA negatively affects the ability of these individuals to register to vote.

99. The failure of the Section 7 Defendants to comply with Section 7 of the NVRA has injured and will continue to injure the Organization Plaintiffs because of the additional resources invested in voter registration, which have been diverted from other activities important to their missions. Remediation of these ongoing violations will permit the Organization Plaintiffs to allocate their scarce resources to other important activities.

100. Plaintiffs are therefore aggrieved by the Section 7 Defendants' past and continuing violations of the NVRA, and have no adequate remedy at law. Declaratory and injunctive relief is required to remedy past and continuing violations of the NVRA and to ensure the Section 7 Defendants' future compliance with the NVRA.

## SECOND CAUSE OF ACTION
## Violation of Section 5 of the National Voter Registration Act of 1993
## (against the Section 5 Defendants)

101. Plaintiffs rely herein upon all the paragraphs of this Complaint.

102. As a consequence of their past and continuing failure to provide required voter registration services, the Section 5 Defendants have violated, and continue to violate, Section 5 of the NVRA. 52 U.S.C. § 20504.

103. The failure of the Section 5 Defendants to comply with Section 5 of the NVRA has injured and will continue to injure the Organization Plaintiffs because of the

33

additional resources invested in voter registration, which have been diverted from other activities important to their missions. Remediation of these ongoing violations will permit the Organization Plaintiffs to allocate their scarce resources to other important activities.

104. The failure of the Section 5 Defendants to comply with Section 5 of the NVRA has injured and will continue to injure the Individual Plaintiffs, as it has deprived them of an opportunity to vote in the 2014 election, and as they face a strong likelihood of future harm in the event they relocate within the State of North Carolina and attempt to exercise their rights under Section 5 to register to vote or update their voter registration information according to its provisions.

105. Plaintiffs are aggrieved by the Section 5 Defendants' past and continuing violations of the NVRA, and have no adequate remedy at law. Declaratory and injunctive relief is required to remedy past and continuing violations of the NVRA and to ensure the Section 5 Defendants' future compliance with the NVRA.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectfully request that this Court:

(i) Declare that the Section 7 Defendants have violated Section 7 of the NVRA, 52 U.S.C. § 20506, by failing to provide the NVRA-required voter registration materials and services through public assistance offices and through remote transactions;

(ii) Issue a preliminary and permanent injunction ordering the Section 7 Defendants, their officers, agents, employees, and successors in office, and all persons in

active concert or participation with them, to develop, implement, and enforce practices and policies to ensure compliance with Section 7 of the NVRA, 52 U.S.C. § 20506;

(iii)    Direct the Section 7 Defendants, under a court-approved plan with appropriate mandatory reporting and monitoring requirements, to take all actions necessary to remedy the past and continuing violations of Section 7 of the NVRA, including, without limitation, ensuring that all persons affected by Defendants' violations are provided opportunities to register to vote or to change their voter registration addresses to enable them to vote in the next federal election cycle;

(iv)    Direct the Section 7 Defendants, under a court-approved plan with appropriate mandatory reporting and monitoring requirements, to take all actions necessary to ensure future compliance with the requirements of Section 7 of the NVRA, 52 U.S.C. § 20506, including, without limitation, practices and policies for distribution of voter registration applications and voter preference forms; training and monitoring public assistance agency personnel to ensure that all public assistance offices are distributing a voter registration application form to each person who applies for public assistance benefits, and to each person who recertifies, renews, and/or changes an address for benefits; inquiring of all such persons, in writing, whether they want to register to vote or change their voter registration addresses, and providing to them the NVRA-required information concerning the voter registration process; assisting such persons in completing voter registration applications to the same level of assistance that is provided with other public assistance forms; accepting completed voter registration applications, and timely transmitting

35

completed registration forms to appropriate election authorities; and retaining voter registration declination forms;

(v) Declare that the Section 5 Defendants have violated Section 5 of the NVRA, 52 U.S.C. § 20504, by failing to ensure that the DMV is completing and transmitting voter registration during in-person driver's license transactions and by failing to offer the required registration services during online transactions;

(vi) Issue a preliminary and permanent injunction ordering the Section 5 Defendants, their officers, agents, employees and successors in office, and all persons in active concert or participation with them, to develop, implement and enforce practices and policies to ensure compliance with Section 5 of the NVRA, 52 U.S.C. § 20504;

(vii) Direct the Section 5 Defendants, under a court-approved plan with appropriate mandatory reporting and monitoring requirements, to take all actions necessary to remedy the past and continuing violations of Section 5 of the NVRA, including, without limitation, ensuring that all persons affected by Defendants' violations are provided opportunities to register to vote or to change their voter registration addresses to enable them to vote in the next federal election cycle, or opt-out if desired;

(viii) Direct Section 5 Defendants, under a court-approved plan with appropriate mandatory reporting and monitoring requirements, to take all actions necessary to ensure future compliance with the requirements of Section 5 of the NVRA, 52 U.S.C. § 20504, including, without limitation, practices and policies to ensure DMV offices and personnel are correctly completing and transmitting in-person voter registration applications and

36

updated voter registration information; and practices and policies for offering voter registration services to individuals engaging in driver's license or ID card transactions online and by mail;

(ix)    Award plaintiffs their reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action, pursuant to 52 U.S.C. § 20510(c);

(x)    Retain jurisdiction over this action to ensure that defendants comply with any order(s) issued by this Court and with their obligations under the NVRA and the North Carolina General Statutes; and

(xi)    Grant such additional relief as to this Court seems just and proper.

Dated: December 15, 2015                    Respectfully submitted,

By:     /s/ *Allison J. Riggs*
_____

Stuart Naifeh*                              Anita S. Earls (State Bar #15597)
Naila Awan*                                 Allison J. Riggs (State Bar #40028)
Dēmos                                       Southern Coalition for Social Justice
220 Fifth Ave., 2nd Flr.                    1415 West Highway 54, Suite 101
New York, NY 10001                          Durham, NC 27707
Telephone: 212-485-6055                     Telephone: 919-323-3380
E-mail: snaifeh@demos.org                   Facsimile: 919-323-3942
                                            E-mail: anita@southerncoalition.org

Dorian L. Spence*
Robert Kengle*                              Matthew M. D'Amore*
Ezra Rosenberg*                             Joshua R. Stein*
Lawyers' Committee for                      MORRISON & FOERSTER LLP
Civil Rights Under Law                      250 West 55th Street
1401 New York Avenue, NW, Suite 400         New York, NY 10019
Washington, DC 20005                        Telephone: 212-468-8168
Telephone: 202-662-8600                     E-mail: MDAmore@mofo.com
E-mail: dspence@lawyerscommittee.org

                                            Steven M. Kaufmann*
Catherine M. Flanagan*                      Kirk A. Sigmon*
Sarah Brannon*                              MORRISON & FOERSTER LLP
Project Vote                                2000 Pennsylvania Avenue, NW
805 15th Street, NW, Suite 250              Suite 6000
Washington, DC 20005                        Washington, DC 20006
Telephone: 202-546-4173                     Telephone: 202-887-8749
E-mail: cflanagan@projectvote.org           E-mail: SKaufmann@mofo.com

                                            Counsel for All Plaintiffs

_____

* Appearing pursuant to local rule 83.1(d).

38