IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:15-CV-1063

| | |
|---|---|
| ACTION NC, DEMOCRACY NORTH CAROLINA, NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE, SHERRY DENISE HOLVERSON, ISABEL NAJERA, and ALEXANDRIA MARIE LANE,<br><br>   Plaintiffs,<br><br>  v.<br><br>KIM W. STRACH, in her official capacity as Executive Director of the North Carolina State Board of Elections,<br><br>RICK BRAJER, in his official capacity as Secretary of the North Carolina Department of Health and Human Services,<br><br>KELLY THOMAS, in his official capacity as Commissioner of the North Carolina Division of Motor Vehicles, and<br><br>NICKY TENNYSON, in his official capacity as Secretary of the North Carolina Department of Transportation,<br><br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **DEFENDANTS BRAJER, THOMAS, AND TENNYSON'S JOINT MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

# INTRODUCTION

Thousands of North Carolinians register to vote through public assistance agencies and the Division of Motor Vehicles each year, and that figure is steadily rising. Plaintiffs' claims that North Carolina is somehow skirting its responsibilities under the National Voter Registration Act of 1993 are unsupported by the facts and certainly do not warrant the extraordinary relief they are seeking in the instant motion. Their claims tenuously rest on (1) sixteen double-hearsay "investigations" conducted by untrained, interested paralegals at public assistance agencies and (2) three voters' debunked anecdotal claims from two years ago who have since registered to vote. Further adding to the unreasonableness of plaintiffs' request for injunctive relief is the draconian remedy they seek.[1]

# STATEMENT OF FACTS

I.    North Carolina's Responsibilities under the NVRA.

The National Voter Registration Act ("NVRA") requires certain state agencies to provide voter registration services. Section 7 obligates certain public assistance offices to offer voter registration materials, along with imposing other responsibilities, and Section 5 obligates motor vehicle offices ("DMV offices") to do the same. 52 U.S.C. §§ 20504, 20506. Specifically, Section 7 requires certain public assistance agencies offer voter

---

[1] In support of this memorandum, defendants submit the declarations of twenty State and county officials: Commissioner Kelly Thomas (Ex. A); Brian Neesby (Ex. B); Betsy Moore (Ex. C); Mary Anne Burghardt (Ex. D); Carolyn McClanahan (Ex. E); Sharon Moore (Ex. F); William Rose (Ex. G); Donna Fayco (Ex. H); Rebecca Gilliand (Ex. I); Sharon Batten (Ex. J); Marlon Hunter (Ex. K); Holly Branch (Ex. L); Rae Alepa (Ex. M); Brenda Jackson (Ex. N); Debra Donahue (Ex. O); Becky Morrow (Ex. P); Nancy Coston (Ex. Q); Michael Becketts (Ex. R); Regina Petteway (Ex. S); and Heather Skeens (Ex. T).

2

registration applications to clients who are applying for, renewing, or recertifying their applications for benefits, or changing their address. 52 U.S.C. § 20506. Section 5 requires DMV offices to provide voter registration opportunities to every client who applies for or renews a driver's license or state-issued identification card and to update a voter's address when the voter updates the address on a driver's license or state-issued identification card, unless otherwise requested by the client. 52 U.S.C. § 20504.

To accomplish these requirements, the NVRA mandates that North Carolina "shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under [the NVRA]." 52 U.S.C. § 20509. As Executive Director of the State Board of Elections ("SBOE"), defendant Kim Strach ("defendant Strach") is the designated Chief State Election Official of North Carolina and is responsible for the coordination of State responsibilities under the NVRA. *See* N.C.G.S. § 163-82.2. The NVRA requires defendant Strach to perform certain actions to ensure North Carolina's compliance with the NVRA, and does not impose any obligations on any other State official.

North Carolina takes its responsibilities under the NVRA very seriously. The number of State and county agencies and employees involved with transactions that trigger obligations under the NVRA is staggering. Millions of North Carolinians visit NVRA-covered offices every year, and complying with the rigorous demands of the NVRA is arduous, but North Carolina is nevertheless meeting its obligations under the NVRA. Despite the sheer enormity of the undertaking, according to the data collected by the State Board of Elections, North Carolina has consistently registered citizens who

undergo NVRA-covered transactions, and current levels are no lower than in years past.[2]

II.     DMV's Successful Efforts to Provide Voter Registration Opportunities.

Defendant Kelly Thomas is the Commissioner of the North Carolina Division of Motor Vehicles ("DMV"). The DMV is a large state agency whose chief responsibility is issuing drivers' licenses. DMV has 239 physical locations in 98 counties. (Ex. A, ¶ 3) DMV operates 5 mobile units and services 24 mobile unit locations. (*Id.*) DMV is comprised of approximately 1,600 employees, including roughly 530 driver's license examiners. DMV also supervises 126 license plate agency contractors and their employees. (*Id.* ¶ 4)

DMV has detailed procedures in place to ensure all North Carolinians who wish to register to vote, or to update their voter registration information, in conjunction with DMV services are able to do so. DMV's transactions are processed through the State Automated Drivers' License System ("SADLS") database. This program is used to track drivers' license issuance statistics. SADLS is used by each driver license examiner to process customer requests for driver's license and/or identification card services. SADLS contains a built-in process to determine whether a customer desires voter registration services and, if so, to accurately capture the customer's voter registration information and transmit the completed application to the SBOE. (*Id.* ¶ 5)

DMV customers that have not provided acceptable proof of United States citizenship, but are otherwise eligible for DMV services, are designated as "legal

---

[2] *See* Second Declaration of Brian D. Neesby, ¶¶ 11, 19, 22, Ex. 1 (D.E. 67) (filed April 14, 2016, with defendant Kim Strach's opposition to plaintiffs' motion for preliminary injunction)

4

presence customers." Upon their request, these customers are provided a voter registration application to complete and return directly to the SBOE. (*Id.* ¶ 7)

After determining that the customer is a U.S. citizen, the examiner asks the customer "Are you registered to vote in your current name and address?" If the customer answers "no", then the examiner enters the response into SADLS and asks "Would you like to apply to register to vote today?" (*Id.* ¶ 6) If the customer accepts voter registration services, the acceptance is denoted in SADLS and the examiner prints a pre-populated voter registration application for the customer to review and sign. Each printed voter registration application contains a barcode that indicates both the customer's unique SADLS number and a timestamp. (*Id.* ¶ 8) If the customer declines voter registration services, the declination is denoted in SADLS and the customer is provided with a voter registration application and is instructed to check the declination box, sign, and return to the examiner.[3] (*Id.* ¶ 9)

Each examiner retains all voter registration applications and voter declinations until the end of the work day. At the conclusion of the work day, all voter registration applications, other than applications completed by legal presence customers, and voter declinations are given to the Senior Examiner, or designee, in each driver license office. (*Id.* ¶¶ 10, 11) The Senior Examiner, or designee, verifies each examiner's paper voter registration applications count against the end of day report generated by SADLS. (*Id.* ¶ 12) All voter registration applications are scanned into the applicants N.C. DMV

---

[3] Voter registration application indicating a customer's declination of voter registration services are hereinafter referred to as "voter declinations" so as to avoid confusion.

Customer Tracking Record and into the SBOE Image Scanning System. After scanning is concluded, a "Scanned Voter Documents End of Day Report" is generated to indicate the number of both successful and unsuccessful voter registration application scans. Any voter registration application denoted as "unsuccessful" is then rescanned. (*Id.* ¶ 13)

All scanned voter registration applications are electronically transmitted to SBOE on a daily basis in batch format. (*Id.* ¶ 14) DMV keeps all voter registration applications and voter declinations on file for 90 days. (*Id.* ¶ 15)

While not required by state or federal law, DMV has offered online registration services since January 1, 2016. DMV customers may now update their voter registration name and/or address via the online services portal when conducting business with N.C. DMV. (*Id.* ¶ 24) DMV offers this option as a convenience to clients.

III.    DMV is Processing Voter Registration Applications at an Unprecedented Level.

SADLS indicates that from January 1, 2010 through March 24, 2016, DMV received and processed 1,990,832 voter registration applications. (*Id.* ¶ 25)

Statewide, DMV received and processed 386,773 voter registration applications in 2015 alone. This figure dwarfs the previous five years' number of voter registration applications received and processed.[4]

IV.    DMV's Investigation of Individual Plaintiffs' Claims.

---

[4] The agency received and processed 265,428 voter registration applications in 2014, 265,133 in 2013, 310,800 in 2012, 299,882 in 2011, and 278,150 in 2010. (*Id.* ¶ 26) In 2016 alone, the DMV has already received and processed 184,655 voter registration applications – more than half of all voter registration applications received and processed in 2010, 2011, 2012, 2013, and 2014. (*Id.*)

6

DMV has investigated the claims of plaintiffs Sherry Denise Holverson, Alexandria Marie Lane, and Isabel Najera, as well as Juliette Muniz Lafargue, first identified in plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction. Plaintiffs Holverson and Lane declined voter registration services on their visits to DMV. (*Id.* ¶ 32) As a legal presence customer, plaintiff Najera would not have been eligible for DMV voter registration services and would have been provided a paper voter registration application to complete and return to the SBOE. (*Id.*) Ms. Lafargue executed both a change of driver license address and a request to update her voter registration address, and her request to update her voter registration information was successfully transmitted to SBOE. (*Id.*) Publicly available voter information shows all four individuals are currently registered to vote.

V.     <u>DHHS and County Departments of Social Services Offices' Efforts to Provide Voter Registration Opportunities.</u>

Defendant Rick Brajer is the Secretary of the North Carolina Department of Health and Human Services ("DHHS"). DHHS manages the delivery of health- and human-related services to needy citizens, and works closely with health care professionals, community leaders, advocacy groups, and local, state, and federal entities. DHHS is divided into 30 divisions and offices and oversees 14 facilities.[5]

Plaintiffs allege DHHS is failing to offer voting registration services in connection with five programs: Medicaid, Health Choice for Children, Food and Nutrition Services

---

[5] *See* http://www.ncdhhs.gov/about/overview.

Case 1:15-cv-01063-LCB-JEP   Document 69   Filed 04/14/16   Page 7 of 33

("FNS"), Work First, and the Women, Infant, and Children program ("WIC").[6] All of these programs are administered at the county or local level through the County Departments of Social Services ("DSS"), local public health departments and authorities, and private local agencies under contract with DHHS.

Significantly, DHHS has no direct supervision over the day to day operations of the County DSS offices. County DSS offices receive applications, review the applications, conduct in-person interviews if necessary to determine whether an applicant is qualified, and finally distribute the applied-for benefit, with no direct oversight by DHHS. (Ex. C, ¶ 6; Ex. D, ¶¶ 10-11; Ex. E, ¶¶ 4, 5; Ex. F, ¶¶ 4-6) Public assistance programs are administered as provided by state statutes. *See* N.C.G.S. §§ 108A-25, 108A-27. DHHS has no authority to hire, fire, or discipline employees of county DSS offices regarding the administration of benefits. (Ex. F; ¶¶ 4, 13; Ex. C, ¶¶ 6, 13; Ex. D, ¶ 17; Ex. E, ¶ 11)[7]

---

[6] Health Choice for Children is federally known as "CHIP"; Food and Nutrition Services is federally known as "SNAP"; Work First is federally known as "TANF."

[7] To help counties comply with NVRA requirements in administering FNS, WIC, Medicaid, and Work First benefits, DHHS writes voter registration policies and provides proper forms to each individual county DSS office. DHHS also provides county DSS offices with administrative messages and letters, which are informal communications that remind the county DSS offices to comply with all applicable regulations in conducting voter registration activities. DHHS also occasionally hosts non-mandatory webinars, conference calls, and other informational training sessions to ensure all citizens are offered the right to vote when obtaining FNS benefits. For example, in June, 2015, DHHS trained county DSS directors on the NVRA's voter registration requirements in conjunction with FNS benefits during the "Statewide DSS Director Conference Call." DHHS will also periodically visit WIC agencies to observe three to five family interactions to ensure the proper voter registration procedures are being followed. DHHS coordinates with SBOE to ensure the individual county agencies have everything they need to comply with the NVRA, but DHHS does not provide any direct training to case

8

FNS provides low-income families with benefits to allow the families to purchase food and nutrients. (Ex. C, ¶ 5) As of February, 2016, there were 772,860 active cases in the FNS program, with 1,580,930 individuals receiving assistance under the program. (*Id.* ¶ 14)[8]

The WIC program is a supplemental nutrition program for women, infants, and children, and is administered through the nutrition services branch of DHHS. (Ex. D, ¶ 5) There are 82 local agencies that provide WIC services, and three "non-local" agencies which contract with the Division of Public Health. (*Id.* ¶ 6) Around 248,000 individuals received WIC benefits in 2016.[9]

Medicaid and Health Choice for Children (collectively "Medicaid") are health insurance programs for low-income individuals and families. As of April 1, 2016, 1,978,630—almost two million—North Carolinians receive Medicaid assistance each year. (Ex. E, ¶ 10)[10]

Work First helps parents support themselves and their families by offering short-term training and other services to increase the chances of employment. As of February, 2016, there were 16,744 households receiving Work First benefits. (Ex. F, ¶¶ 3, 12)

During the application process, applicants provide information to the county DSS offices based on which type of benefits they seek. The application and recertification

---

workers or the "front line" employees that interact with clients. (Ex. C, ¶¶ 8-9; Ex. D, ¶ 9; Ex. E, ¶ 6; Ex. F, ¶¶ 9-11)

[8] *See also* http://www.fns.usda.gov/sites/default/files/pd/29SNAPcurrPP.pdf.

[9] *See* http://www.fns.usda.gov/sites/default/files/pd/26wifypart.pdf.

[10] *See also* https://www.medicaid.gov/medicaid-chip-program-information/by-state/north-carolina.html.

9

systems provide liberal voter registration opportunities. For instance, if a minor child seeks to be the technical recipient of benefits, each guardian of record will be offered voter registration materials. (Ex. D, ¶¶ 14-16) Further, each benefit program has a fairly short certification period; beneficiaries are in frequent contact with county agencies to recertify their eligibility to receive benefits. (Ex. D, ¶ 14; Ex. C, ¶ 7, Ex. E, ¶ 4) Each time the beneficiaries begin recertification, they are offered the opportunity to register. (Ex. D, ¶ 16; Ex. C, ¶ 7; Ex. F, ¶ 8)

VI.  <u>County Administration of Public Assistance Benefits.</u>

County DSS offices go to great lengths to ensure they are providing voter registration opportunities to all citizens who apply for or recertify their FNS, WIC, Medicaid, and Work First benefits. County DSS offices maintain voter registration policies and procedures, and employees tasked with providing voter registration services are constantly monitored and trained. (*See* Ex. G, ¶¶ 7-11, 15-16; Ex. H, ¶¶ 6-11; Ex. I, ¶¶ 7,9; Ex. J, ¶¶ 7-8, 10; Ex. K, ¶¶ 6-7, 9; Ex. L, ¶¶ 7-8, 10; Ex. M, ¶¶ 6, 9-10; Ex. N, ¶¶ 5, 7-8; Ex. O, ¶¶ 6, 9-10; Ex. P, ¶¶ 7, 11-12; Ex. Q, ¶¶ 6, 9-10; Ex. R, ¶¶ 7-8, 10-13; Ex. S, ¶¶ 7, 10-11; Ex. T, ¶¶ 6, 9-10)

County DSS offices have recently concentrated on providing voter registration opportunities, which has resulted in a significant increase of voter registrations processed compared to previous years, which allegedly yielded low registration numbers as a result of coding issues, presidential elections, and various online case management systems and

application processes.[11] (*See* Ex. G, ¶¶ 17-18; Ex. H, ¶ 7; Ex. M, ¶¶ 11-13; Ex. N, ¶¶ 9-10; Ex. O, ¶ 11; Ex. P, ¶¶ 13-14; Ex. Q, ¶¶ 11-12; Ex. R, ¶¶ 14-15; Ex. S, ¶ 12; Ex. T, ¶ 11)

VII.    DHHS and County Agencies' Response to Plaintiffs' "Investigations."

No county "investigated" by Colline Ferrier and Pamela Cataldo (D.E. 36; D.E. 38) has ever received a complaint of a failure to provide voter registration opportunity to a client. The allegations contained in the Ferrier and Cataldo Declarations are the first of their kind. (*See* Ex. G, ¶ 19; Ex. H, ¶¶ 10-11; Ex. I, ¶ 11; Ex. J, ¶ 12; Ex. K, ¶ 11; Ex. L, ¶ 12; Ex. M; ¶ 14; Ex. N, ¶ 10; Ex. O, ¶ 12; Ex. P, ¶ 15; Ex. Q, ¶ 13; Ex. R, ¶ 16; Ex. S, ¶ 13; Ex. T, ¶ 12)

Each "investigated" county disputes the validity of the allegations that the county office failed to offer voter registration services.[12] First, because the declarations fail to identify the particular individuals who claimed to have not received voter registration services, the agencies cannot verify the claims. Next, county DSS agencies offer a plethora of services, the majority of which do not trigger obligations under the NVRA. The declarations do not indicate which service the interviewee was utilizing the day of

---

[11] *See* Second Declaration of Brian D. Neesby, ¶¶ 17, 21, Ex. A, and Declaration of Veronica W. Degraffenreid, ¶ 28 (D.E. 66, 67) (filed April 14, 2016, with defendant Kim Strach's opposition to plaintiffs' motion for preliminary injunction).

[12] It must be noted that the "investigations" were conducted by a "Program Assistant/Public Policy Analyst" and a "Paralegal and Field Investigator" employed by a two plaintiff organizations. (D.E. 36 ¶ 1; D.E. 38 ¶ 1) The "investigators'" employers, obviously, have a vested interest in obtaining information favorable to their claims in this case. Additionally, not only are the investigators interested parties, there is no evidence the "investigators" have any training or experience conducting surveys or recording answers.

11

the alleged investigation. Thirdly, each county office had processes and procedures in place on the day of the alleged investigations which required each individual engaged in a NVRA-covered transaction be offered the opportunity to register to vote, and if they declined, to fill out and sign a preference form to be sent to the county board of elections. (*See* Ex. G, ¶¶ 19-20; Ex. H, ¶ 12; Ex. I, ¶ 13; Ex. J, ¶ 14; Ex. K, ¶ 12; Ex. L, ¶ 14; Ex. M; ¶ 14; Ex. N, ¶ 11; Ex. O, ¶ 13; Ex. P, ¶ 15; Ex. Q, ¶ 14; Ex. R, ¶ 16; Ex. S, ¶ 13; Ex. T, ¶ 13)

Further, the declarations are demonstrably factually deficient in a number of ways. For instance, Ms. Ferrier claimed to speak to WIC applicants at 1203 Maple Street in Greensboro. The Guilford County DSS at that location does not offer WIC services covered by the NVRA. An applicant or beneficiary must visit a WIC office to apply for or recertify their WIC benefits, and a WIC beneficiary may not change their address at the location visited by Ms. Ferrier. Simply, Guilford County was under no obligation to offer voter registration services to WIC applicants and beneficiaries visiting the 1203 Maple Street location. (*See* Ex. I, ¶ 5; Ex. T, ¶ 14) Similarly, Ms. Cataldo claims she interviewed beneficiaries in Rowan County at 1236 West Innes Street. The Rowan County DSS moved from that location in 2010. Rowan County DSS is now located, and has been located for quite some time, across town at 1813 East Innes Street. (*See* Ex. H, ¶ 15) These are just two examples of factual deficiencies in the declarations by plaintiffs' paralegals. (*See also* Ex. O, ¶ 13)

VIII. <u>County Agencies are Continuously Processing Registration Applications.</u>

More than 144,000 of North Carolina's voters submitted their most recent voter

registration through services offered by DHHS.[13]  SBOE received 33,588 registration

applications from public assistance and disability service offices in 2015, nearly as many

as the combined totals from 2014 (14,669) and 2013 (19,752).[14] (Ex. B, ¶ 8.f)

Additionally, SBOE is collecting voter preference data submitted to county public

assistance agencies indicating that the average customer declination rate was 94.3% in

2014 and 92.7% in 2015 of the hundreds of thousands given the opportunity to register at

county offices across the state.[15]

It is undeniable that public assistance agencies are submitting voter registration

documentation on behalf of thousands of beneficiaries at a higher rate than in the past.

## ARGUMENT

I.    <u>Plaintiffs fail to satisfy the standard required for a preliminary injunction and
      otherwise fail to justify such an extraordinary and drastic remedy.</u>

Far from evidencing the irreparably worsening conditions which are necessary to

warrant the issuance of a mandatory preliminary injunction, the facts show that

registrations are on the rise and that North Carolinians are given ample opportunities to

exercise their voting rights.  On these facts, plaintiffs are unable to make the necessary

"clear showing" that they are entitled to a preliminary injunction, "an extraordinary

remedy."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008).  To justify

---

[13] *See* Declaration of Veronica W. Degraffenreid, ¶ 13 (D.E. 66)

[14] This is a conservative figure.  A number of county agencies may have submitted
incorrectly coded voter registration forms to their county boards of election, which would
prevent the registration from being traced as originating in the DSS office.  (*See*
Degraffenreid Decl. ¶ 28)  Therefore, the true voter registration numbers are most likely
higher than those tracked by SBOE.

[15] *See* Declaration of Veronica W. Degraffenreid, ¶ 26 (D.E. 66)

Case 1:15-cv-01063-LCB-JEP   Document 69   Filed 04/14/16   Page 13 of 33

preliminary injunctive relief, plaintiffs must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Id.* at 20. It is not enough that plaintiffs show a "grave or serious question for litigation." *Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009). Moreover, for a court to issue a mandatory preliminary injunction, which plaintiffs request here and which seeks more than preservation of the status quo, plaintiffs must show that it is necessary to protect against "irreparably worsening conditions caused by" defendants. *Wheelihan v. Bingham*, 345 F. Supp. 2d 550, 553 (M.D.N.C. 2004). Plaintiffs fail to meet their burden under either standard.

a) Plaintiffs' claims are procedurally barred.

Plaintiffs are barred from pursuing a preliminary injunction against defendants because there are no ongoing injuries and the Eleventh Amendment bars the retrospective relief they seek; the organizational and individual plaintiffs lack standing, and plaintiffs have failed to identify the proper defendants to this action. These procedural bars are further evidence that plaintiffs will not succeed on the merits of their claims.

i. *The Eleventh Amendment bars plaintiffs' claim.*

Plaintiffs' requested relief is barred by the Eleventh Amendment. The Eleventh Amendment protects an unconsenting State from lawsuits brought by private parties in federal court. *Green v. Mansour*, 474 U.S. 64, 68 (1985). In *Ex parte Young*, the Court recognized an exception to this general rule: a lawsuit challenging a state official's action under federal law is not one against the State. 209 U.S. 123 (1908); *Pennhurst State Sch.*

& *Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). However, the *Ex parte Young* exception applies only where suit is brought against state officials and "(1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective." *Republic of Paraguay v. Allen*, 134 F.3d 622, 627 (4th Cir. 1998).

Here, the *Ex parte Young* exception does not apply because (1) the NVRA violations plaintiffs allege are not ongoing, and (2) the requested relief is retrospective. Defendants' alleged violations of Section 7 are not "ongoing" because statistics show voter registration through public assistance agencies are dramatically increasing and have returned to historic levels, and plaintiffs have not identified a single individual who was denied services required by Section 7. (*See supra* Sections VII, VIII) Similarly, defendants' alleged violations of Section 5 are not "ongoing" because the individual plaintiffs are all currently registered to vote, and DMV and DOT currently offer online voter registration services via DMV's online services portal. (*See supra* Sections IV, II)

Moreover, plaintiffs' requested injunction does not seek "only prospective" relief.[16] *Allen*, 134 F.3d at 627. "[J]ust because a private citizen's federal suit seeks declaratory injunctive relief against State officials does not mean that it must automatically be allowed to proceed under an exception to the Eleventh Amendment protection." *Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002). Rather than seeking an injunction that prospectively relieves the continuation of ongoing NVRA violations,

---

[16] Plaintiffs nearly admit that the relief they seek is retrospective: "Since monetary damages are not available," plaintiffs claim the injunction should "compensate" plaintiffs. (Pls.' Br. at 26); *see Allen*, 134 F.3d at 628 (referring to money damages as "the purest and more recognizable form of retrospective relief")

15

plaintiffs instead demand that defendants, for example, "mail an Explanatory Letter" to individuals who "engaged in covered transaction[s]" as far back as 2013, and "mail a prepaid, populated voter registration application" to any individual who has ever "conducted an online application, renewal or change of address transaction with the DMV." (Pls.' Br. at 27) This relief is quintessentially retrospective by seeking to remedy alleged *prior* violations of the NVRA. (Pls.' Br. at 27) "That this could be effectuated in an injunctive or declaratory decree directed at state officials does not alter the inescapable fact that its effect would be to" undo and remedy any past alleged NVRA violations. *See Allen*, 134 F.3d at 627. As such, plaintiffs' motion for preliminary injunction is barred by the Eleventh Amendment.

ii. *Plaintiffs lack standing to proceed on the merits of their claims.*

The organizational and individual plaintiffs all lack standing to assert their claims. The organizational plaintiffs lack standing because they have not suffered any injury caused by the challenged actions of defendants. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (requiring a "causal connection between the injury and the conduct complained of" for Article III standing). Without any allegation that they expended additional resources they would not otherwise have expended, and in ways they would not have expended, *but for* defendants' alleged violations of Sections 7 and 5, these plaintiffs fail to establish the requisite causation. *See, e.g.*, *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015). Remarkably, while plaintiffs formulaically recite that they could devote their resources to other "important areas" if defendants were complying with their obligations to provide voter registration services,"

16

Pls.' Br. at 5, the declarations which the organizational plaintiffs use to *post hoc* bolster their standing admit that they regularly engage in voter registration drives with plans to continue to do so in the future. The organizational plaintiffs' voter registration efforts conform with their stated missions and are not the result of defendants' alleged violations of the NVRA. *Lujan*, 504 U.S. at 560. Plaintiffs have not conducted voter registration drives at DHHS, public assistance agencies, DMV, or DOT, redirected resources to address defendants' alleged voter registration issues, or altered their voter registration efforts in any manner beyond that which their mission proscribes. By all accounts, plaintiffs would "continue and expand [their] voter engagement efforts" even if they believed defendants to be in perfect compliance with the NVRA.[17] (*See* D.E. 45, Montford Decl. ¶ 20)

The organizational plaintiffs also lack statutory standing due to their failure to provide sufficient notice pursuant to § 20510(b). As explained further in defendant Strach's Memorandum in Support of Motion to Dismiss, plaintiffs failed to provide defendants with actionable notice of redressable wrongs. (D.E. 29 at 15-17) (explaining plaintiffs' conclusory notice letter failed to identify the locations of the alleged "investigations" and third-party contractors, and merely presented uncorroborated "data" that allegedly evidenced statutory violations)

The individual plaintiffs—who raise only Section 5 claims—also lack standing. Although plaintiffs' complaint asserts generically that "Plaintiffs" are "aggrieved by the

---

[17] Because defendants are in compliance with the NVRA, plaintiffs' continued voter registration efforts, and attestation of the same, undercut their position that they have been harmed.

Section 7 Defendants'" alleged violations of the NVRA, Compl.¶ 100, the individual plaintiffs have not alleged any facts or harm to support a cause of action under Section 7 against the Section 7 defendants, nor did they provide *any* advance notice of Section 7 claims to DHHS before filing suit, as required by § 20510(b). Should the individual plaintiffs assert claims under Section 7, defendants reserve the right to move for their dismissal on these grounds.

Moreover, while the individual plaintiffs allege they were injured when their provisional ballots were not counted in the 2014 election, all three individuals are currently registered to vote. Accordingly, there is no redress for the individual plaintiffs' claimed injury, and plaintiffs' requested preliminary injunction omits any redress for the harms the individual plaintiffs allege. *Lujan*, 504 U.S. at 560-61. Conversely, any retroactive relief for plaintiffs' past injuries falls outside the private cause of action created in § 20510(b) and is otherwise barred by the Eleventh Amendment. *See Allen*, 134 F.3d at 627.

### iii. *DHHS is not a proper party.*

Plaintiffs' claims are further barred because DHHS does not administer any of the services which trigger the requirements under the NVRA nor does it have any control over the hundreds of local and county agencies, which do administer those services. The local and county public assistance agencies are not accountable to DHHS. The employees of the local and county public assistance agencies are not employees of DHHS nor do they answer the directives of DHHS. Moreover, DHHS was not given authority by the North Carolina legislature to enforce the NVRA against local and county public

18

assistance agencies. *See United States v. Missouri*, 535 F.3d 844 (8th Cir. 2008). If plaintiffs wish to enjoin the actions of the local and county public assistance agencies, plaintiffs are required to sue these agencies directly.

Given the Eleventh Amendment sovereign immunity considerations, the lack of standing, and the failure to identify the proper defendants, plaintiffs cannot succeed on the merits of their claims.

    b) <u>Plaintiffs are not likely to succeed on the merits.</u>

In addition to the procedural bars, plaintiffs have not, and cannot, clearly demonstrate that they are likely to succeed on the merits at trial. *Winter*, 555 U.S. at 20. Not only have plaintiffs failed to establish more than a possibility of success at trial, but they fail to show the existence of a systemic pattern of NVRA violations. *See Ferrand v. Schedler*, No. 11-926, 2011 U.S. Dist. LEXIS 82906, at *23 (E.D. La. July 21, 2011) (requiring more than an isolated violation to establish a NVRA violation).

    i. *Plaintiffs cannot establish a violation of Section 7 of the NVRA.*

Plaintiffs are unlikely to succeed on the merits of their Section 7 claims. Although plaintiffs allege that DHHS violated Section 7 of the NVRA by failing to provide certain voter registration services, plaintiffs fail to allege, show, or produce reliable evidence demonstrating that they are likely to succeed on these claims at trial—even under more lenient evidentiary standards. Plaintiffs' Section 7 claims fall into two categories: (1) failure to disclose voter registration rights in writing, and (2) failure distribute voter registration forms to clients who have not declined in writing to receive such forms. Plaintiffs allege that each of these violations are occurring in both in-person and remote

19

public assistance transactions.  However, these claims completely rely on unreliable and improper hearsay evidence, which, even if true, fails to establish a systemic, ongoing pattern of NVRA violations, and they otherwise seek redress based on requirements not included in the NVRA.

It is within the court's discretion to discount statements in affidavits or declarations based on "belief rather than personal knowledge."  *Imagine Medispa, LLC v. Transformations, Inc.*, 999 F. Supp. 2d 862, 869 (S.D. W.Va. 2014).  Conclusory affidavits based on hearsay and those provided by declarants without personal knowledge of defendants' alleged conduct should be denied.  *See Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*, 446 F.2d 353, 357 (5th Cir. 1971).  "[W]here the moving party substantiates his side of a factual dispute on information and belief," *id.*, such evidence is inappropriate "given the character and objectives of the injunct[ion]," and should be stricken.  *Am. Angus Ass'n v. Sysco Corp.*, 829 F. Supp. 807, 816 (W.D.N.C. 1992).

The thirteen declarations attached to plaintiffs' motion do not contain sufficient indicia of reliability or applicability to defendants, and should be stricken.  None of the declarations used by plaintiffs to bolster their Section 7 claims (the Ferrier, Cataldo, Seawell, and D'Amore Declarations) are based on personal knowledge of the allegations against defendants.  The Ferrier and Cataldo Declarations are made by paralegals employed by plaintiffs, include *secondhand* characterizations of procedures employed at 16 county agency offices two and half years ago, and otherwise omit any foundation for the methodologies employed in the surveys described.  Worse, the Seawell Declaration is based entirely on Seawell's observations of an unknown third party's experience with the

Case 1:15-cv-01063-LCB-JEP   Document 69   Filed 04/14/16   Page 20 of 33

ePass online registration system.[18]  It is precisely this type of double hearsay that renders these Declarations wholly unreliable.  Therefore, the Ferrier, Cataldo, and Seawell Declarations lack any degree of reliability and should be stricken.

Without the Ferrier, Cataldo, and Seawell Declarations, only the D'Amore Declaration is left to support plaintiffs' Section 7 claims.  Notably, D'Amore is *counsel of record for plaintiffs*, and has submitted his declaration for the self-serving purpose of "substantiat[ing] his side of a factual dispute on information and belief."  *Marshall Durbin Farms*, 446 F.2d at 357.  "Declarations are frequently drafted by lawyers, and the evidence presented within them is not subject to the rigors of cross examination."  *G.G. v. Gloucester Cnty. Sch. Bd.*, No. 4:15cv54, 2015 U.S. Dist. LEXIS 124905, at *27 (E.D. Va. Sep. 17, 2015) (declining to consider affidavits' hearsay statements at preliminary injunction stage).  Plaintiffs who rely "on such weak evidence" are "unlikely to make the clear showing required for the issuance of a preliminary injunction."  *Id.*  Here, the D'Amore Declaration is not merely *drafted* by counsel, it is *attested* by counsel.  Accordingly, the declaration should be stricken.  Plaintiffs' reliance on "such weak evidence" necessarily prevents them from succeeding on the merits.

Even assuming the Ferrier, Cataldo, Seawell, and D'Amore Declarations provided reliable evidence, the facts presented therein fail to establish the existence of a systemic pattern of in-person NVRA violations.  *Ferrand*, 2011 U.S. Dist. LEXIS 82906, at *23.  Plaintiffs have not identified a single individual denied NVRA-required services by

---

[18]  Adding to the Seawell Declaration's unreliability is the fact that plaintiffs give no explanation as to who Emily Seawell is or her connection to this case.

21

DHHS. At best, plaintiffs' evidence establishes that more than two years ago, 146 out of thousands of clients left 16 out of 185 county-operated public assistance agencies statewide—over which DHHS has no direct oversight—"unaware" of the opportunity to register to vote. (Pls.' Br. at 16) Plaintiffs improperly assume defendants' alleged failure to comply with Section 7 is the only explanation for a client's subjective "unawareness" of the opportunity to register to vote. But even accepting that incredible assumption, plaintiffs' "evidence" proves nothing more than isolated issues among unknown individuals more than two years ago at a handful of public assistance agency offices over which DHHS has no control.

Even if plaintiffs were able to produce evidence with the necessary indicia of reliability capable of supporting the issuance of a preliminary injunction, they still are unable to show a system wide pattern of Section 7 violations. First, any decreases in voter registration over the past two years can be attributed to factors outside the control of defendants, including, certain county agencies' use of registration forms lacking a proper source code, the lack of interest on the part of North Carolinians to register to vote in a period with no presidential election, and the implementation of N.C. FAST case management system and the online application process associated with the Affordable Care Act.[19] Second, as discussed *supra* voter registration activity from public assistance agencies more than doubled (2.29x) in 2015 as compared to 2014, and registration activity in the first few months of 2016 is nearly equal to all of 2014 (98.4%) (Ex. B, ¶ 8)

---

[19] *See* Second Declaration of Brian D. Neesby, ¶ 17, Ex. A, and Declaration of Veronica W. Degraffenreid, ¶ 28 (D.E. 66, 67)

Third, because the NVRA does not apply to remote transactions and because, in any event, defendants are now providing those services, plaintiffs' claims based on E-Pass and telephone transactions will fail.

When interpreting statutory language, courts must apply the plain language of the statute and give words their ordinary meaning. *Nat'l Coalition for Students with Disabilities Educ. & Legal Defense Fund v. Allen*, 152 F.3d 283, 288 (4th Cir. 1998). Courts decide whether statutory language is plain by considering "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Statutory construction is a holistic endeavor, and provisions ambiguous in isolation are "often clarified by the remainder of the statutory scheme," when "the same terminology is used elsewhere in a" clearer context. *United Savings Ass'n of Texas v. Timbers of Inwood Forrest Assocs.*, 484 U.S. 365, 371 (1988).

Here, plaintiffs allege the county DSS agencies' telephone and ePass transactions violated Section 7 by failing to provide statements in conformity with § 20506(a)(6)(B), and by failing to universally require applicants to decline, in writing, to register to vote pursuant to § 20506(a)(6)(A). However, such services are not required by, nor governed by, the NVRA. Rather, the agencies provide telephone and ePass transactions as a service to North Carolina residents and in furtherance of its agency functions, and to the extent either are not in perfect conformance with Section 7, plaintiffs cannot use their remote transaction claims to prove their in-person transaction claims.

Under the plain language of Section 7, paragraph (a)(6) only applies to physical

locations. *See* § 20506(a)(6) (requiring compliance by "an office," implying a physical location). Even if "office" creates an ambiguity, the context of Section 7 and other NVRA provisions further confirm that the services proscribed by § 20506(a)(6) apply to in-person transactions only. Under paragraph (a)(4) of Section 7, State-designated public assistance voter registration agencies are mandated to make available the "mail voter registration forms in accordance with *paragraph [(a)](6)*" (the section giving rise to defendants' remote transaction allegations) "*at* each voter registration agency." § 20506(a)(4)(i) (emphasis added). Use of the word "at" indicates Congressional intent for these services to be made available at physical agency locations, and not, rather, during remote applications. *See Ferrand*, 2011 U.S. Dist. LEXIS 82906, at *8.

Similarly, Section 4 directs States to "establish procedures to register to vote in elections for Federal office" (1) by application made simultaneously with an application for a driver's license, (2) by mail application, (3) "by application in person *at* the appropriate registration site . . . and at a[n] . . . office designated under section 7." § 20503(a). Again, use of "at" confirms that Congress intended for Section 7 to apply to services conducted *at* the physical public assistance agency offices. Plaintiffs' efforts, therefore, to fault DHHS for the telephone and ePass services the county agencies voluntarily provide are without merit, and such claims cannot be used to bolster plaintiffs' in-person allegations.

Even if Section 7 applied to telephone and ePass transactions, plaintiffs have no reliable or admissible evidence that defendants were ever in violation of Section 7 with respect to those services, and DHHS now conforms all in-person and remote transactions

24

to the requirements of Section 7.

In sum, plaintiffs cannot establish a likelihood of success on the merits of their Section 7 claims because plaintiffs' evidence fails to prove a pattern of violations and is otherwise contradicted by defendants' evidence, and Section 7 does not apply to remote transactions.

ii.   *Plaintiffs cannot establish a violation of Section 5 of the NVRA.*

As with plaintiffs' Section 7 claims, plaintiffs cannot make a clear showing of the likelihood of success on their Section 5 claims.  Plaintiffs' evidence in support of their Section 5 claims is unreliable and inadmissible and should be stricken.  Even accepting plaintiffs' Section 5 evidence, plaintiffs cannot establish a likelihood of success on the merits of their Section 5 claims because their evidence is disputed and inaccurate.

Plaintiffs' allegations under Section 5 fall into two categories: (1) the DMV fails to transmit voter registration information, and (2) the DMV fails to provide voter registration services through its self-service internet portal.  However, plaintiffs support these Section 5 claims with unreliable declarations riddled with hearsay and double hearsay.  Plaintiffs' Section 5 evidence should thus be stricken.

In support of their claim that DMV is failing to transmit voter registration information to election officials, plaintiffs rely on declarations from each of the three individual plaintiffs, a declaration from third party Juliette Muniz Lafargue, and documents attached to declarations which were received by third parties from other third parties.  None of these declarations and documents are reliable, admissible, or appropriate "given the character and objectives of the injunct[ion]," and all are contradictory to

25

defendants' reliable evidence. *Am. Angus Ass'n*, 829 F. Supp. at 816.

The facts contained in the individual plaintiffs' declarations are inaccurate. (*See* Ex. A, ¶ 32) For instance, while Holverson and Lane each claim that the DMV failed to transmit their voter registrations, Holverson and Lane each *declined* voter registration services while engaging in in-person transactions at the DMV on June 16, 2014 and May 29, 2014, respectively. (*Id.*) The Lafargue Declaration similarly fails to provide plaintiffs with sufficient evidence of a pattern of failures to transmit voter registrations. Not only is Lafargue a third party whose declaration neither lends credence to plaintiffs' claims nor establishes a system-wide Section 5 violation, but DMV records contradict Lafargue's allegations and confirm Lafargue's voter registration information was successfully transmitted to the SBOE more than a month before Lafargue was allegedly forced to vote provisionally. (Ex A, ¶ 32)

Without any reliable, individual evidence of DMV and DOT failures to transmit voter registrations to election officials, plaintiffs have only the documents attached to the Hall and Flanagan Declarations—which should be stricken for their hearsay, unreliability, and lack any foundation. Even accepting these declarations as true, the Hall and Flanagan Declarations show only isolated incidents untraceable to DMV and DOT, and otherwise insufficient to establish a pattern of NVRA violations. *Ferrand*, 2011 U.S. Dist. LEXIS 82906, at *23. The documents attached to the Hall Declaration show only that the SBOE did not receive DMV voter registration for *one person*, and Exhibits F-P of the Flanagan Declaration show that 355 provisional voters in Durham, Mecklenburg, Nash, Pitt, and Wake Counties in 2014—0.5 percent of the total voter registration

26

applications received by DMV offices in each of those counties in 2014—indicated they had registered through the DMV. (Ex. A, ¶¶ 26-31) Outside of the fact an individual's own representation that they registered to vote through the DMV does not *ipso facto* establish any wrongdoing by DMV, the Hall and Flanagan Declarations fail to show a pattern of Section 5 violations. As a result, plaintiffs cannot show a likelihood of success on the merits.

Plaintiffs are similarly unlikely to succeed on the merits of their claim that the DMV is failing to provide adequate voter registration services through its online portal. Because plaintiffs base their injury on the absence of such service, the fact DMV now offers this service leaves plaintiffs without the redressable injury needed for standing, *see Lujan*, 504 U.S. at 560-61, or the ongoing injury to fall under the *Ex parte Young* exception. *See Allen*, 134 F.3d 627. While plaintiffs admit that the DMV now offers online voter registration services, *see* Ex. A, ¶ 25, they attempt to overcome their lack of injury by claiming that continued Section 5 violations are "very likely," because of "recent history and the experiences with the March 2016 primary." (Pls.' Br. at 22) Without elaboration on the alleged issues in "recent history" or with the "March 2016 primary," or any factual support for these conclusory statements, plaintiffs' claim for preliminary injunctive relief on the basis of a possibility mandates denial of their claim. Moreover, DMV's online voter registration services are not covered by the NVRA, due to the plain language of Section 5, Section 4, and the context of the NVRA as a whole.

Plaintiffs are thus unlikely to succeed on their Section 5 claims because (1) plaintiffs' evidence is unreliable and disputed by defendants, (2) even if plaintiffs'

evidence were reliable or true, it fails to establish systemic violations, and (3) although the NVRA does not apply to online transactions, the DMV now offers voter registration services online and plaintiffs admit as much.[20]

c) <u>Irreparable injury is not likely in the absence of a preliminary injunction.</u>

Plaintiffs fail to demonstrate that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. In fact, neither the organizational nor individual plaintiffs[21] can establish any ongoing injury, much less one requiring or justifying the draconian preliminary injunctive relief they seek. *See id.* (stating that the movant for preliminary injunctions must establish that "*he* is likely to suffer irreparable harm in the absence of preliminary relief"). The nature of plaintiffs' requested injunction implicitly concedes plaintiffs' lack of harm because plaintiffs' injunction requires more than what is proscribed by the NVRA. This Court should not be persuaded by plaintiffs' compliance-*plus* injunction.

---

[20] By including copies of email correspondences between the Deputy Director of the Wake County Board of Elections and the SBOE discussing whether Anna Grace Martin registered to vote at a DMV office in October 2014, plaintiffs seemingly insinuate that Ms. Martin did not receive voter registration services required by Section 5. (*See* Hall Decl. Ex. A) However, plaintiffs fail to include any firsthand account from Ms. Martin, do not raise any allegation relating to Ms. Martin or her receipt of voter registration services, do not allege that Ms. Martin was harmed by a violation of the NVRA, and do not include Ms. Martin as an individual plaintiff to this action. Nor could they -- DMV's reliable evidence confirms that Ms. Martin's only DMV transaction in 2014 before the General Election was to change her address online and that there is no record of Ms. Martin's voter registration activity prior to the 2016 General Election. The documents relating to Ms. Martin's voter registration are therefore inaccurate, unreliable, and cannot be used to support the issuance of a preliminary injunction.

[21] Plaintiffs do not even argue that the individual plaintiffs face irreparable harm if an injunction is not issued in the section of their brief regarding irreparable injury. Rather, plaintiffs focus solely on the harm of the organizational plaintiffs.

Attempting to manufacture harm where it is otherwise lacking, the organizational plaintiffs claim they face irreparable harm because they will continue to spend time and resources on voter registration efforts, which will cost them the "the ability to spend those resources on other important activates." (Pls.' Br. at 26) In addition to the fact plaintiffs fail to include any support for this conclusory assertion; *i.e.*, how much time and resources will be diverted and what other important activities will suffer, etc., plaintiffs fail to link these voter registration efforts to defendants' alleged NVRA violations, and otherwise fail to show that they would not be engaging in these voter registration efforts *but for* defendants' alleged conduct.

As demonstrated, defendants are in compliance with Sections 7 and 5 of the NVRA, and there is no ongoing or continuous violation making the threat of irreparable harm to voter registrations likely. As here, where "denying the preliminary injunction will not result in irreparable harm, [the] preliminary injunction should not be considered." *Wheelihan*, 345 F. Supp. 2d at 554.

> d) The balance of equities and consideration of public interest tip strongly in defendants' favor.

The balance of equities and consideration of public interest strongly tip in favor of defendants. *See Winter*, 555 U.S. at 26. Unlike plaintiffs, who will suffer no harm from denial of the preliminary injunction, defendants will suffer substantial harm if the Court grants the requested preliminary injunction. For plaintiffs, the most serious possible injury would be the continued use of their resources on voter registration drives—actions which, according to the organizational plaintiffs' declarations, plaintiffs would continue

regardless. In contrast, forcing defendants to identify and provide extra services to potentially hundreds of thousands of individuals who engaged in past transactions covered by the NVRA is an undue and extraordinary burden. Defendants would be forced to expend significant time and resources coordinating among all offices, local agencies, and third party contractors, including those over which they have no control, and who are not defendants in this case and therefore not bound by any preliminary injunction or any other order of the Court, to comply with the injunction. Moreover, to the extent North Carolina, through its representative defendants, suffers harm from having additional obligations imposed beyond those required by the NVRA, the North Carolina public would suffer harm as well. Where the lack of an injunction would simply maintain the status quo of plaintiffs, but granting the injunction would unduly harm defendants, the injunction should not be issued. Given that the balance of equities and public interest considerations tip in favor of defendants, plaintiffs' request for preliminary relief should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiffs' motion for preliminary injunction must be denied.

Respectfully submitted this 14th day of April, 2016.

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

/s/ Thomas A. Farr
Thomas A. Farr (N.C. Bar No.: 10871)
thomas.farr@ogletreedeakins.com
Phillip J. Strach (N.C. Bar No.: 29456)
phil.strach@ogletreedeakins.com
Michael D. McKnight (N.C. Bar No.: 26932)
michael.mcknight@ogletreedeakins.com
Patrick D. Lawler (N.C. Bar No.: 47882)
patrick.lawler@ogletreedeakins.com
4208 Six Forks Road, Suite 1100
Raleigh, NC  27609
Telephone:  919.787.9700
Facsimile:  919.783.9412

/s/ Amy Pocklington
Amy Pocklington (VA Bar No.: 45233)
amy.pocklington@odnss.com
901 East Byrd Street, Suite 900
Richmond, Virginia 23219
Telephone: 804.663.2335
Facsimile: 804.225.8641


*Attorneys for N.C. DHHS, N.C. DMV, and N.C. DOT Defendants*

## CERTIFICATE OF SERVICE

I, Thomas A. Farr, hereby certify that I have this day electronically filed the foregoing **JOINT MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of Court using the CM/ECF system which will provide electronic notification of the same to the following:

Anita S. Earls
Allison J. Riggs
Southern Coalition for Social Justice
1415 West Highway 54, Suite 101
Durham, NC 27707
anita@southerncoalition.org

Stuart Naifeh
Naila Awan
Demos
220 Fifth Ave., 2nd Floor
New York, NY 10001
Room 7254-NWB
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
snaifeh@demos.org

Dorian L. Spence
Robert Kengle
Ezra Rosenberg
Lawyers' Committee for
Civil Rights Under Law
1401 New York Avenue, NW, Suite 400
Washington, DC 20005
dspence@lawyerscommittee.org

Catherine M. Flanagan
Sarah Brannon
Project Vote
805 15th Street, NW, Suite 250
Washington, DC 20005
cflanagan@projectvote.org

Matthew M. D'Amore
Joshua R. Stein
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
MDAmore@mofo.com

Steven M. Kaufmann
Kirk A. Sigmon
Morrison & Foerster LLP
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006
SKaufmann@mofo.com

*Attorneys for Plaintiffs*

This, the 14th day of April, 2016.

<div style="margin-left: 40%;">

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

/s/ Thomas A. Farr
Thomas A. Farr (N.C. Bar No.: 10871)
thomas.farr@ogletreedeakins.com
Phillip J. Strach (N.C. Bar No.: 29456)
phil.strach@ogletreedeakins.com
Michael D. McKnight (N.C. Bar No.: 26932)
michael.mcknight@ogletreedeakins.com
Patrick D. Lawler (N.C. Bar No.: 47882)
patrick.lawler@ogletreedeakins.com
4208 Six Forks Road, Suite 1100
Raleigh, NC  27609
Telephone:  919.787.9700
Facsimile:  919.783.9412

*Attorneys for N.C. DHHS, N.C. DMV, and N.C. DOT Defendants*

</div>

24451241.3

33