IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ACTION NC, DEMOCRACY NORTH CAROLINA, NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE, SHERRY DENISE HOLVERSON, ISABEL NAJERA, AND ALEXANDRIA MARIE LANE, | ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:15-cv-1063 |
| | ) | |
| KIM WESTBROOK STRACH, RICK BRAJER, KELLY THOMAS, AND NICK TENNYSON, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

LORETTA C. BIGGS, District Judge.

On December 15, 2015, Plaintiffs, Action NC, Democracy North Carolina, and North Carolina A. Philip Randolph Institute ("Organizational Plaintiffs"), and Plaintiffs Sherry Denise Holverson, Isabel Najera, and Alexandria Marie Lane ("Individual Plaintiffs") commenced this action seeking declaratory and injunctive relief, alleging violations of Sections 5 and 7 of the National Voter Registration Act, ("NVRA" or the "Act"). Named as Defendants are Kim Westbrook Strach, in her official capacity as Executive Director of the North Carolina State Board of Elections ("SBE"), Rick Brajer, in his official capacity as Secretary of the North Carolina Department of Health and Human Services ("DHHS"), Kelly Thomas, in his official capacity as Commissioner of the North Carolina Division of Motor

Vehicles ("DMV"), and Nick Tennyson, in his official capacity as Secretary of the North Carolina Department of Transportation ("DOT") (collectively, "Defendants").

Defendant Strach filed her Answer and a Motion to Dismiss, and the remaining Defendants ("Agency Defendants") filed their Answer and a Motion to Dismiss. (ECF Nos. 27, 28, 30, 31.) Before the Court are Defendant Strach's Motion to Dismiss, Agency Defendants' Motion to Dismiss, (ECF Nos. 28, 31), and Plaintiffs' Motion for Preliminary Injunction, (ECF No. 34). The United States filed a Statement of Interest on behalf of the Department of Justice ("DOJ"), which the Court has considered.[1] (*See* ECF No. 84.) For the reasons that follow, Defendants' Motions are denied and Plaintiffs' Motion is granted in part and denied in part.

# I. THE NATIONAL VOTER REGISTRATION ACT

Recognizing that the right to vote is a fundamental right, Congress, in 1993, passed the NVRA "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(b)(1); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334 (4th Cir. 2012) ("The NVRA reflects the view of Congress that the right to vote 'is a fundamental right.'" (quoting 52 U.S.C. § 20501(a)(1))). The Act requires states to provide at least three ways for citizens to register to vote for federal elections: (1) as part of the application, renewal, or change of address for a driver's license or similar

---

[1] The United States submitted its Statement of Interest pursuant to 28 U.S.C. § 517, which states that "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a Sate, or to attend to any other interest of the United States." 28 U.S.C. § 517.

identification; (2) by mail; and (3) through state-designated voter registration agencies. *See* 52 U.S.C. §§ 20504–20506; *Young v. Fordice*, 520 U.S. 273, 275 (1997). Section 4(a) of the Act identifies a state's general obligation to "establish procedures" for voter registration in each of these circumstances.[2] 52 U.S.C. § 20503(a). Further, the NVRA sets forth detailed requirements regarding voter registration through each of the following three methods: Section 5 covers voter registration in connection with certain state motor vehicle transactions, often referred to as "motor voter" registration; Section 6 covers voter registration by mail-in application; and Section 7 covers voter registration in connection with transactions for public assistance, disability services, and services provided by other designated agencies. *Id.* §§ 20504–20506. At issue in this case are motor voter registration under Section 5 and agency-based registration under Section 7.

## A. Section 5

Section 5 provides that "[e]ach State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application." 52 U.S.C. § 20504(a)(1). Further, Section 5 provides that a voter registration application shall be integrated with the driver's license application. If an applicant is already registered to vote, a driver's license application or renewal must include the opportunity to update the registrant's existing

---

[2] While certain states are exempt from the NVRA's requirements, *see* 52 U.S.C. § 20503(b), North Carolina is not exempt.

voter registration. *Id.* § 20504(a)(2). In addition, a change of address form submitted for driver's license purposes must also serve as notification of a change of address for voter registration, absent a written declination by the registrant. *See id.* § 20504(d). Section 5 also requires that each State's motor vehicle authority transmit the completed voter registration portion of an application for a driver's license to the appropriate election official within ten days. *Id.* § 20504(e).

## B. Section 7

Section 7 of the NVRA requires states to designate public assistance agencies and disability services offices as agencies providing voter registration services, without exception. Specifically, the Act requires that states must designate as voter registration agencies ("VRAs") all offices in the state that provide (1) public assistance, or (2) state-funded programs primarily serving persons with disabilities. 52 U.S.C. § 20506(a)(2)(A)–(B).

Section 7 prescribes what these designated VRAs must do. Section 7(a)(4) requires all designated VRAs to distribute voter registration application forms, offer assistance in completing such forms, and accept and timely transmit completed registration forms to appropriate state election officials. 52 U.S.C. § 20506(a)(4)(A). Under Section 7(a)(6), VRAs "that provide[] service or assistance in addition to conducting voter registration" must also "distribute with each application for such service or assistance, and with each recertification, renewal, or change of address . . . the mail voter registration application form" unless "the applicant, in writing, declines to register to vote." *Id.* § 20506(a)(6)(A). Section 7(a)(6) also requires that these VRAs provide their clients with a voter preference form that, among other things, provides the opportunity to record in writing a client's desire to register to vote or

4

decline the opportunity to register. *Id.* § 20506(a)(6)(B). For a client who wishes to register to vote, Section 7(a)(6) requires VRAs to provide not only general assistance, but "the same degree of assistance with regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance." *Id.* § 20506(a)(6)(C).

## II. THE COMPLAINT

The Complaint in this action was filed by Individual Plaintiffs and Organizational Plaintiffs. The Individual Plaintiffs are citizens and residents of North Carolina who allege that in the 2014 election they were denied the right to have their votes counted. (ECF No. 1 ¶¶ 32, 35, 37.) Specifically, each Individual Plaintiff alleges that in 2014 she (a) went to the DMV and applied for a driver's license or change of address; (b) either requested to update her voter registration information or answered "yes" when asked if she wished to register; (c) attempted to vote in the November 2014 election but was told that she was not on the voter registration rolls; and (d) was allowed to submit a provisional ballot but later learned that the ballot was not counted. (*Id.* ¶¶ 33, 36, 38.) Individual Plaintiffs further allege that their ballots were not counted because of DMV's failure to comply with the NVRA by not transmitting their voter registration and/or their change of address information to the SBE as required by Section 5 of the Act. (*Id.*)

The Organizational Plaintiffs are non-profit organizations that provide voter registration and other services to low income individuals. (*Id.* ¶¶ 22, 25, 28.) They allege, among other things, that Defendants have violated Sections 5 and 7 of the NVRA because (a) DMV is failing to submit voter registration information to SBE after in-person covered

transactions, (*id.* ¶ 11); (b) public assistance agencies are failing to register eligible voters during in-person transactions, (*id.* ¶ 8); and (c) both DMV and public assistance agencies are failing to meet the mandate of NVRA with regard to registering eligible voters during remote transactions, (*id.* ¶ 14). Organizational Plaintiffs also allege that because of the Defendants' failure to comply with both Sections 5 and 7 of the NVRA, they have been forced to divert limited resources to assist voters with registrations that should have been accomplished through DMV or the public assistance agencies and therefore have been unable to conduct other activities important to their respective missions. (*Id.* ¶ 31.) Plaintiffs seek injunctive relief that requires, among other things, Defendants to develop, implement, and enforce practices and policies to ensure compliance with Sections 5 and 7 of the Act.[3] (*Id.* at 34–35.)

Defendant Strach is the Executive Director of the SBE and is responsible for, among other things, the coordination of North Carolina's responsibilities under the NVRA including the receipt and processing of voter registration information for the DMV and North Carolina public assistance agencies. 52 U.S.C. § 20509; N.C. Gen. Stat. § 163-82.2. The Agency Defendants include the Commissioner of DHHS, the Secretary of NCDOT, and the Commissioner of NCDMV. Plaintiffs allege that each of the Agency Defendants has a responsibility to ensure that its respective agency is in compliance with the NVRA.

---

[3] Plaintiffs also seek declaratory relief which is not before the Court at this time. Therefore, nothing in this Opinion shall be construed to address the declaratory relief sought by Plaintiffs. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (finding that "it is generally inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the merits").

Defendant Strach moves to dismiss Plaintiffs' Complaint pursuant to Rules 12(b)(1), (2), and (6) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction, lack of personal jurisdiction,[4] and for failure to state a claim. In addition, Strach asserts Eleventh Amendment immunity. (ECF No. 29 at 15–17.) The Agency Defendants bring their Motion to Dismiss based on Eleventh Amendment immunity and, pursuant to Rule 12(b)(6), for failure to state a claim. (ECF No. 31, 32 at 7.)

## III. STANDARDS OF REVIEW AND RELEVANT LAW

### A. Rule 12(b)(1): Subject Matter Jurisdiction

Subject-matter jurisdiction is a threshold issue that relates to the court's power to hear a case and must be decided before a determination on the merits of the case. *Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 453 (4th Cir. 2012) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)). A motion under Rule 12(b)(1) raises the question of "whether [the plaintiff] has a right to be in the district court at all and whether the court has the power to hear and dispose of [the] claim." *Id.* at 452. The burden of establishing subject-matter jurisdiction is on the plaintiff. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). When evaluating a Rule 12(b)(1) motion to dismiss, the court can consider evidence outside the pleadings and should grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* (quoting *Richmond,*

---

[4] The Court is unable to discern the basis of Defendant Strach's request for relief under 12(b)(2) for lack of personal jurisdiction, nor does Strach specifically address it in her brief, thus the Court will not explore it further. *See Mayfield v. Nat'l Ass'n for Stock Car Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) ("A party's failure to raise or discuss an issue in his brief is to be deemed an abandonment of that issue." (quotation omitted)).

*Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). Once the court determines it lacks subject-matter jurisdiction over a claim, it must dismiss that claim. *See Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 301 (4th Cir. 2009). Irrespective of whether the parties raise the issue of subject-matter jurisdiction, the court has an independent obligation to ensure it possesses such jurisdiction before proceeding. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 480 (4th Cir. 2005).

Defendant Strach asserts that Plaintiffs lack standing. Standing is a threshold issue in every case, with plaintiff bearing the burden of demonstrating "a personal stake in the outcome of the controversy" that is sufficient to warrant the "invocation of federal court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). "To establish standing at the motion to dismiss stage a plaintiff must plausibly allege that: '(1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 89 (4th Cir. 2013) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

It is not enough that a plaintiff have such a personal stake in the controversy at the commencement of the action, "an actual 'controversy' must exist at all stages of the federal court proceedings." *N.C. Right to Life PAC v. Leake*, 872 F. Supp. 2d 466, 470 (E.D.N.C. 2012). Otherwise, the action becomes moot. *Pashby v. Delia*, 709 F.3d 307, 316 (4th Cir. 2013). "A case becomes moot, and thus deprives federal courts of subject matter jurisdiction, 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the

8

outcome.'" *Id.* (quoting *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008)). A controversy is moot if it lacks "one of the three required elements of Article III standing: (1) injury-in-fact, (2) causation, or (3) redressability." *Townes v. Jarvis*, 577 F.3d 543, 546–47 (4th Cir. 2009) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

However, an exception to this general rule of mootness exists where the underlying dispute is "capable of repetition yet evading review." *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007). This exception applies where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Davis v. FEC*, 554 U.S. 724, 735 (2008). The Fourth Circuit has observed that "this is a narrow exception," which is limited to "exceptional" circumstances. *Williams v. Ozmint*, 716 F.3d 801, 810 (4th Cir. 2013). This exception is especially germane to cases involving election-related issues, as they "frequently present issues that will persist in future elections, and resolving these disputes can simplify future challenges." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1343 (11th Cir. 2014).

### B. Rule 12(b)(6): Failure to State a Claim

The purpose of a motion made under Rule 12(b)(6) of the Federal Rules of Civil Procedure "is to test the sufficiency of a complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A complaint may fail to state a claim upon which relief may be granted in two ways: first, by failing to state a valid legal cause of action, *i.e.*, a cognizable claim, *see Holloway*, 669 F.3d at 452; or second, by failing to allege sufficient facts to support a legal cause of action, *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). A dismissal

9

under Rule 12(b)(6) is appropriate only when the complaint "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.,* 521 F.3d 1097, 1104 (9th Cir. 2008); *Capital Associated Indus. v. Cooper*, 129 F. Supp. 3d 281, 299 (M.D.N.C. 2015).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although a plaintiff need only plead a short and plain statement of the claim establishing that he or she is entitled to relief, *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992), "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do," *Twombly*, 550 U.S. at 555. Nor is the Court required to accept a plaintiff's legal conclusions. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). In other words, a claim is plausible when the complaint alleges facts that allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Where, as here, Defendants have filed an Answer, a Rule 12(b)(6) motion "should be viewed as a Rule 12(c) motion for judgment on the pleadings." *Edwards*, 178 F.3d 231 at 243. As a practical matter, however, a Rule 12(c) motion is analyzed "under the same standards as a motion to dismiss under Rule 12(b)(6)." *Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013). Like a Rule 12(b)(6) motion, "[a] Rule 12(c) motion tests only the sufficiency of the complaint and does not resolve the merits of the plaintiff's claims or any disputes of fact." *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014). Unlike on a Rule 12(b)(6) motion to dismiss, however, on a motion for judgment on the pleadings, the Court may also

consider the Answer. *Alexander v. City of Greensboro*, 801 F. Supp. 2d 429, 433 (M.D.N.C. 2011). The factual allegations contained in the Answer "are taken as true only where and to the extent they have not been denied or do not conflict with the complaint." *Jadoff v. Gleason*, 140 F.R.D. 330, 331 (M.D.N.C. 1991). Because the plaintiff is not required to reply to the Answer, "all allegations in the [A]nswer are deemed denied." *Id.* at 332. "[D]ocuments attached to the Answer are part of the pleadings for Rule 12(c) purposes, and may be considered." *Mendenhall v. Hanesbrands, Inc.*, 856 F. Supp. 2d 717, 724 (M.D.N.C. 2012).

## C. Eleventh Amendment Immunity

Both Defendant Strach and the Agency Defendants assert Eleventh Amendment immunity, which bars suits by citizens against their own states. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984) (explaining that "despite the limited terms of the Eleventh Amendment, a federal court could not entertain a suit brought by a citizen against his own State"). Because a "suit against a state official in his or her official capacity . . . is a suit against the [State]," *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), Eleventh Amendment immunity extends to state officials sued in their official capacity, *Gray v. Laws*, 51 F.3d 426, 430 (4th Cir. 1995). However, under *Ex parte Young*, 209 U.S. 123, 155–56 (1908), state officials engaged in ongoing violations of federal law may be sued, in their official capacity, for prospective injunctive relief, because "such a suit is not a suit against the state for purposes of the Eleventh Amendment," *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010). Suits requesting retrospective relief against state officers are, however, barred by the Eleventh Amendment. *Republic of Para. v. Allen*, 134 F. 3d 622, 627 (4th Cir. 1998). "Whether an action is barred by the Eleventh Amendment is a question of law" for the court to decide. *Hutto v.*

*S.C. Ret. Sys.*, 773 F.3d 536, 542 (4th Cir. 2014). To determine whether a suit falls within the *Ex parte Young* exception, the court applies a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (alteration in original) (citation omitted). This inquiry focuses on Plaintiffs' allegations and "does not include an analysis of the merits of the claim[s]." *Id.* at 646. Further, the court "must find a 'special relation' between the officer being sued and the challenged statute before invoking the exception." *McBurney*, 616 F.3d at 399. Essentially, the state official "must have *some* connection with the enforcement of the act." *Young*, 209 U.S. at 157 (emphasis added); *see S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008) (explaining that, under *Ex parte Young*, the state official must have "*proximity to* and *responsibility for* the challenged state action").

## IV.   DEFENDANT STRACH'S MOTION TO DISMISS

Defendant Strach moves to dismiss Plaintiffs' Complaint based on the following:  (A) the Individual Plaintiffs' lack standing to bring suit; (B) the Organizational Plaintiffs likewise lack standing to bring suit; (C) Plaintiffs failed to comply with the NVRA's Section 7 notice requirement and are thus barred by the Eleventh Amendment; (D) the NVRA does not cover remote transactions; and (E) Organizational Plaintiffs' claim concerning third-party contractors fails. The Court will address each argument in turn.

### A.  Do Individual Plaintiffs Lack Standing?

Defendant Strach argues that because all three Individual Plaintiffs are now registered to vote, there exists no "ongoing" violation of federal law by State officials against Individual

Plaintiffs and thus, no injury-in-fact sufficient to establish standing. (ECF No. 29 at 8–9.) She contends that Individual Plaintiffs' "allegations do not rise to the concrete and particularized injury sufficient to sustain standing for prospective injunctive relief." (*Id.* at 9.) The Individual Plaintiffs argue, on the other hand, that they have alleged sufficient facts to establish standing. (ECF No. 64 at 5.)

Individual Plaintiffs allege, in their Complaint, that they were individually and collectively injured when deprived of their right to vote in the 2014 General Election because DMV failed to transmit their voter registration information to the SBE in violation of the NVRA. (ECF No. 1 ¶¶ 32–39.) Specifically, each Individual Plaintiff alleges that in 2014 she (a) went to the DMV and applied for a driver's license or change of address; (b) either requested to update her voter registration information or answered "yes" when asked if she wished to register; (c) attempted to vote in the November 2014 election but was told that she was not on the voter registration rolls; and (d) was allowed to submit a provisional ballot, but later learned that the ballot was not counted. (*Id.* ¶¶ 33, 36, 38.)

Individual Plaintiffs cite *Charles H. Wesley Education Foundation, Inc., v. Cox*, 408 F.3d 1349 (11th Cir. 2005), in support of their position that they have alleged a sufficient injury-in-fact to support standing.[5] Defendants in that case argued that plaintiff did not allege a specific injury-in-fact because, though denied the opportunity to vote in her home precinct due to

---

[5] Defendant Strach argues that Plaintiffs' reliance on this case is misplaced because, unlike that plaintiff whose change of address voter registration form was rejected causing her injury-in-fact, the Individual Plaintiffs here "do not allege a presently pending transaction with DMV preventing them from voting." (ECF No. 77 at 2.) This Court does not find this distinction persuasive.

defendant's violation of the NVRA, she was already registered to vote. The court, in rejecting

defendant's argument, stated:

> A plaintiff need not have the franchise wholly denied to suffer
> injury. Any concrete particularized, non-hypothetical injury to a
> legally protected right is sufficient. . . . Moreover, where an
> alleged injury is to a statutory right, standing exists "even where
> the plaintiff would have suffered no judicially cognizable injury
> in the absence of statute."

*Id.* at 1352 (quoting *Warth v. Seldin*, 422 U.S. 490, 514 (1975)).

Individual Plaintiffs allege in significant detail that they were denied the right to vote

because Defendant Strach and Agency Defendants violated Section 5 of the NVRA. There is

little question that Individual Plaintiffs' allegations are sufficient to satisfy the injury-in-fact

requirement for standing. However, Defendant Strach argues further that, even if this Court

were to find, as it has here, a sufficient injury-in-fact, Plaintiffs' injury can only be redressed

by retrospective relief, a type of relief disallowed by the Eleventh Amendment. (ECF No. 29

at 8–9.) While Strach is correct that the Eleventh Amendment bars retrospective relief against

a state official, Plaintiffs have sufficiently pled that if Defendants are not required to comply

with the NVRA, there would likely be injury to them in the future. (ECF No. 1 ¶ 40.)

Individual Plaintiffs further argue that their claim is not barred because, whether

Defendant Strach's argument is characterized as one of lack of standing or mootness, the

exception to mootness is applicable since the alleged injury is "capable of repetition yet

evading review." (ECF No. 64 at 6–7.) This exception to mootness applies in instances where:

"(1) the challenged action is in its duration too short to be fully litigated prior to cessation or

expiration, and (2) there is a reasonable expectation that the same complaining party will be

subject to the same action again." *Wis. Right to Life, Inc.*, 551 U.S. at 462 (quotation omitted). As to the first factor, as is common in election cases, the alleged injury here could not be fully litigated prior to the 2014 election. *See Arcia*, 772 F.3d at 1343. As to the second factor, Defendant Strach argues that this exception is inapplicable to Individual Plaintiffs because "the Complaint is devoid of allegations of a 'reasonable expectation' or 'demonstrated probability' that the 'same controversy will recur.'" (ECF No. 77 at 3 (quoting ECF No. 64 at 7–8).) The Court finds that not only have Individual Plaintiffs alleged sufficient facts to support a particularized, concrete claim of injury-in-fact when denied their right to vote in 2014, they have also sufficiently alleged that if Defendants are not enjoined into compliance with the NVRA, there is a reasonable expectation they will be so injured in the future. Plaintiffs specifically allege that "because each of the Individual Plaintiffs reside in the State and may relocate within the State at some time in the future, each Individual Plaintiff is reasonably likely to have need of the DMV's licensing, change of address, and voter registration services in the future and therefore is at substantial risk of suffering from the Defendants' non-compliance with the NVRA in the future as well." (ECF No. 1 ¶ 40; *see id.* ¶ 104.)

Individual Plaintiffs have plausibly alleged sufficient facts in this Complaint to support their claim of standing. The Court thus denies Defendant Strach's motion to dismiss Individual Plaintiffs' claims for lack of standing.

## B. Do Organizational Plaintiffs Lack Standing?

Defendant Strach likewise argues that Organizational Plaintiffs are unable to show a sufficient injury-in-fact to support standing and therefore their claims should be dismissed.

(ECF No. 29 at 10–14.) The Organizational Plaintiffs, on the other hand, contend that their allegations "are more than enough to allege standing." (ECF No. 64 at 10.)

Organizations may establish standing to bring suit on their own behalf and for injuries on behalf of their members. *See White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005). To bring suit on its own behalf an organization must meet the same standing requirements that apply to individuals, *i.e.*, injury-in-fact, causal connection and redressability. *See S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F. 3d 175, 182 (4th Cir. 2013). The Supreme Court has held that if a defendant's practices have hampered an organization's stated objectives causing the organization to divert its resources as a result, then "there can be no question that the organization has suffered injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The Court further stated that such a "drain on [an] organization's resources [] constitutes far more than simply a setback to [its] abstract social interests." *Id.*; *see also Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012) ("An organization may suffer an injury-in-fact when a defendant's actions impede its efforts to carry out its mission."). In *National Coalition for Students with Disabilities Education & Legal Fund v. Scales*, the District of Maryland held that using scarce resources to register voters because the University of Maryland was not complying with the NVRA was "sufficient to show an actual or threatened injury in fact that is fairly traceable to the alleged illegal action and is likely to be redressed by a favorable court decision ordering injunctive relief." 150 F. Supp. 2d 845, 850 (D. Md. 2001); *see also S. Walk*, 713 F.3d at 183 (noting that organizational standing requires both an "injury to organizational purpose" and a "consequent drain" on resources).

Plaintiffs' Complaint includes the following allegations to support standing for each of the Organizational Plaintiffs:

> Plaintiff ACTION NC is a non-profit organization focused on reducing the root causes of poverty, underdevelopment, and social and economic inequality in North Carolina. . . . As part of its mission of community engagement and empowerment, Action NC is committed to increasing voter participation in North Carolina's low-income communities, by, among other activities, conducting voter registration drives in neighborhoods and at public sites, generating and distributing issue-based materials in low-income neighborhoods, and hosting public presentations on issues related to elections and voting in these neighborhoods. ACTION NC has registered voters and conducted issue-based outreach throughout North Carolina, including in this Judicial District. On information and belief, a substantial proportion of the unregistered individuals reached by ACTION NC have contact with the DMV and/or public assistance agencies, and could have registered to vote without ACTION NC's assistance had Defendants complied with their obligations under the NVRA. (ECF No. 1 ¶¶ 22–23.)

> Plaintiff DEMOCRACY NORTH CAROLINA is a nonpartisan organization based in Durham that is dedicated to reducing barriers to voting and increasing voter participation in North Carolina. Democracy North Carolina's work is focused on three areas: money in politics, voting and elections, and good governance. Democracy North Carolina conducts year-round voter registration drives and trainings across the state. It provides voter registration services at numerous community gatherings and events. . . . On information and belief, a substantial proportion of the unregistered individuals reached by Democracy North Carolina have contact with the DMV and/or public assistance agencies, and could have registered to vote without Democracy North Carolina's assistance had Defendants complied with their obligations under the NVRA. (ECF No. 1 ¶¶ 25–26.)

> Plaintiff NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE ("APRI") is a state chapter of the A. Philip Randolph Institute, a national organization for African-American trade unionists and community activists, established in

1965 to forge an alliance between the civil rights and labor movements. . . . While APRI devotes considerable time and resources to efforts supporting charitable ventures, such as feeding the hungry and providing clothing to those in need, the bulk of APRI's work is focused on voter education, registration, and outreach efforts. Among its recent voter registration activities, APRI has participated in door-to-door canvassing, been present at community events, and placed phone calls to unregistered voters. APRI's voter registration efforts have traditionally focused on underserved communities and geographies where a high number of unregistered individuals reside. On information and belief, a substantial proportion of the unregistered individuals reached by APRI have contact with the DMV and/or public assistance agencies, and could have registered to vote without APRI's assistance had Defendants complied with their obligations under the NVRA. (ECF No. 1 ¶¶ 28–29.)

In addition to the allegations outlined above, Organizational Plaintiffs allege that "as a direct result of Defendants' Section 7 and 5 NVRA violations, [they have] had to divert time and resources to voter registration efforts, which [they] otherwise would have directed toward" voter education, outreach, and engagement efforts. (ECF No. 1 ¶¶ 24, 27, 30.) Further, Organizational Plaintiffs allege that they have suffered "individually and collectively . . . and will continue to suffer direct harm from the Defendants' non-compliance with Sections 5 and 7 of the NVRA." (*Id.* ¶ 31.) "By forcing these institutions to divert limited resources to assist voters with registration that could have or should have been accomplished through the DMV or the public assistance agencies, these institutions have been unable to conduct other activities important to their respective missions." (*Id.*) Moreover, each Organizational Plaintiff has

submitted a declaration to support its allegations and provide additional detail. (*See* ECF Nos. 40, 44, 45.)[6]

As argued by Plaintiffs, these kinds of allegations have been held, in similar cases, sufficient to confer standing on an organization. *See, e.g.*, *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040–41 (9th Cir. 2015) (finding standing where organizations alleged that, because of the defendants' failure to comply with the NVRA, they had to allocate resources differently); *Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014) ("[A]n organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices." (alteration in original) (quotation omitted)); *Arcia*, 772 F.3d at 1341–42 (finding organizational standing when organizational plaintiffs "submitted affidavits showing . . . they had diverted resources to address" the alleged violation at issue); *Scales*, 150 F. Supp. 2d at 849–50 (finding organizational standing under the NVRA where plaintiff alleged that, due to the state's noncompliance with the Act, it had to direct resources away from pursuing other goals to voter registration efforts at the University of Maryland at College Park). Thus, the allegations in the Complaint, along with the Declarations of the Organizational Plaintiffs, are sufficient to show injury-in-fact under *Havens Realty* and its progeny.

Defendant Strach next contends that "[Plaintiffs'] allegations are not anchored to any facts connecting Plaintiffs' activities with voter registration assistance for DHHS clients at DHHS public assistance agencies or for persons seeking services from DMV." (ECF No. 29 at 10–11.) Further, she alleges that allegations based upon information and belief do not meet

---

[6] As discussed in § III.A, *supra*, when evaluating a 12(b)(1) motion to dismiss, the court can consider evidence outside the pleadings. *Evans*, 166 F.3d at 647.

the pleading standards of Rule 8(a)(2) and are thus insufficient to survive a motion to dismiss. (*Id.*)  The Court disagrees.

Organizational Plaintiffs allege that "[o]n information and belief, a substantial portion of the unregistered individuals reached by [them] have contact with DMV and/or public assistance agencies and could have registered to vote without [Organizational Plaintiffs'] assistance had Defendants complied with their obligations under the NVRA."  (ECF No. 1 ¶¶ 23, 26, 29.)  Each also alleges that it serves low wealth communities and has encountered individuals who are unregistered but believed that they had registered at DMV or a public assistance agency.  (ECF No. 44 ¶ 12.)  "In the course of providing voter registration at community events, we regularly assist people who receive services from public assistance agencies in North Carolina, and who either want to register to vote or to update their voter registration information."  (ECF No. 45 ¶ 15.)  These allegations and declarations plausibly allege a causal connection between Organizational Plaintiffs' injury and those harmed by Defendants' alleged violations to withstand a motion to dismiss based on standing.

Finally, "[p]leading 'upon information and belief' was not abolished by *Twombly* or *Iqbal*."  *In re Lilley*, No. 10-81078C-13D, 2011 WL 1428089, at *2 (M.D.N.C. Apr. 13, 2011).  "The *Twombly* plausibility standard, which applies to all civil actions, does not prevent a plaintiff from pleading facts alleged 'upon information and belief' . . . where the belief is based on factual information that makes the inference of culpability plausible."  *Malibu Media, LLC v. Doe*, No. 13-365, 2014 WL 7188822, at *4 (D. Md. Dec. 16, 2014) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).  Such is the case here.  Therefore, dismissal

of Organizational Plaintiffs' claims on standing grounds is not required and Defendant Strach's motion to dismiss on this basis is denied.

### C. Sufficiency of Section 7 Notice Letter[7]

Defendant Strach next moves for dismissal of Organizational Plaintiffs' Section 7 claims on the grounds that they did not serve adequate notice.[8] The notice provision of the NVRA reads, in pertinent part, as follows:

> (b) Private right of action
>
> (1) A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.
>
> (2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

52 U.S.C. § 20510(b)(1).

It is undisputed that on May 8, 2015, the Organizational Plaintiffs sent a Notice Letter to Defendant Strach and Defendant Brajer's predecessor at DHHS notifying them of alleged non-compliance with Section 7 of the NVRA. (*See* ECF No. 27, Ex. 1.) However, Strach

---

[7] Attached to Defendant Strach's Answer is the May 8, 2015 letter ("Notice Letter") sent from the Organizational Plaintiffs to Defendant Strach and Defendant Brajer's predecessor at DHHS. (ECF No. 27, Ex. 1.) Because this Notice Letter is central to Plaintiffs' claims and its authenticity has not been challenged, the Court will include this Notice Letter in its consideration of Defendant Strach's motion. *See Mendenhall*, 856 F. Supp. 2d at 724 (explaining that "documents attached to the Answer are part of the pleadings for Rule 12(c) purposes, and may be considered").

[8] Defendants do not challenge the notice sent regarding Plaintiffs' Section 5 claims.

argues that "[t]he written notice of the violation [] must contain sufficiently particularized information in order to enable a chief State election official to substantiate and correct an alleged violation" and that Plaintiffs' notice failed to do so. (ECF No. 29 at 15.) Specifically, she contends the notice failed to identify the specific offices and counties where the reported problems were found by the investigators; that the letter did not connect the data alleged to demonstrate a violation to the six offices; and that Plaintiffs alleged violations by third party contractors in a conclusory way and did not name these contractors. (*Id* at 16.)

First, the Notice Letter informed Strach (and by copy Brajer) that a review of SBE and DHHS data, interviews conducted, and third-party contractor processes, revealed that DHHS is "systemically failing to provide voter registration services mandated by Section 7 of the NVRA." (ECF No. 27, Ex. 1 at 3.) The Notice Letter went on to state that "[a]t a minimum, DHHS is violating its obligation to provide the voter preference form and to distribute voter registration applications to clients engaged in covered transactions, in person or through remote means." (*Id.*) It further alleged that because DHHS was not offering the required applications, it was also not offering the required assistance that the Act requires. (*Id.*) After setting forth these general allegations, the Notice Letter set forth some of the data reviewed and field investigations conducted. The Notice Letter informed Defendants that "the number of voter registration applications originating from North Carolina public assistance agencies has decreased . . . nearly 69%" since 2011. (*Id.* at 3–4.) Further the Notice Letter stated that 74.5% of those interviewed neither saw a voter preference question nor received a voter registration application, (*id.* at 4), and that 31% of the offices visited "lacked even the materials, procedures, and/or infrastructure to comply with the NVRA," (*id.* at 5).

The Notice Letter informed Defendants that Section 7 requires compliant voter registration services during remote transactions, and that North Carolina's Medicaid page in particular was lacking such services. (*Id.* at 5, n.6.) The Notice Letter also notified Defendants that third-party contractors offering public assistance were not complying with the NVRA, presumably because they had not been so instructed or equipped by DHHS. (*Id.* at 6.) The Notice Letter concludes with an offer to "work cooperatively . . . to develop a plan for bringing North Carolina into compliance with the NVRA," and notice that, in the absence of such a plan, Organizational Plaintiffs "will have no alternative but to initiate litigation at the conclusion of the statutory 90-day waiting period." (*Id.* at 6–7.)

While the NVRA does not address the specificity of the notice required, a number of courts have addressed this issue. *See, e.g., Cegavske*, 800 F.3d at 1044 ("A plaintiff can satisfy the NVRA's notice provision by plausibly alleging that [an] ongoing, systematic violation is occurring at the time the notice is sent[.]"); *Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919, 922 (S.D. Ind. 2012) (finding notice requirement satisfied when the notice letter "set[] forth the reasons for [plaintiff's] conclusion" that the defendant failed to comply with the NVRA generally); *Ga. State Conference of N.A.A.C.P. v. Kemp*, 841 F. Supp. 2d 1320, 1334 (N.D. Ga. 2012) (finding sufficient notice where plaintiff's notice letter "alleged not only widespread violations of the NVRA [but] also gave concrete figures more than sufficient to support [plaintiff's] claim").

The Notice Letter, here, provides "more than enough notice that a complete review of [DHHS] practices was needed." *Kemp*, 841 F. Supp. 2d at 1334; *see also Delgado v. Gavin*, No. 12-10872, 2014 WL 1004108, at *6 (D. Mass. Mar. 14, 2014) (finding notice sufficient where

23

letter alleged systematic failure and pointed to allegedly noncompliant text in agency manuals and "statewide aggregate statistics" to supports its allegations); *Scales*, 150 F. Supp. 2d at 852 (finding that the mere statement that agencies failed to provide voter registration services to clients that made their initial application for services at those agencies "is sufficient to dispense with the notice provisions of the NVRA").

Finally, Defendant Strach once again argues that Organizational Plaintiffs' use of the term "upon information and belief" in their Complaint is overly vague and thus fails to meet the pleading standards set forth in *Iqbal* and *Twombly*. (ECF No. 29 at 3, 6, 11, 12, 16, 19.) The Court has addressed this issue in the preceding section. *See* § IV.B, *supra*.

This Court, having examined the Notice Letter and the allegations in Plaintiffs' Complaint (ECF No. 1 ¶¶ 91, 92, 95), concludes that the Plaintiffs have demonstrated that the May 8, 2015 Notice Letter satisfies the pre-suit notice requirement of Section 7 of the NVRA. Accordingly, Defendants' motion to dismiss on notice grounds is denied. Based on this Court's conclusion, it need not address Defendant's Eleventh Amendment immunity argument.

### D. Whether the NVRA Applies to Remote as well as In-Person Transactions?

Defendant Strach argues that Plaintiffs' allegations that the NVRA applies to public assistance agency remote transactions by mail, telephone and online and to DMV transactions online lack statutory support. (ECF No. 29 at 17.) Plaintiffs argue that Section 7 of the Act explicitly requires that voter registration services be provided with "each" covered transaction and such services are not limited to only those transactions that are in-person as argued by Defendant Strach. (ECF No. 64 at 21–22.) Plaintiffs likewise argue that the plain meaning of

24

Section 5 requires that voter registration services must be offered with "each" covered transaction irrespective of whether that transaction occurs in-person or remotely. (*Id.* at 27–28.)

1. *Section 7*

Section 7 of the NVRA states that "all offices in the state that provide public assistance" must provide voter registration services alongside "each application for such service or assistance, and with each recertification, renewal, or change of address relating to such service or assistance." 52 U.S.C. § 20506(a)(6)(A). Defendants point to the word "office" used in § 20506(a)(1) as meaning only physical locations. (ECF No. 77 at 11.)

The Fourth Circuit, however, has held that the word "office" as used in the NVRA has a broad definition. *See Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283, 290 (4th Cir. 1998). In *Allen*, the court read "office" as meaning "a subdivision of a government department or institution." *Id.* The court then observed that "the use of the word 'all' to modify 'offices' suggests an expansive meaning because 'all' is a term of great breadth." *Id.* Such a plain meaning "cannot be circumvented unless we have the rare instance where there is a clearly expressed Congressional intent to the contrary or when a literal application of the plain language would frustrate the statute's purpose or lead to an absurd result." *Id.* at 291 (citing *In re Vial*, 115 F.3d 1192, 1196 (4th Cir. 1997) (en banc)).

Further, the language of paragraph (a)(6) of Section 7 provides that state public assistance offices are required to "distribute with *each* application for such service or assistance, and with *each* recertification, renewal, or change of address form" a mail voter registration application form and a voter preference form. 52 U.S.C. § 20506(a)(6)(A) (emphasis added).

Defendant Strach argues that Section 4 of the NVRA requires states to only offer voter registration services to people who are "in person" at public assistance agencies and thus does not include remote transactions. (ECF No. 29 at 17.) Courts have held that Section 4 is "general" and "simply regulates a different requirement under the NVRA." *Kemp*, 841 F. Supp. 2d at 1330; *see also Ferrand v. Schedler*, No. 11-926, 2012 WL 1570094, at *8 (E.D. La. May 3, 2012) ("This Court finds that Section 4 does no more than identify a state's general obligation to establish procedures for voter registration . . . [and] are not intended to be exclusive."), *vacated on jurisdictional grounds sub nom. Scott v. Schedler*, 771 F.3d 831 (5th Cir. 2014). Section 7, by contrast, adds specifics on "the manner in which voter registration forms . . . must be distributed or provided." *Id.* When reading two subparts together, "normally the specific governs the general." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007). In addition, the DOJ, tasked with enforcing the NVRA, offered guidance that Defendants' positions in this matter are "simply incorrect" and both Sections 5 and 7 apply to remote as well as in-person transactions. (ECF No. 84 at 13–17.) Such guidance is "entitled to a measure of respect." *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399 (2008).

Plaintiffs allege in their Complaint the following, in pertinent part:

> The NVRA requires states to provide voter registration services with each covered public assistance transaction regardless of whether the transaction is conducted in person, *i.e.*, in a public assistance office, or by remote means such as through the Internet, by mail, or by telephone. This requirement also applies regardless of whether the transaction is conducted by a state public assistance agency or by a nongovernmental entity with which the state agency has contracted. *See* 52 U.S.C. § 20506(a)(2).

26

DHHS is also failing to comply with its Section 7 obligations because it does not provide the required voter registration services to each client conducting a covered transaction through remote means, *i.e.* through the Internet, telephone, mail or any other process in which the client does not appear in person at the office of DHHS or a DHHS grantee.

(ECF No. 1 ¶¶ 50, 65.)

The Court concludes that Defendants have failed to demonstrate that there is no statutory support for Plaintiffs' claim that Section 7 applies to transactions by mail, telephone and online. Thus, Organizational Plaintiffs' allegations in the Complaint have sufficiently alleged a cognizable claim that Section 7 applies to remote as well as in-person transactions. Accordingly, Defendant Strach's motion to dismiss on this ground is denied.

*2. Section 5*

Defendant Strach uses largely the same arguments to advance the theory that Section 5 of the Act is also limited to in-person transactions. Section 5 provides in relevant parts:

(a)(1) *Each* State motor vehicle driver's license application (including *any* renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration . . .

…

(d) *Any* change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration with respect to elections for Federal office for the registrant involved unless the registrant states on the form that the change of address is not for voter registration purposes.

52 U.S.C. §§ 20504(a), (d) (emphasis added).

As with the words "each" and "all" in Section 7, the words "each" and "any" in Section 5 require voter registration services to be provided with all covered transactions. The word "each" applies to applications and renewals and, as with Section 7, signifies that the requirements adhere to every covered transaction, regardless of where they occur. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (noting that "identical words used in different parts of the same act" are deemed to possess "the same meaning" (quotation omitted)).

Section 5(d)'s requirement that "any" change of address be coupled with a voter registration update, appears to encompass all address changes without regard to where or how they occur. Because Congress did not include restrictive language in Section 5, the word "any" must be given its ordinary meaning. *See United States v. Gonzalez*, 520 U.S. 1, 5 (1997) (noting that, absent an instruction to the contrary, "'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind'").

Defendant again argues that use of the word "office," this time in Section 5(c)(2)(D)(iii), requires a reading that Section 5 applies to in-person transactions. (ECF No. 29 at 18.) The subpart in question reads, in relevant part:

> The voter registration application portion of an application for a State motor vehicle driver's license . . . shall include, in print that is identical to that used in the attestation portion of the application . . . a statement that if an applicant does register to vote, *the office* at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes[.]

52 U.S.C. § 20504(c)(2)(D)(iii) (emphasis added).

Regarding Section 5, Plaintiffs' Complaint provides, among other things:

28

Section 5 requires state DMV offices to provide individuals with voter registration services whenever they apply for, renew, or change their address on a driver's license or state-issued identification card. *See* 52 U.S.C. §§ 20504(a)(1), (d).

(ECF No. 1 ¶ 71.)

Further, Plaintiffs' Complaint sets forth specific alleged violations related to covered transactions online and through its website. (*See id.* ¶¶ 87–89.)

For the reasons articulated in the previous discussion of Section 7, the Court concludes that Defendant Strach's argument that the reference to "office" supports her position that the Act refers only to in-person transactions, is not persuasive. Moreover, the reference to "an office" in this subpart does not reduce or diminish the mandates in Section 5(a) or (d) that "each" application and "any" change of address be accompanied by voter registration services.

For these reasons, this Court concludes that Plaintiffs have sufficiently pled a plausible claim that Sections 5 and 7 of the NVRA apply equally to in-person and remote covered transactions. Accordingly, Defendant Strach's motion to dismiss is denied.

### E. Third-Party Contractors Claims

Defendant Strach argues that Organizational Plaintiffs' claims that "[o]n information and belief, DHHS . . . does not ensure that voter registration services are provided to individuals engaged in transactions with third-party contractors," (ECF No. 1 ¶ 64), is devoid of any allegation showing a concrete, particularized injury, (ECF No. 29 at 19–20). Further, Strach argues that Organizational Plaintiffs lack standing to bring such a claim. (*Id.* at 19.)

In paragraphs 50 and 64 of their Complaint, Organizational Plaintiffs allege the following:

The NVRA requires states to provide voter registration services with each covered public assistance transaction regardless of whether the transaction is conducted in person, *i.e.*, in a public assistance office, or by remote means such as through the Internet, by mail, or by telephone. This requirement also applies regardless of whether the transaction is conducted by a state public assistance agency or by a nongovernmental entity with which the state agency has contracted. *See* 52 U.S.C. § 20506(a)(2).

. . .

On information and belief, DHHS is further violating Section 7 because it does not ensure that voter registration services are provided to individuals engaged in covered transactions with third-party contractors. Regardless of whether a public assistance transaction is conducted by DHHS or by a nongovernmental entity with which the state agency has contracted, the NVRA requires DHHS to provide voter registration with each covered transaction. To enroll individuals in SNAP, DHHS has contracted with community-based organizations, providing them funding to facilitate the SNAP application process. On information and belief, these third-party contractors do not provide any of the required NVRA voter registration services, because DHHS has not directed or equipped them to do so, nor does DHHS itself provide voter registration services to clients who conduct transactions with third-party contractors at any point in the application process.

(ECF No. 1 ¶¶ 50, 64.)

Taken as true, the allegations in these paragraphs are sufficient to support a claim that DHHS' responsibility under the NVRA applies to all covered transactions and does not cease because DHHS delegates to non-governmental agencies the authority to conduct transactions which are covered under the NVRA. To conclude otherwise, as argued by Plaintiffs, would allow agencies to merely delegate away their responsibility under the Act to third-party

contractors. The harm to Organizational Plaintiffs would be the same as alleged with respect to all of its Section 7 claims earlier discussed. *See* § IV.B, *supra*.

Thus, the Court concludes that Plaintiffs' Complaint sufficiently alleges a plausible claim with respect to third-party contractors and Defendant Strach's motion to dismiss this claim is denied.

## V. AGENCY DEFENDANTS' MOTION TO DISMISS

Agency Defendants move to dismiss Plaintiffs' Complaint based on Eleventh Amendment immunity and, in the alternative, based on their assertion that they are "improper parties" to the lawsuit. (*See* ECF No. 32 at 4–7.) As to the Agency Defendants' Eleventh Amendment immunity argument, they contend that they have no special relation to the implementation of the NVRA requirements and, thus, the *Ex parte Young* exception does not apply to Plaintiffs' claims against them. (ECF No. 32 at 7.) Defendants further argue that in North Carolina, the Executive Director of the State Board of Elections, as the Chief State Election Official, is solely responsible for enforcing the NVRA requirements. (ECF No. 32 at 5.) In response, Plaintiffs argue that "the NVRA does not limit liability to a single state official" given that the NVRA's "comprehensive voter registration scheme . . . places complementary obligations on . . . agencies like DHHS, DOT, and DMV." (ECF No. 64 at 43–44.)

As an initial matter, this Court has concluded that the Complaint sufficiently alleges ongoing violations of the NVRA, a federal law, and seeks certain prospective injunctive relief, (ECF No. 1 ¶¶ 96–105; *see also id.* at 34–37.) Having satisfied this element of the *Ex parte Young* inquiry, the Court next considers whether the requisite special relation exists between

the Agency Defendants and enforcement of the NVRA. While a general duty to enforce the law is not enough to satisfy the *Ex parte Young* exception, *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001), the Supreme Court has held that "[t]he fact that the state officer, by virtue of his office, has *some* connection with the enforcement of the act, is the important and material fact" to be considered, *Young*, 209 U.S. at 157 (emphasis added). This duty of enforcement need not be explicitly "declared in the same act which is to be enforced" for, whether the officer's connection with enforcement of the act "arises out of the general law, or is specially created by the act itself, is not material so long as it exists." *Id.*

The parties in this case agree that Defendant Strach, as the Executive Director of the State Board of Elections, "is the 'Chief State Election Official' . . . responsible for coordination of State responsibilities under the [NVRA]." N.C. Gen. Stat. § 163-82.2. However, the Agency Defendants contend that North Carolina law does not require "the NCDHHS, NCDMV, or NCDOT, or any related official to implement or enforce the NVRA." (ECF No. 32 at 5.) The Court finds this argument unpersuasive because, as argued by Plaintiffs, both the NVRA and North Carolina statutes explicitly require implementation of specific voter registration procedures by the DMV, DOT, and DHHS. *See* 52 U.S.C. §§ 20504, 20506; N.C. Gen. Stat. §§ 163-82.19, 163-82.20; *see also S.C. Wildlife Fed'n*, 549 F.3d at 333 (finding that "[a]s the administrative head of the agency with the responsibility for carrying out its policies and representing the agency in its dealings with the federal government, [the Director of South Carolina's Department of Transportation] possesses a sufficient connection to the alleged violation of federal law"); *Fish v. Kobach*, -- F. Supp. 3d --, 2016 WL 2866195, at *13 (D. Kan. May 17, 2016) (holding that the DMV is a responsible party under the NVRA and

32

noting that "the DMV and Secretary of State's Office are engaged in a cooperative effort to process motor voter registration applications" and that "§ 5 of the NVRA specifically tasks the DMV with transmittal of voter registration applications to the Chief Election Official for the State"), *aff'd*, 2016 WL 6093990 (10th Cir. Oct. 19, 2016).

Further, the Complaint alleges that the agency heads are responsible for ensuring compliance with the NVRA. Specifically, Plaintiffs allege the following:

> Defendant Rick Brajer . . . is the Secretary of the North Carolina DHHS. . . . DHHS and its offices are also a designated voter registration agency under both federal law and the North Carolina General Statutes. . . . In his official capacity, Mr. Brajer is responsible for overseeing the compliance of North Carolina's public assistance agencies with the NVRA. This includes ensuring that voter registration materials and services mandated by Section 7 of the NVRA are made available through DHHS.

> Defendant Kelly Thomas is North Carolina's Commissioner of Motor Vehicles. In this capacity, Mr. Thomas oversees the daily operations of the North Carolina DMV . . . [and] the DMV is required to provide voter registration services under Section 5 of the NVRA and the North Carolina General Statutes. . . . In his official capacity as North Carolina's Commissioner of Motor Vehicles, Defendant Thomas is responsible for ensuring that North Carolina's DMV offices are in compliance with Section 5 of the NVRA and North Carolina law. Defendant Thomas is also responsible for ensuring that all DMV voter registration materials are timely forwarded to the appropriate County Board of Elections.

> Defendant Nick Tennyson . . . is North Carolina's Secretary of Transportation. . . . In his official capacity as Secretary of Transportation, Defendant Tennyson supervises the operations of the DMV, including its voter registration obligations, and shares responsibility with Defendant Thomas for ensuring that North Carolina's DMV offices are in compliance with Section 5 of the NVRA and North Carolina law (*i.e.*, that the offices provide the requisite services, process materials, and timely forward them to the appropriate County Board of Elections).

33

(ECF No. 1 ¶¶ 42–44.)

Plaintiffs plausibly allege in the Complaint that the Agency Defendants bear responsibility for ensuring compliance with the NVRA's voter registration requirements as to state motor vehicle agencies and public assistance agencies. The Court therefore finds that, on its face, Plaintiffs' Complaint alleges sufficient facts which, taken as true as we are required to do on a motion pursuant to 12(b)(6), establish a special relation between the Agency Defendants and enforcement of the Act. Accordingly, the Court finds that the *Ex parte Young* exception to Eleventh Amendment immunity is applicable and the Agency Defendants' motion to dismiss on this ground will be denied.

Defendants argue, in the alternative, that "[e]ven if it is determined that the Eleventh Amendment does not bar plaintiff's [sic] claims, defendant Strach is the proper defendant in this case, and plaintiffs' claims against [the Agency Defendants] must be dismissed under [Fed. R. Civ. P. 12(b)(6)]." (ECF No. 32 at 7–8.) Plaintiffs argue that their Complaint survives a Rule 12(b)(6) motion to dismiss because it contains "sufficiently specific" factual allegations "that the Agency Defendants are failing to meet their obligations under the NVRA." (ECF No. 64 at 45.) The Court agrees with the Plaintiffs.

As to DHHS, in their Complaint, Plaintiffs allege, among other things, that:

> DHHS offices . . . routinely fail to (i) provide forms that invite DHHS clients engaging in covered transaction [sic] to register to vote; (ii) provide voter registration forms to DHHS clients who do not decline in writing to register to vote; (iii) provide the required assistance to clients in completing the voter registration forms; and (iv) make the disclosures mandated by 52 U.S.C. § 20506(a)(6)(B).

(ECF No. 1 ¶ 54.)

As to DMV, Plaintiffs allege, among other things, that:

> [T]he Section 5 Defendants' non-compliance includes but is not limited to the failure to keep complete and accurate records of the voter registration applications and change of address information they collect, failure to timely transmit voter registration and change of address information to the Board of Elections, and/or failure to properly train employees on their obligation to provide voter registration services.

(ECF No. 1 ¶ 84.)  Despite Defendants' assertion that the Complaint fails to allege an NVRA violation "as it pertains to the [Agency Defendants]," (ECF No. 32 at 8), the above excerpts demonstrate that, indeed, Plaintiffs' Complaint sets forth factual allegations against these Defendants which, if true, establish violations of the requirements set forth in the NVRA, as well as violations of North Carolina's implementing statutes.  The Court therefore finds that the allegations in Plaintiffs' Complaint sufficiently state a plausible claim for relief against the Agency Defendants, and as such, they are proper parties to this suit.  Accordingly, the Agency Defendants' motion to dismiss on this ground will be denied.

The Court also notes that in their Response to the Agency Defendants' Motion to Dismiss, Plaintiffs seemingly contend that Congress has abrogated Eleventh Amendment immunity as to claims against the Agency Defendants under the NVRA.  (ECF No. 64 at 40–41.)  Having concluded, however, that the Agency Defendants' motion to dismiss will be denied on the grounds discussed above, the Court need not reach a determination on the issue of abrogation.

Based on the preceding discussions, this Court denies the Agency Defendants' motion to dismiss.

## VI.  MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs request that this Court grant a preliminary injunction prior to the November 8, 2016, election to remedy alleged violations of Sections 5 and 7 of the NVRA.

A preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power that is only to be employed in the limited circumstances that demand it. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524 (4th Cir. 2003), *abrogated on other grounds by eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).  Whether to grant this relief is in the sound discretion of the court. *Winter*, 555 U.S. at 24.  Courts generally employ preliminary injunctions for the limited purpose of preserving the status quo during the course of litigation in order to prevent irreparable harm and to preserve the ability of the court to render meaningful relief on the merits. *In re Microsoft Litig.*, 333 F.3d at 525.  The Fourth Circuit has defined the status quo as the "last uncontested status between the parties which preceded the controversy." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (quoting *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012)).  The party seeking a preliminary injunction bears the burden of justifying such relief. *Wagner v. Bd. of Educ.*, 335 F.3d 297, 302 (4th Cir. 2003).

To prevail on a motion for preliminary injunction, a party must establish that (1) the party is likely to succeed on the merits, (2) the party is likely to suffer irreparable harm without preliminary injunctive relief, (3) the balance of the equities tips in the party's favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.  "[A] clear showing" of likelihood of success on the merits and irreparable harm is required in addition to satisfying the other

36

factors before a preliminary injunction can be entered. *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346–47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010).

Such a remedy "does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32. "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)). In doing so, the Supreme Court has instructed federal courts to "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* Even in cases where a plaintiff has shown likelihood of success on the merits and irreparable harm, the balance of equities and the public interest factors can weigh in favor of denying a preliminary injunction. *See id.* at 23–24, 31 n.5, 32.

## A. Likelihood of Success on the Merits

Plaintiffs contend that Defendants have failed to provide voter registration services with respect to covered transactions performed at DMV and DHHS in violation of Section 5 and Section 7 of the NVRA.[9] In particular, Plaintiffs assert that Defendants, Strach, Thomas, and Tennyson ("Section 5 Defendants"), have violated the NVRA by: (1) failing to collect and/or transmit voter registration applications; and (2) failing to provide online voter registration opportunities. (ECF No. 53 at 2; ECF No. 100 at 2.) Organizational Plaintiffs

---

[9] A "covered transaction" is understood to mean an initial application for a driver's license (including renewals), a change of address submitted to the DMV, and initial applications for public benefits as well as a "recertification, renewal, or change of address form relating to such service or assistance." 52 U.S.C. §§ 20504(a), (d), 20506(a)(6)(A).

contend that Defendants, Strach and Brajer ("Section 7 Defendants"), have violated the NVRA by: (1) failing to provide voter registration services for online and telephone transactions ("remote transactions"); (2) failing to provide meaningful voter registration disclosures; and (3) failing to provide voter registration applications unless the voter declines in writing to receive the application. (ECF No. 53 at 1–2; ECF No. 100 at 2.)

Before turning to the merits of the alleged violations, the Court must address two threshold issues raised by Defendants: pre-suit notice and standing. Section 7 Defendants argue that Organizational Plaintiffs' Section 7 Notice Letter was not sufficient under the NVRA and thus Organizational Plaintiffs are not entitled to preliminary injunctive relief.[10] (ECF No. 68 at 7; ECF No. 69 at 17.) They also argue that both Individual and Organizational Plaintiffs lack standing to assert violations of Sections 5 and 7. (ECF No. 68 at 11–13; ECF No. 69 at 14.) Although the Court concluded that Plaintiffs' Complaint contained plausible allegations of both notice and standing sufficient to withstand dismissal at the Rule 12(b)(1) motion to dismiss stage, the standard for determining whether Article III standing exists at the preliminary injunction stage carries a higher burden, *i.e.,* a clear likelihood of success. The Court first addresses pre-suit notice.

1. *Was Organizational Plaintiffs' Section 7 Notice Letter Sufficient to Confer Statutory Standing under the NVRA?*

The NVRA provides for a "[p]rivate right of action" for any person "who is aggrieved by a violation" of the NVRA, provided that such individual give "written notice of the violation to the chief election official of the State involved." 52 U.S.C. § 20510(b)(1). "No

---

[10] Defendants do not contest the Section 5 Notice Letter.

standing is therefore conferred if no proper notice is given."[11] *Scott v. Schedler*, 771 F.3d 831, 835 (5th Cir. 2014) (quoting *Ga. State Conference of NAACP v. Kemp*, 841 F. Supp. 2d 1320, 1335 (N.D. Ga. 2012)).

Section 7 Defendants argue that, with respect to in-person transactions, the pre-suit notice letter did not provide them with specifics about Defendants' alleged violations of the NVRA. In particular, they argue that the notice letter did not provide the "field office locations and never connected allegations of noncompliance with an office, making it impossible for [them] to correct any alleged violation in relation to a specific office." (ECF No. 68 at 7; ECF No. 69 at 17.) They explain that "[t]he specifics about each location are material for purposes of rectifying noncompliance within the 90 day statutory window" and that "[s]uspending a specificity requirement allows Plaintiffs to re-package their notice letter as a complaint without Plaintiffs having to prove that noncompliance remained an issue at those offices after the 90 days." (ECF No. 68 at 7.)

While "[t]he apparent purpose of the notice provision is to allow those violating the NVRA the opportunity to attempt compliance with its mandates before facing litigation," *Project Vote, Inc. v. Kemp*, --- F. Supp. 3d ----, 2016 WL 5092512, at *21 (N.D. Ga. Sept. 20, 2016), the express language of the NVRA does not include the "specificity requirement" Section 7 Defendants press in this case. *See* 52 U.S.C. § 20510(b)(1). Further, Defendants' argument appears to miss the point of Organizational Plaintiffs' notice letter. The general

---

[11] The Court notes that Section 7 Defendants also argue that Organizational Plaintiffs' failure to give proper notice bars their claims under the Eleventh Amendment. (ECF No. 68 at 8.) However, Defendant Strach provides no cases to support her argument. The Court will address this argument within the context of statutory standing under the NVRA.

proposition advanced by Organizational Plaintiffs in the Notice Letter was that North Carolina's compliance with the NVRA had begun to decline in recent years because DHHS was "systemically failing to provide the voter registration services mandated by Section 7 [of] the NVRA." (ECF No. 27, Ex. 1 at 3.) The letter stated that Organizational Plaintiffs had conducted field investigations at 19 public assistance offices in 11 North Carolina counties. (*Id.* at 4.) Of the offices visited, the letter asserted that DHHS had "consistently fail[ed] to distribute voter registration applications to public assistance clients, as required by the NVRA." (*Id.*) The letter also provided figures to support its assertions: (1) 146 (74.5%) of the public assistance clients interviewed did not receive an "offer of voter registration of any kind"—that is, those interviewed did not see any voter registration questions, were not asked whether they would like to receive a voter registration application, and did not receive an application; (2) 74% of the interviewees claimed that they did not decline the opportunity to register to vote, either verbally or in writing; and (3) "six of the 19 offices (31.6%) lacked even the materials, procedures, and/or infrastructure to comply with the NVRA." (*Id.* at 4–5.) Section 7 Defendants argue that such figures represent "out-dated information" because the field investigations took place in October 2014. (ECF No. 68 at 19–20.) They, therefore, argue that Organizational Plaintiffs' reliance on such data in their declarations cannot support the immediacy of harm requirement for issuance of a preliminary injunction. (*Id.* at 21–24.) Organizational Plaintiffs, however, are not requesting that the Court rely exclusively on the 2014 data, but rather use this data as evidence of ongoing violations. (*See* ECF No. 100 at 28.)

Section 7 Defendants next argue that the Court should not consider the declarations offered by Plaintiffs because they contain hearsay and thus are not sufficiently reliable. (ECF

No. 68 at 22.) However, "district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 726 (4th Cir. 2016), *stay and recall of mandate granted on other grounds*, 136 S. Ct. 2442 (2016). Because the data contained in these declarations were submitted in the context of a preliminary injunction, which is "designed to prevent irreparable harm before a later trial," the Court may consider them along with the other evidence in the record, even if they contain inadmissible evidence. *Id.* at 725–26; *see Simone v. VSL Pharms., Inc.*, No. TDC-15-1356, 2016 WL 3466033, at *16 (D. Md. June 20, 2016) (characterizing hearsay evidence as admissible in the preliminary injunction context, though "carr[ying] less weight").

Organizational Plaintiffs' Section 7 Notice Letter reveals that Section 7 Defendants had sufficient notice that certain public agency offices were not complying with the NVRA, especially in light of the data provided in the letter which appeared to support Plaintiffs' allegations that voter registration at public assistance agencies had declined by 69% from 2011 to 2014,[12] (ECF No. 27, Ex. 1 at 4). Thus, Organizational Plaintiffs have made a clear showing of likelihood of success that the Section 7 Notice Letter satisfies the NVRA's notice requirement. *See Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919, 922 (S.D. Ind. 2012) (finding

---

[12] The Court notes that, according to Defendants, voter registration increased in 2015 to 33,591 and is on pace to reach a comparable level in 2016. (ECF No. 69-2 ¶ 8.) This information, however, does not change the Court's analysis as even the higher numbers from 2015 represent a 23% decline from 2011 registration numbers.

notice requirement satisfied when the notice letter "set[] forth the reasons for [plaintiff's] conclusion" that the defendant failed to comply with the NVRA).[13]

## 2. Do Plaintiffs have Article III Standing?

As a threshold issue, Defendants next argue that Plaintiffs lack Article III standing. On a motion for a preliminary injunction, a plaintiff's "burden of showing a likelihood of success on the merits . . . necessarily . . . depends on a likelihood that plaintiff has standing." *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (quoting *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987)); *see Bennett v. Spear*, 520 U.S. 154, 167–68 (1997) ("[E]ach element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992))). As earlier stated, the three elements required to establish Article III standing are "(1) injury in fact, (2) causation, [and] (3) redressability," *Townes v. Jarvis*, 577 F.3d 543, 546–47 (4th Cir. 2009), and the presence of these three elements must continue throughout the entire case, otherwise the case becomes moot, *N.C. Right to Life PAC v. Leake*, 872 F. Supp. 2d 466, 470–71 (E.D.N.C. 2012).

---

[13] *See, e.g.*, *Delgado v. Gavin*, No. 12-cv-10872, 2014 WL 1004108, at *6–7 (D. Mass. Mar. 14, 2014) (holding notice sufficient where letter alleges systematic failure and points to allegedly noncompliant text in agency manuals and "statewide aggregate statistics" to supports its allegations); *Kemp*, 841 F. Supp. 2d at 1334 (holding that notice letter was sufficient, explaining that the "general proposition . . . that Georgia was not complying with the mandates of the NVRA . . . with respect to providing voter registration services . . . is set out clearly in the notice letter," which also provided concrete supporting figures); *Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Scales*, 150 F. Supp. 2d 845, 852 (D. Md. 2001) (finding allegations "that DSS failed to provide voter registration services to its clients," *i.e.*, 21 out of 670 clients, sufficient to satisfy the NVRA's notice requirement).

42

*a. Individual Plaintiffs*

Individual Plaintiffs have alleged only Section 5 violations. There is little question that Individual Plaintiffs have demonstrated a clear likelihood of success on the first element, *i.e.*, that they have suffered an injury-in-fact; they claim that because of Section 5 Defendants' noncompliance with the NVRA, they were denied the right to vote in the 2014 General Election, (ECF No. 100 at 26). *See Charles H. Wesley Educ. Found. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) (holding that an alleged violation of rights conferred by the NVRA is sufficient to show standing). Likewise, Individual Plaintiffs have established a likelihood of demonstrating causation—that is, their alleged injuries are traceable to Section 5 Defendants' actions. *Id.* As to the last factor, redressability, which is satisfied if the alleged injury can be redressed by a favorable conclusion, it is not quite as clear as the first two factors. Individual Plaintiffs were injured during the 2014 election, and this Court "has no power to alter the past," *Herron for Congress v. FEC*, 903 F. Supp. 2d 9, 13 (D.D.C. 2012). Further, since the time of their alleged injury, the record shows that each of the Individual Plaintiffs has registered and voted in the March 2016 Primary Election. (ECF No. 67 ¶¶ 23–25.) To demonstrate that their claims are not moot, Individual Plaintiffs must therefore establish that their injury is likely to recur in the future and is "capable of evading review."

Under this exception to the mootness doctrine, Individual Plaintiffs must show a likelihood that "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Davis v. FEC*, 554 U.S. 724, 735 (2008) (quoting *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007)). Plaintiffs have shown a clear likelihood

that they can clear the first hurdle, as this case, like many election cases, could not be fully litigated prior to the 2014 Election. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1343 (11th Cir. 2014); *Johnson v. FCC*, 829 F.2d 157, 159 n.7 (D.C. Cir. 1987). Individual Plaintiffs argue, however, that "[t]hey are likely to be aggrieved in the future should they relocate or conduct a covered transaction at the DMV." (ECF No. 53 at 22.) While their assertion that they may move sometime in the future does appear speculative, the Court concludes that there is a reasonable expectation that Individual Plaintiffs will conduct a covered DMV transaction in the future and thus could experience the same alleged transmission issue which they believe caused their votes not to be counted in 2014. *See Arcia*, 772 F.3d at 1341 (finding that the individual had standing, explaining that although the individual plaintiffs were not prevented from voting, there was a "realistic probability that they would be misidentified due to unintentional mistakes in the Secretary's data-matching process"). The Court concludes, therefore, that Individual Plaintiffs have demonstrated a likelihood of success in establishing standing to assert the alleged violations of Section 5.

### b. Organizational Plaintiffs

An organization can show that it has suffered an injury-in-fact if the defendant's practices have hampered its stated objectives, causing it to redirect its resources. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also S. Walk at Broadlands Homeowner's Ass'n*, v. *OpenBand at Broadlands, LLC*, 713 F.3d 175, 183 (4th Cir. 2013); *Lane v. Holder*, 703 F.3d 668, 674–75 (4th Cir. 2012). At the hearing on the preliminary injunction, this Court asked counsel for Organizational Plaintiffs to address the "resources that have been diverted by virtue of what [they] contend are the alleged wrongs of the Defendants." (ECF No. 118 at 165:5–7.)

44

Counsel responded that Organizational Plaintiffs could provide additional declarations on this issue. (*Id.* at 165:15–18.) Eight days later, Organizational Plaintiffs submitted second declarations. Although Section 7 Defendants move to strike these declarations, (ECF No. 116), the Court, in its discretion, will consider the second declarations along with the first ones that were filed.[14]

After reviewing the declarations, the Court is persuaded that Organizational Plaintiffs have demonstrated a likelihood of success in establishing standing to assert their claims of alleged violations of Section 5 and Section 7, with one exception as discussed below. APRI has provided specific details related to its mission and work, explaining that voter registration, while an important piece of its mission, "is far from [its] only important goal." (ECF No. 112-1 ¶ 12.) According to APRI, it has used $60,000 since May 2016 on voter registration, which it contends could have been used to support its other charitable work had Defendants fulfilled their obligations under the NVRA. (*Id.* ¶¶ 16–17.) APRI states that in 2015 it conducted door-to-door voter registration canvassing of residents who were not registered to vote where its workers encountered people who indicated that they had registered to vote at DMV. (*Id.*

---

[14] Section 7 Defendants argue that the declarations are untimely in that they were submitted eight days after the hearing on the motion for preliminary injunction in violation of the Court's Local Rules and the Federal Rules of Civil Procedure. (*See* ECF No. 117 at 2, 4.) Organizational Plaintiffs argue, among other things, that the "proposed supplemental filings" were discussed at the preliminary injunction hearing and thus good cause exists for their filings. (ECF No. 119 at 2–4.) The Court is not persuaded that Section 7 Defendants will suffer any prejudice from consideration of the second declarations. The Court considers the second declarations only for the limited purpose of determining whether Organizational Plaintiffs have demonstrated a likelihood of establishing standing, not whether they in fact have standing. Defendants remain free to challenge the sufficiency of the second declarations moving forward. *See Lovelace v. Lee*, 472 F.3d 174, 204 (4th Cir. 2006) (concluding that, although "it is puzzling that [the defendant] did not offer any explanation for his five-week delay, we cannot say that the district court abused its discretion in considering the late affidavit, an important document in this case").

¶ 18.)  APRI contends that, had DMV registered these voters, it would not have had to spend approximately $30 per door in expenses.  (*Id.*)  Likewise, Democracy North Carolina explains that it would shift its staff and resources from voter registration to other activities related to its mission, including voter empowerment and certain educational activities, if the state were to send a notice to DMV and DHHS clients informing them of opportunities to register in North Carolina and to implement the provisional ballot remedy it requested.  (ECF No. 112-2 ¶¶ 9, 14–15, 17.)  Democracy North Carolina's declaration identifies a number of areas to which it would redirect its resources if the Court granted its requested injunctive relief with respect to DMV and DHHS.  (*See id.* ¶ 15.)  Action NC's declaration states that its mission is to reduce the root causes of poverty, underdevelopment, and social and economic inequality, among other things, and that it started a "21 week voter registration program," registering voters at various sites, including DSS offices, Crisis Assistance Ministry, and homeless shelters. (ECF No. 112-3 ¶¶ 8, 12.)  Action NC explains that it would not have selected these sites if the state would have provided these individuals with voter registration services that complied with the NVRA and further it would redirect its efforts to other activities if the state would mail certain notifications related to voter registration to DHHS and DMV clients.  (*Id.* ¶¶ 13–14.)

46

Based on the declarations outlined above, the Court concludes that Organizational Plaintiffs have demonstrated a likelihood of success on standing to pursue their claims of alleged violations of Section 5[15] and Section 7 with one exception.

With respect to their claim that Section 7 Defendants are failing to provide meaningful voter registration disclosures, the record does not contain sufficient evidence that the process in which the disclosures are provided is a source of Organizational Plaintiffs' injury that can be traced to DHHS's actions. Specifically, with respect to disclosures, Organizational Plaintiffs contend that during online and in-person transactions, Section 7 Defendants are not providing the mandatory disclosures until the end of the transaction and therefore the client is "not receiving the statutory form that contains the voter preference question together with the disclosure of rights." (ECF No. 100 at 6, 11.) Organizational Plaintiffs also contend that Section 7 Defendants "bury the disclosures in a five page, single-spaced document called "Rights and Responsibilities." (*Id.* at 6.) It is unclear, however, how this process in which the required disclosures are provided to voters has perceptibly impaired Organizational Plaintiffs' voter registration activities. *See Havens Realty*, 455 U.S. at 379 (explaining that an organization has alleged sufficient injury where defendants' actions "perceptibly impaired" organization). Organizational Plaintiffs have not sufficiently demonstrated that they reallocated resources to engage in any of the voter registration activities described in their declarations to counteract

---

[15] Section 5 Defendants also argue that both Individual and Organizational Plaintiffs lack standing with respect to Defendants' alleged violations of Section 5 relating to remote transactions. (ECF No. 68 at 12.) However, the NVRA does not make distinctions between one type of covered transaction and another. At this stage in the litigation, the Court's conclusion that Individual and Organizational Plaintiffs have demonstrated a likelihood of success in establishing standing to challenge Defendants' alleged Section 5 violations extends to both in-person and remote transactions.

DHHS's alleged failure to properly implement the NVRA's required disclosures during covered transactions. *See ACORN v. Fowler*, 178 F.3d 350, 360 (5th Cir. 1999) (explaining that nonprofit's evidence was insufficient to establish standing to bring suit against state for allegedly violating the NVRA by failing to, among other things, include voter registration forms with mail-in-driver's license applications, in the absence of evidence that nonprofit engaged in activities as a direct result of state's alleged noncompliance with NVRA). Thus, at this stage in the litigation, the record is not sufficiently developed for this Court to conclude that Organizational Plaintiffs have made a clear showing of standing on their claim that DHHS is failing to provide meaningful NVRA disclosures.

### 3. *Are Sections 5 and 7 Applicable to Remote Transactions?*

Plaintiffs contend that, until January 2016,[16] Section 5 Defendants failed to provide voter registration services for covered transactions performed through DMV's online portal.[17] (ECF No. 100 at 9; *see* ECF No. 118 at 109.) In addition, they argue that Section 7 Defendants have failed to provide compliant voter registration services during covered remote transactions. (ECF No. 100 at 3.) Defendants argue that the NVRA only applies to in-person transactions and not to remote ones. (ECF No. 104 at 6; ECF No. 105 at 7.) This is an issue of first impression in this Circuit. Further, though this Court has concluded that Plaintiffs

---

[16] According to Plaintiffs, prior to January 2016, DMV did not offer online voter registration that complied with the NVRA. (ECF No. 53 at 11; *see* ECF No. 100 at 9.)

[17] Plaintiffs also assert that DMV's online change of address services is not compliant with the NVRA but that they are not seeking preliminary relief with respect to this issue at this time. (ECF No. 118 at 109.)

have pled a plausible claim that Sections 5 and 7 of the NVRA apply equally to in-person and remote transactions,[18] a showing of a likelihood of success on the merits for a preliminary injunction demands a higher standard. *See Winter,* 555 U.S. at 22 (explaining that a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief"). Therefore, the Court must look anew at Plaintiffs' argument to determine if they make a clear showing of a likelihood of success on these claims.

An analysis of whether the NVRA applies to remote transactions must start with the plain text of the statute itself. *Jimenez v. Quarterman,* 555 U.S. 113, 118 (2009). As a general rule, when the terms of a statute are unambiguous on their face, then the court's inquiry is complete, *United States v. James,* 834 F.2d 92, 92 (4th Cir. 1987), and the court must enforce the statute according to its terms, *Jimenez,* 555 U.S. at 118. "Only if [the court] determine[s] that the terms of a statutory provision are ambiguous [is the court] then permitted to consider other evidence to interpret the meaning of the provision, including the legislative history and the provision's heading or title." *United States v. Hatcher,* 560 F.3d 222, 226 (4th Cir. 2009).

Applying these principles of statutory interpretation to this case, the Court finds that Plaintiffs are likely to succeed on the merits of their claim that the NVRA applies to remote covered transactions. The plain language of Section 5 states that "[e]*ach* State motor vehicle driver's license application (including *any* renewal application) . . . shall serve as an application for voter registration" and that "[a]*ny* change of address form submitted . . . shall serve as notification of change of address for voter registration." 52 U.S.C. §§ 20504(a)(1), (d)

---

[18] *See* Motion to Dismiss, § IV.D, *supra.*

(emphasis added).  Similarly, Section 7 of the NVRA states voter registration agencies that "provide[] service or assistance in addition to conducting voter registration shall . . . distribute with *each* application . . . and with *each* recertification, renewal, or change of address . . . the mail voter registration application form . . . unless the applicant, in writing, declines to register to vote." 52 U.S.C. § 20506(a)(6)(A) (emphasis added).  Congress' use of the word "each" and "any" throughout these sections is instructive.  The ordinary meaning of the word "each" is "every (individual of a number) regarded or treated separately."[19]  Likewise, "any" is typically understood to mean "each without exception (*of* the specified kind); every single; each and every."[20]  The words "each" and "any," as used in the NVRA, are thus unambiguous, and reflect Congress' intent to make the Act applicable to "each" and "any" covered transaction, irrespective of whether the transaction occurs remotely or in-person.

Defendants, nevertheless, argue that Section 4, which is titled "National Procedures for voter registration for elections for Federal office," "expressly limit[s] the coverage of the NVRA to an 'application *in person* . . . at a federal, state, or nongovernmental office designated under Section 7.'"  (ECF No. 29 at 17 (quoting 52 U.S.C. § 20503).)  Section 4 specifically provides:

> (a) In general
> [E]ach State shall establish procedures to register to vote in elections for Federal office—

---

[19] *Oxford English Dictionary Online*, available at http://www.oed.com/view/Entry/58924?redirectedFrom=each#eid (last visited Oct. 22, 2016); *see also Dickenson-Russell Coal Co. v. Sec'y of Labor*, 747 F.3d 251, 258 (4th Cir. 2014).

[20] *Oxford English Dictionary Online*, available at http://www.oed.com/view/Entry/8973?redirectedFrom=any#eid (last visited Oct. 22, 2016); *see also United States v. Gonzalez*, 520 U.S. 1, 5 (1997).

> 1. by application made simultaneously with an application for a
> motor vehicle driver's license pursuant to section 20504 of this
> title;
> 2. by mail application pursuant to section 20505 of this title; and
> 3. by application in person—
> A. at the appropriate registration site designated with respect to
> the residence of the applicant in accordance with State law; and
> B. at a Federal, State, or nongovernmental office designated
> under section 20506 of this title.

52 U.S.C. § 20503(a). Defendants' argument that Section 4 limits voter registration services to in-person transactions at agencies under Section 7 is not persuasive. Contrary to Defendants' argument, Section 4 sets forth a state's general obligations and "requires the establishment of procedures for voter registration." *Kemp*, 841 F. Supp. 2d at 1330. In particular, Section 4 requires the state to establish "procedures to register to vote . . . by application in person," but does not set forth the specifics related to the "manner in which voter registration forms or voter preference forms must be distributed or provided." *Id.* Section 7 regulates those forms, adding the specifics on the manner in which they "must be distributed or provided." *Id.*

Defendants next argue that Congress' use of the phrase "the office" in Section 5 of the NVRA "delineate[s] the in-person transactions covered by Section 5." (ECF No. 29 at 18.) This phrase, when read within the context of Section 5 only shows that "*the office* at which the applicant submits a voter registration application will remain confidential." 52 U.S.C. § 20504(c)(2)(D)(iii) (emphasis added). This provision does not impose in-person limitations on the requirement that "[e]*ach* State motor vehicle driver's license application (including any renewal application) . . . shall serve as an application for voter registration" and that "[*a*]*ny* change of address form submitted . . . shall serve as notification of change of address for voter

51

registration." 52 U.S.C. §§ 20504(a)(1), (d) (emphasis added). The Court will not read isolated phrases such as "the office" as revealing Congress' intent to limit other provisions in Section 5. *See S.E.C. v. Pirate Inv'r LLC*, 580 F.3d 233, 254 (4th Cir. 2009) (explaining that statutes should not be read as a collection of isolated phrases); *see also Kemp*, 841 F. Supp. 2d at 1330–31 (refusing to infer from ambiguous phrases such as "here" and "at an office" that Congress intended to limit paragraph (a)(6) in Section 7 "to in-person transactions conducted at the physical location of the assistance offices"); *Schedler*, 2012 WL 1570094, at *11 (holding that "mandating an in person requirement to Section 7(a)(6) frustrates the plain intent of the NVRA").

Likewise, Defendants' reliance on the Fourth Circuit's decision in *National Coalition for Students with Disabilities Education & Legal Defense Fund v. Allen*, 152 F.3d 283, 290 (4th Cir. 1998), as support for their position that the Act applies to in-person transactions only is misplaced. There, the Fourth Circuit was considering whether a department or institution, such as a university, qualified as an "office" under the NVRA or whether offices providing disability services within a university were "offices" under the NVRA.[21] *Id.* at 288–89. The Fourth Circuit determined that the word "office" as used in the NVRA meant a "subdivision of a government department or institution," which includes an "office, as a subdivision of the college." *Id.* at 290, 291. Although the court was considering the term "office" in a context different from this case, the court's statement that modifying "offices" with the word "all," as

---

[21] Under Section 7, the state must designate as a voter registration agency "all offices . . . that provide State-funded programs primarily engaged in providing services to persons with disabilities." 52 U.S.C. § 20506(a)(1)(B).

Section 7 does, "suggests an expansive meaning" is applicable.  *Id.* at 290.  This case appears more supportive of Plaintiffs' arguments than the arguments raised by Defendants.

Each court that has considered this issue has concluded that the NVRA is not limited to in-person covered transactions.[22]  *See United States v. Louisiana*, --- F.3d ----, 2016 WL 4055648, at *37–*41, *48 (M.D. La. July 26, 2016); *see also Kemp*, 841 F. Supp. 2d at 1329–32. This is also the view of the United States Attorney General, who has enforcement authority under the Act.  (*See* ECF No. 84 at 8, 13.)  Though not dispositive, the United States argues that "[n]either Section 5's language nor its legislative purpose suggest that Congress intended to restrict its application to in-person transactions only and permit the denial of voter registration opportunities to all other DMV clients."  (*Id.* at 12.)  Likewise, the United States asserts that Section 7 does not "permit states to deny voter registration opportunities to citizens conducting transactions remotely."  (*Id.* at 14.)

For the reasons outlined, the Court concludes that Plaintiffs have demonstrated a likelihood of success on the merits on their claim that the NVRA applies to remote covered transactions in both the Section 5 and Section 7 contexts.

*4.  Section 5 Defendants' Alleged Failure to Collect and/or Transmit Voter Registration Applications*

Having determined Plaintiffs have shown a likelihood of success on the merits of their claim that the NVRA applies to remote transactions, the only Section 5 claim remaining involves DMV's alleged failure to transmit voter registration applications to the SBE.  (ECF

---

[22] The courts that have considered whether the Act applies to remote transactions have done so only in the context of Section 7.  It does not appear that a court has considered whether such remote transactions apply in the context of Section 5.

No. 53 at 10–11; ECF No. 118 at 109.)  The Act provides that "a completed voter registration portion of an application for a State motor vehicle driver's license accepted at a State motor vehicle authority shall be transmitted to the appropriate State election official not later than 10 days after the date of acceptance."[23]  52 U.S.C. § 20504 (e)(1).

According to Plaintiffs, DMV regularly fails to submit either the voter registration data or the scanned image of the vote registration application, which contains the customer's signature,[24] leading SBE to deem those voter registration applications incomplete.  (*See* ECF No. 100 at 23.)  Plaintiffs further contend that SBE's policy of not contacting either the DMV or the voter to correct an identified problem until 14 days after an incomplete transaction is in violation of the 10-day statutory timeframe.  (*Id.* at 23.)

As an initial matter, the details surrounding Section 5 Defendants' procedures and practices in ensuring that completed voter registration applications are successfully transmitted from DMV to SBE are unclear on this record.  According to DMV, an agreement exists between Section 5 Defendants that allegedly gives DMV a 14-day period to resolve transmittal issues.  (*See* ECF No. 104-4 at 65:18–21.)  Though SBE does not characterize this purported

---

[23] Under North Carolina law, completed applications "shall be forwarded by the Department of Transportation to the appropriate board of elections not later than five business days after the date of acceptance."  N.C. Gen. Stat. § 163-82.19(a).

[24] DMV transmits two streams containing voter registration information to SBE.  (*See* ECF No. 104-3 at 77:3–8; 78:8–14, 79:22–80:7.)  The first stream consists of data that the DMV examiner entered into DMVs system.  (*See id.*; ECF No. 66 ¶ 38.)  The second stream includes a scanned voter registration application, if the transaction was completed in-person, which has the customer's signature.  (*See* ECF No. 66 ¶¶ 38–41; ECF No. 100-2, Interrog. Resp. 12.)  For online services, there is no scanned image, so SBE facilitates a process in which a prepopulated voter registration form is mailed by county officials to those voters for their signature.  (*See* ECF No. 100-2, Interrog. Resp. 12.)

agreement this way, it is undisputed that SBE waits 14 days, at a minimum, for DMV to resolve any transmission issues before contacting the appropriate county board of election to initiate a mailing to the affected voter. (*See* ECF No. 104-3 at 80:24–82:7 (explaining that if SBE does not receive the missing information within 14 days after its attempt to resolve the issue, SBE refers the matter to the local county boards of elections to send a letter informing the affected voter that his or her application is incomplete).) Because the Act requires that a completed voter registration portion of a DMV license application must be transmitted within 10 days, a policy that allows DMV to provide such information within a 14-day window is a likely violation of the NVRA.

As it relates to the alleged transmission issues, much of the evidence in the record on which Plaintiffs rely does not clearly show a systematic failure on the part of DMV to transmit voter registration information to SBE. First, Individual Plaintiffs and Section 5 Defendants offer conflicting accounts surrounding the circumstances leading to Individual Plaintiffs having to cast provisional ballots during the 2014 General Election.[25] While Individual Plaintiffs contend that they responded "yes" to DMV's voter registration question, (*see* ECF No. 41 ¶¶ 17, 22; ECF No. 43 ¶¶ 17, 23; ECF No. 46 ¶¶ 10–11; ECF No. 100 at 24), Section

---

[25] In North Carolina, a voter who goes to the polls and is not on the voter rolls is allowed to cast a provisional ballot and must execute a written affirmation that he is a registered voter. N.C. Gen. Stat. §§ 163-166.11, 163-91.

5 Defendants contend that they declined voter registration services at DMV,[26] (ECF No. 69 at 7; ECF No. 69-1 ¶ 32).

Second, while there is evidence that other voters in the 2014 General Election were not on the voter rolls and therefore voted provisionally, indicating that they had registered at DMV, (*see* ECF No. 39, Exs. F–P; ECF No. 40 at 5, Ex. A; ECF No. 42 ¶¶ 9, 10, 12, 18), it is unclear to what extent DMV was the cause of these voters having to cast provisional ballots.[27] Some of these provisional ballots were not counted because of issues with voters' addresses.[28] Likewise, Plaintiffs' declaration from a voter in the 2016 Primary Election who was forced to vote provisionally, believing that she had registered at DMV, does not clearly show that the

---

[26] DMV asserts that Najera's citizenship status could not be determined at the time of her DMV visit and therefore, "upon her request," she would have been given a voter registration application to sign and return to SBE. (ECF No. 69-1 ¶ 32.) Individual Plaintiffs do not seek preliminary injunctive relief with respect to this issue at this time. (ECF No. 118 at 85.)

[27] According to Section 5 Defendants, failure to sign a voter registration application would also explain why a voter had to vote provisionally, but would not necessarily be a failure to transmit voter registration materials by DMV. (*See* ECF No. 104-5 at 148:8–11.) The signature on the provisional voting application allegedly "cures the deficiency in the application." (*See* ECF No. 66 ¶ 41.)

[28] Registration in North Carolina is county specific. (*See* ECF No. 66 ¶ 44 (explaining that "DMV data has helped county elections officials better understand why an individual may insist that he or she registered at the DMV but their names do not appear on the poll book in their new county of residence").) As such, some of these ballots were not counted because, although the voter completed a covered transaction at DMV, the "Driver License was issued with an address in a different county" than where the voter cast the provisional ballot, (ECF No. 39-16). Other ballots were not counted because the voter visited DMV "many years prior with an address . . . that did not match the address provided by the voter on the provisional envelope." (*Id.*)

56

reason this voter had to cast a provisional ballot was due to a transmission error on the part of DMV.[29]

Nor do the SBE auditing emails, noting missing voter registration data and/or scanned images, on which Plaintiffs rely, clearly show that DMV is regularly or systematically failing to transmit complete voter registration applications to the SBE within 10 days as required by the NVRA.[30] (*See* ECF No. 100 at 23.) Although the auditing emails submitted by Plaintiffs do indicate missing data and/or images transmitted by DMV to SBE at times, (*see* ECF No. 100-30 at 5, 8; ECF No. 100-31 at 3), they fail to clearly show a violation of NVRA's 10-day requirement in that the emails only note missing information, not how long such information was missing. Further, most of the transmission issues noted in one audit cycle were resolved a few days later. (*Compare* ECF No. 100-30 at 5, 8; ECF No. 104-6 at 5, 8 (noting that on February 7 and 8, 2016, there were 167 missing images and 1 data record missing), *with* ECF No. 104-7 at 5, 8 (noting that on February 9, 2016, there was only 1 missing image and no data records missing).)

---

[29] Section 5 Defendants do not dispute that Lafargue and her mother updated their voter registration information online in February 2016 when they updated their driver's licenses. (*See* ECF No. 69-1 ¶ 32.) According to DMV, their voter registration information was transmitted the day after Lafargue and her mother completed their online transactions. (*Id.*) The Court is thus unable to determine whether DMV failed to transmit these individuals' voter registration information.

[30] The record shows that SBE has an internal audit policy, which is run daily to ensure registration data submitted is paired with the scanned applications submitted. (*See* ECF No. 66 ¶ 38; ECF No. 100-2, Interrog. Resp. 12.)

57

Despite the evidence above demonstrating that DMV may not be systematically failing to transmit voter registration information to SBE, the Court cannot overlook the fact that Section 5 Defendants' own evidence shows unsuccessful transmissions from DMV to SBE. (*See* ECF No. 67 ¶ 9 (noting that out of 386,773 voter registration transactions at DMV offices in 2015, 40 of these transactions were unable to be matched with a specific application).) In a public records request, a local board of election official, in 2014, acknowledged transmission failures on the part of DMV, stating that DMV "has failed to do their job . . . over and over again" and that "[t]hey simply do not get their roll [sic] in registration and this results in a lot of provisionals." (ECF No. 40-1 at 4.) This election official goes on to explain that "[t]here is a bigger meltdown with DMV that [sic] what we are seeing." (*Id.* at 6.) DMV later implemented a policy in the summer of 2015 of securing a written declination from a person declining voter registration. (ECF No. 107-3 at 47:14–48:20; ECF No. 69-1 ¶¶ 9-10.) This written declination provides independent evidence when a customer declines to register to vote at DMV. Though it is unclear from the record whether DMV's 2015 policy was implemented in response to the alleged transmission issues, it does appear to address the transmission failures alleged by Individual Plaintiffs. While the evidence, taken as a whole, may not show a wholesale failure on the part of DMV to transmit voter registration applications to SBE at this stage in the litigation, this Court recognizes that "even one disenfranchised voter . . . is too many." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014).

DMV's evidence shows that, at a minimum, there were transmittal issues with at least 40 individuals in 2015. (*See* ECF No. 67 at 9.) The Court finds no language in the NVRA to

suggest that "substantial compliance [with the Act is] sufficient." *Louisiana*, 2016 WL 4055648, at *44. "A plaintiff need not have the franchise wholly denied to suffer injury." *Cox*, 408 F.3d at 1352. When Congress requires DMV to transmit completed voter registration applications to SBE within 10 days, a violation of that requirement places those voters in jeopardy of losing their rights to vote and have their votes counted. *See United States v. Mosley*, 238 U.S. 383, 386 (1915) (holding that included within the right to vote is the right to have one's vote counted). The Court thus concludes that Plaintiffs have demonstrated a likelihood of success that Section 5 Defendants have failed to transmit voter registration applications as required by the NVRA.

5. *Whether Section 7 Defendants are Violating the NVRA by Treating Failures to Respond to the Voter Preference Question as a Declination to Receiving a Voter Registration Form?*

Section 7 of the Act requires that public assistance agencies "distribute with each application" a voter registration application "unless the applicant, in writing, declines to register to vote." 52 U.S.C. § 20506(a)(6)(A). This section further explains that a public assistance agency shall:

> (B) provide a form that includes–
> . . .
> (iii) boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote (failure to check either box being deemed to constitute a declination to register for purposes of subparagraph (C)), together with the statement (in close proximity to the boxes and in prominent type), "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME."
>
> . . .
> (C) provide to each applicant who does not decline to register to vote the same degree of assistance with regard to the completion

of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance.

52 U.S.C. §§ 20506(a)(6)(B)(iii), (C).

Section 7 Defendants argue that "[a]n applicant who returns or submits a blank voter preference form is deemed, as a matter of law not to wish to register to vote, and therefore the local agency is not required to send that applicant a voter registration form." (ECF No. 105 at 10.) Organizational Plaintiffs contend, however, that Section 7 only relieves public assistance agencies of their responsibility to assist a client with an application pursuant to subsection (C), and not from their broader obligation to provide voter registration applications. (*See* ECF No. 53 at 13–14; ECF No. 100 at 7–8, 10–11.) Whether or not states are allowed to treat non-responses to the voter preference question as declinations is an issue of first impression in this Circuit and the only two circuits that have considered this issue have reached different conclusions.

In *Valdez v. Squier*, the New Mexico Human Services Department ("HSD") did not provide voter registration forms to individuals who checked "NO" on the declination form or left the declination form blank. 676 F.3d 935, 945 (10th Cir. 2012). HSD argued that the phrase "in writing" is defined by subsection (B) "to include either a check in the 'NO' box on the declination form" or by leaving the form blank. *Id.* at 946. In rejecting this argument, the Tenth Circuit first noted that HSD's "interpretation of the phrase 'in writing' is clearly at odds with the ordinary meaning of that phrase" and noted that there was no indication that Congress intended that the phrase hold an unusual meaning. *Id.* The court explained that subsection (A) must be interpreted as requiring the agency to provide "an applicant with a

60

voter registration form unless the applicant declines, in written form, to register to vote." *Id.*
at 945. As such, the court went on to note that a blank declination form only "relieves the
agency from its duty to provide the applicant with assistance in completing a voter registration
form [under subsection (C)]," *id.* at 946, which mandates public assistance agencies assist
applicants with filling out registration applications, 52 U.S.C. § 20506(a)(6)(C). "If an applicant
is passive, *i.e.*, does not check either the 'YES' or 'NO' box on the declination form and thereby
indicate his or her intent in writing," the court held that "HSD must, in accordance with the
mandate of subsection (A), still provide him or her with a voter registration form, but is
relieved from providing . . . assistance in completing that form." *Id.* at 947.

In *Scott v. Schedler*, however, a divided Fifth Circuit panel reached a different result,
holding that "an applicant handing back a form with neither box checked has created
documentation 'in writing' showing that he did not wish to register [to vote]." 771 F.3d 831,
840 (5th Cir. 2014). The court in *Scott* found the phrase "for the purposes of subparagraph
(C)" ambiguous, reasoning that the phrase "does not specify if unchecked boxes relieve the
state *only* from complying with [subparagraph (C)], which deals with assisting applicants in
filling out voter registration forms, or also relieve the state from complying with [subparagraph
(A)], which deals with distributing voter registration forms." 771 F.3d at 840. "Faced with
this ambiguity," the court then interpreted "'for the purpose of subparagraph (C)' as illustrative

61

rather than exclusive" to avoid introducing what the court believed would be an inconsistency into the statute.[31] *Id.* at 840–41.

This Court finds the *Valdez* court's interpretation of Section 7 persuasive. As the dissent observed in *Scott*, the plain language of subparagraph (B) "clearly states that 'failure to check either box . . . constitute[s] a declination to register *for purposes of subparagraph (C).*'" 771 F.3d at 843. Had Congress chosen to apply this reasoning to subparagraph (A), it could have expressly done so. *See Nken v. Holder*, 556 U.S. 418, 430 (2009) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration in original) (quotation omitted)). Further, failure to check either box, thereby leaving the form blank is not consistent with the ordinary meaning of the phrase "in writing," which is typically defined to mean "the state or condition of having been written or penned; written form." [32] There is no indication in the Act that this phrase should "carry a specialized—and indeed, unusual—meaning." *Valdez*, 676 F.3d at 946 (quoting *Hamilton v. Lanning*, 560 U.S. 505, 517 (2010)).

---

[31] It is worth noting that the dissent in *Scott* agreed with the *Valdez* court, arguing that "reading § (6)(B)(iii) in accordance with its plain language would not create any inconsistency. To the contrary, if an applicant leaves the declination form blank, the agency would no longer have to assist the applicant with registering to vote, but the agency would remain responsible for providing the applicant with a voter registration form." *Scott*, 771 F.3d at 843 (Stewart, C.J., dissenting).

[32] *Oxford English Dictionary, Online*, available at
http://www.oed.com/view/Entry/230775?rskey=ilFUwu&result=2&isAdvanced=false#eid140094
91 (last visited October 23, 2016).

The Court therefore concludes that Organizational Plaintiffs have established a likelihood of success on the merits of this claim.

6. *Remaining Section 7 Alleged Violations*

Additional violations alleged by Organizational Plaintiffs against Section 7 Defendants include the following: (1) Section 7 Defendants were noncompliant with the Act between April 2013 and June 2015 with regard to the voter preference question presented to clients, (ECF No. 100 at 16–17); (2) Section 7 Defendants are failing to assist citizens in completing their voter registration application who respond "yes" to the voter preference question online, (*id.* at 8);[33] (3) Section 7 Defendants are currently noncompliant with Section 7 during telephone transactions, (*id.* at 5); (4) Section 7 Defendants' in-person systems are violating the NVRA, (*id.* at 12–13); and (5) DHHS is failing to fulfill its obligations as a voter registration agency, (*id.* at 15–22).

As to the allegation that the voter preference question was noncompliant from 2013 to 2015, it does not appear that this issue is ongoing and thus cannot serve as the basis for

---

[33] Section 7 requires that each agency provide an applicant with "the same degree of assistance with regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance." 52 U.S.C. § 20506(a)(6)(C).

preliminary injunctive relief.[34] Organizational Plaintiffs' alleged Section 7 violations related to online and telephone transactions, which has been discussed in detail in § VI.A.3, *supra*. Nor will the court address Organizational Plaintiffs' contentions related to DHHS's in-person procedures[35] and whether DHHS is failing to perform its obligations under the NVRA on a motion for preliminary injunction. There are too many open questions concerning DHHS's in-person processes, which can vary by county, and implicate issues of North Carolina law. [36] (*See, e.g.*, ECF No. 105 at 15–19; ECF No. 104 at 9–13; ECF No. 118 at 124–128; *see also* ECF No. 69-3–69-20.) Such issues should be addressed on a complete and fully developed record

---

[34] The Court notes that there is no dispute that the voter preference question that was used from April 2013 to December 2014, "Is claimant registered to vote?," (ECF No. 100-4 at 73:5–10), is not the required voter preference question under the NVRA, "If you are not registered to vote where you live now, would you like to apply to register to vote here today?" 52 U.S.C. § 20506(6)(B)(i). In December 2014, Section 7 Defendants replaced this voter preference question with the question under the NVRA, but did not change the "mapping" of the answers within the system, meaning that citizens who answered "yes" to the question, *i.e.*, "[i]f you are not registered to vote where you live now, would you like to apply to register to vote here today?", were treated as if they had answered "no." (*Id.* at 76:15–77:3.) This "mapping" issue was fixed in June 2015. (*Id.* at 74:6–9.)

[35] Organizational Plaintiffs contend that SBE's online preference form violates Section 7 in that it allows for a verbal response from a client during an in-person transaction to be treated as a written declination, (ECF No. 100 at 12); and Defendants' in-person and online systems violate Section 7 because they provide no disclosures of rights and no assurance that clients respond to the voter preference questions, (*id.* at 13–15).

[36] DHHS argues that it is not a proper party to this action because it "does not administer any of the services which trigger the requirements under the NVRA nor does it have any control over the hundreds of local and county agencies, which do administer those services." (ECF No. 69 at 18; *see also* ECF No. 105 at 17–18.) In the Fourth Circuit, however, the notion that a parent agency is not responsible for its obligations because county agencies are largely responsible for implementation has been explicitly rejected. *See Robertson v. Jackson*, 972 F.2d 529, 533 (4th Cir. 1992) (rejecting the argument that Virginia's Commissioner of Social Services was not responsible under the Food Stamp Act because the local county offices processed the applications, noting that the "finding that the Commissioner is ultimately responsible for compliance with federal law is sound, irrespective of any finding as to a statutory basis for regarding the local agencies as the Commissioner's agents in accepting and processing food stamp applications").

and thus will be reserved for trial. *See St. Jude Med. S.C., Inc. v. Janssen-Counotte*, No. A-14-CA-877-SS, 2014 WL 7237411, at *14 (W.D. Tex. Dec. 17, 2014) (noting that there are "far too many open questions and disputed issues of fact to conclude at this juncture" that the plaintiff had shown a substantial likelihood of success on the merits with respect to the motion for preliminary injunction); *Price v. City of Fayetteville*, No. 5:13-CV-150-FL, 2013 WL 1751391, at *4 (E.D.N.C. Apr. 23, 2013) ("'On an application for preliminary injunction, the court is not bound to decide doubtful and difficult questions of law or disputed questions of fact,' and '[a]s a prerequisite to the issuance of an interlocutory injunction, . . . [t]here must be no disputed issues of fact.'" (alterations in original) (quoting *Gantt v. Clemson Agric. Coll. of S.C.*, 208 F. Supp. 416, 418–19 (W.D.S.C. 1962))).

### B. Irreparable Harm

Plaintiffs must next make a clear showing that they will likely suffer irreparable harm in the absence of an injunction. *Real Truth*, 575 F. 3d at 347. To demonstrate irreparable harm a party must establish that the harm is "certain and great," "actual and not theoretical," and so "imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm;" and (2) "the harm must be beyond remediation." *League of Women Voters of the U.S. v. Newby*, --- F.3d ----, 2016 WL 5349779, at *4 (D.C. Cir. Sept. 26, 2016) (alteration in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). An injury is deemed irreparable when monetary damages are inadequate or difficult to ascertain. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994), *abrogated on other grounds by Winter*, 555 U.S. 7 (2008).

The Court first considers whether Individual Plaintiffs will suffer irreparable harm if this injunction does not issue. As this Court earlier concluded, it is without question that Individual Plaintiffs have demonstrated a likelihood of success on their claim that they suffered great harm when their provisional ballots were not counted in 2014 as a result of alleged violations by Section 5 Defendants. Further, they have demonstrated a likelihood of success in showing a reasonable expectation that they could be subject to the same actions again if the Section 5 Defendants do not correct the violation that they contend caused their injury. However, Individual Plaintiffs have not established that such an injury to them is so imminent that the requested injunction is needed to prevent irreparable harm before the November 8, 2016 election. *See Microsoft*, 333 F.3d at 530–31. Quite to the contrary, the record shows that Individual Plaintiffs are registered to vote and did in fact vote in the March 2016 Primary Election. (ECF No. 67 ¶¶ 23–25.) Nothing in the record suggests that they have moved or intend to move prior to the November election or are likely to have a covered transaction with DMV prior to the election such that their registration to vote could be altered. Accordingly, the Court finds that Individual Plaintiffs have not demonstrated a likelihood that they will suffer irreparable harm if the requested injunctive relief is not issued.

The Court next considers whether Organizational Plaintiffs have established that they "face irreparable harm if an injunction is not issued." (ECF No. 53 at 26.) An organization has been harmed if the defendant's actions "perceptibly impaired" the organization's programs, making it more difficult to carry out its mission. *See S. Walk*, 713 F.3d at 183; *Lane*, 703 F.3d at 674–75.

Organizational Plaintiffs in this case have satisfied this burden. By continuing to spend resources on registration efforts[37] between now and Election Day, Organizational Plaintiffs continue to divert resources to voter registration, sacrificing other voter mobilization and voter education efforts. (ECF No. 112-1 ¶ 20; ECF No. 112-2 ¶ 15; ECF No. 112-3 ¶ 14.) Such a diversion of resources in response to Defendants' alleged noncompliance "perceptibly impair[s]" Organizational Plaintiffs' ability to mobilize and educate voters before the General Election, a key piece of their missions. *Havens Realty*, 455 U.S. at 379. That Organizational Plaintiffs would have to divert resources in the absence of such relief is enough to satisfy their burden of showing a likelihood of suffering irreparable harm. *See League of Women Voters*, 769 F.3d at 247 (noting that once an election passes, "there can be no do-over and no redress").

## C. Balance of the Equities and Public Interest Factors

The Court must next determine whether the balance of the equities weighs in favor of granting Plaintiffs' requested injunctive relief. Plaintiffs request that this Court enter a preliminary injunction: (1) directing Section 5 Defendants to send a mailing to anyone who engaged in a covered DMV transaction online at any time prior to January 2016, containing information on how these individuals can register to vote during early voting and how they can check their voter registration status; (2) directing SBE to count the provisional votes of anyone who engaged in a covered transaction with DMV and DMV can confirm that such

---

[37] Although the voter registration deadline was October 14, 2016 for individuals seeking to vote on Election Day, at oral argument, counsel for Organizational Plaintiffs represented that their organizations would bear the burden of having to continue their registration efforts by notifying affected individuals that "they can get out and register and vote during the early voting period." (ECF No. 118 at 117.)

transaction took place, regardless of whether DMV can confirm that such individual responded "yes" to the voter preference question or submitted a voter registration application during that transaction; (3) directing Section 7 Defendants to send a mailing to anyone who engaged in a covered transaction with a public assistance agency or office dating from January 1, 2013 until Section 7 Defendants are compliant with the Act, containing information on how these individuals can register to vote during early voting and how they can check their voter registration status; and (4) directing Section 7 Defendants to "institute certain interim procedures" to ensure that everyone engaged in a covered transaction receives voter registration services, regardless of whether that transaction took place in-person or remotely. (*See* ECF No. 53 at 27; ECF No. 118 at 87; ECF No. 107 at 13–15.)[38]

Unlike an injunction that merely preserves the status quo, Plaintiffs' requested relief goes beyond maintaining the last uncontested status of the parties in that it requires Defendants to perform positive acts to *remedy* their alleged violations of the NVRA. *See Perry v. Judd*, 840 F. Supp. 2d 945, 950 (E.D. Va. 2012). This is not a case where it is "necessary to require a party who has *recently* disturbed the status quo to reverse its actions." *Aggarao*, 675 F.3d at 378 (emphasis added) (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004)). Rather, the type of preliminary injunctive relief Plaintiffs request may significantly change the parties' position and therefore "must be necessary . . . to protect against irreparable harm in a deteriorating circumstance created by [Defendants]."

---

[38] At oral argument, Plaintiffs stated that mailing a voter registration application to individuals for the alleged NVRA violations was no longer necessary in light of the Fourth Circuit's decision in *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016); (ECF No. 118 at 86–87.)

*Wheelihan v. Bingham*, 345 F. Supp. 2d 550, 553 (M.D.N.C. 2004) (quoting *In re Microsoft*, 333 F.3d at 526). Thus, the Court must carefully consider the impact on each party if the Court were to grant this extraordinary relief. In addition, because North Carolina has begun early voting and the November election is less than two weeks away, granting a number of Plaintiffs' requests would be futile in that they would be impracticable, if not impossible, to achieve. The Court will review each of the requests.

1. *Directed Mailing*

Plaintiffs request that this Court enter a preliminary injunction: (1) directing Section 5 Defendants to mail a document containing information on early voting and checking one's voter registration status to anyone who engaged in a covered DMV transaction online at any time prior to January 2016 and (2) directing Section 7 Defendants to also mail such a notification to anyone who engaged in a covered transaction with a public assistance agency or office dating from January 1, 2013 to present. The Court denies these requests for a number of reasons.

According to Section 7 Defendants, to accomplish the mailings requested "[i]t would take three to four weeks to generate the flat file database containing the names and address data" for public assistance participants. (ECF No. 105 at 20.) They further assert that "it would take five to six months to print and mail the materials needed to complete the mailing." (*Id.*) In total, Section 7 Defendants contend that "it would take a total of approximately six to seven months to complete the mailing." (*Id.*) Organizational Plaintiffs estimate that they could "complete a mailing in 3 to 4 weeks after receiving names and addresses." (ECF No.

69

107-11 ¶ 5.) The record does not afford sufficient information for the Court to determine which estimate is most realistic.

Given that the election is less than two weeks away, under either parties' projection, it would be impracticable to generate a mailing to the public assistance clients. *See Ohio A. Phillip Randolph Inst. v. Husted*, No. 2:16-cv-303, 2016 WL 6093371, at *9 (S.D. Ohio Oct. 19, 2016). Although neither party has provided estimates of how long it will take to send such a notice to DMV clients, the Court concludes that it would likely be impracticable to send such a notice to these individuals as well.[39] Even if practicality were not an issue, the Court would still have significant concerns regarding whether Plaintiffs' requested extraordinary relief should be granted. "Injunctions are, by their nature, forward looking remedies meant to 'forestall future violations.'" *Krieger v. Loudon Cty.*, No. 5:13cv073, 2014 WL 4923904, at *6 (W.D. Va. Sept. 30, 2014) (quoting *United States v. Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952)). "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005). Thus, past harms suffered by Organizational Plaintiffs' diversion of resources cannot be prevented at this point through the issuance of an injunction directing the Section 5 and Section 7 Defendants to mail certain notices to DMV and public assistance clients going back several years prior to this date. Moreover, such relief is likely to be

---

[39] The Court notes that at oral argument, Plaintiffs' counsel indicated that an email can be sent to DMV customers. (ECF No. 118 at 87, 161.) Without more factual development on how this could be accomplished, the Court is unable to evaluate the feasibility of the request. Nor can the Court for the same reasons evaluate the feasibility of Plaintiffs requested signage.

70

retrospective in nature, thus implicating Eleventh Amendment prohibition.[40]  *Edelman v. Jordan*, 415 U.S. 651, 675–77 (1974) (holding that the Eleventh Amendment bars retrospective relief in suits against public officials).  Also, the requested mailings would number in the millions and Plaintiffs have not demonstrated that such request is narrowly tailored to address those actually harmed or likely to be harmed in the future.  The balance of the equities does not tip in favor of the Plaintiffs on this requested relief.  Accordingly, Plaintiffs' requests for these directed mailings are denied.[41]

   2. *Remote Transactions and Interim Procedures*

   With respect to Organizational Plaintiffs' claim that remote transactions are covered under the NVRA, while the Court has determined there is a likelihood of success on their claim, this Court has not declared that the NVRA covers remote transactions.  Ordering that North Carolina institute interim procedures in the form of a mandatory injunction should "be reserved for extreme cases of demonstrated noncompliance with milder measures."  *ACORN*

---

[40] Though Plaintiffs have argued that the NVRA has abrogated Eleventh Amendment immunity, the Court finds it unnecessary to reach an issue of such broad constitutional proportions to resolve the issues before it at this time.  *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 156–57 (4th Cir. 2010) ("[T]he principle of constitutional avoidance . . . requires the federal courts to strive to avoid rendering constitutional rulings unless absolutely necessary." (citation omitted)).

[41] The Court is further concerned that Plaintiffs' delay in bringing this motion which includes numerous alleged violations and requesting such extraordinary mandatory relief when in fact they had notice of the alleged violations as early as October of 2014, has had the effect of shifting Plaintiffs' burden to the Defendants and the Court, requiring both to act under severely compressed time limitations.  *See Manhattan State Citizens' Grp., Inc. v. Bass*, 524 F. Supp. 1270, 1276 (S.D.N.Y. 1981) (explaining that "[i]t is an unfair imposition on the defendants and on the Court to force an unnecessarily hasty decision on such an important question of constitutional law" when the plaintiff's counsel unnecessarily waited fifteen months to file suit).  Moreover, even if the Court had been in a position to hear this matter on the day that it became ripe for determination, it is doubtful that Plaintiffs' requested relief could have been accomplished before the November 8, 2016 election.

*v. Edgar*, 56 F.3d 791, 796 (7th Cir. 1995). "Detailed mandatory injunctions 'are last resorts, not first.'" *Southworth v. Grebe*, 151 F.3d 717, 734 (1998) (quoting *ACORN*, 56 F.3d at 798), *rev'd on other grounds sub nom. Bd. of Regents of the Univ. of Wis. Sys. Southworth*, 529 U.S. 217 (2002); *Olagues v. Russoniello*, 770 F.2d 791, 803 (9th Cir. 1985) ("There is a considerable difference between *ordering* a government official to conduct his activities in a certain manner, and simply *pronouncing* that his conduct is unlawful and should be corrected."). Defendants should be given the opportunity to comply with such a declaration if indeed such declaratory relief is granted at trial. *Cf., ACORN*, 56 F.3d at 798 (explaining that until it appears that the state will not comply with an injunction, "there is no occasion for entry of a complicated decree that treats the state as an outlaw"). At this stage in the litigation, the Court does not deem it appropriate to consider any alleged violations related to remote transactions as a basis for the mandatory injunctive relief requested by Plaintiffs. This likewise applies to Plaintiffs' request that the Court direct Section 7 Defendants to "institute certain interim procedures" to ensure that everyone engaged in a covered transaction receives voter registration services, regardless of whether that transaction takes place in-person or remotely.

The unsettled state of the law with respect to whether remote transactions are covered under the NVRA, the burdens that would be placed on the state in altering its procedures before a final resolution on this issue, and the nature and number of disputed issues regarding the alleged violations of Section 7, supports that the balance of the equities and public interest factors weigh in favor of resolving these issues at trial, thus ensuring a proper and just resolution of the entire controversy. *See Wetzel v. Edwards*, 635 F.2d 283, 291 (4th Cir. 1980).

72

3. *Directing SBE to Count Ballots of Provisional Voters*

Plaintiffs request that the Court direct Defendant Strach to count the provisional votes of anyone who engaged in a covered transaction with DMV so long as DMV can confirm that such transaction took place, regardless of whether DMV can confirm that the individual responded "yes" to the voter preference question or submitted a voter registration application during that transaction. While the Court will not grant the specific relief requested by Plaintiffs, the Court concludes that the balance of the equities and public interest factors weigh decidedly in favor of protecting eligible voters who (1) have completed a covered DMV transaction, (2) have provided all necessary information to register to vote, and (3) reports to the polls on Election Day only to find their names not on the voter rolls through no fault of their own.

Currently, under North Carolina law, any voter who reports to the polls on Election Day and is not on the voter rolls must be allowed to cast a provisional ballot. *See* N.C. Gen. Stat. § 163-166.11; *see also* 52 U.S.C. § 21082(a); N.C. Gen. Stat. § 163-91. The voter executes a written affirmation that he or she is eligible to vote in the election, N.C. Gen. Stat. § 163-166.11, and provides a reason for voting provisionally, (ECF No. 39-11 at 5). By statute, the county boards of elections must investigate the information provided on the provisional ballot before determining whether the provisional ballot should count. *See* N.C. Gen. Stat. § 163-166.11; 52 U.S.C. § 21082. If a person, who is otherwise eligible to vote, indicates that she registered through DMV, and it can be confirmed, then the person is deemed registered and the provisional ballot counted. *See* N.C. Gen. Stat. § 163-182.2(a); (*see also* ECF No. 118 at 34).

73

Beginning in the summer of 2015, DMV instituted a policy that if a DMV customer declines voter registration services during an in-person transaction, DMV is to secure a written declination from that person confirming that the customer declined voter registration services.[42]  (ECF No. 107-3 at 46:5–48:25; ECF No. 69-1 ¶¶ 9–10.)  Given that Individual Plaintiffs and Section 5 Defendants dispute whether Individual Plaintiffs registered at the DMV back in 2014, DMV's 2015 policy would appear to resolve any such disputes going forward.  If DMV customers now decline voter registration services during a covered in-person transaction, there would be a written declination to that effect, providing independent evidence of whether the customer registered to vote.  The Court believes that any preliminary injunctive relief granted in this case must include DMV's written declination policy.

The Court finds that a narrowly tailored injunction is warranted to ensure that qualified voters are not deprived of their right to participate in the upcoming election because of transmission errors on the part of DMV to the SBE.  *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("[T]he possibility that qualified voters might be turned away from the polls would caution any district judge to give careful consideration to the plaintiffs' challenges.").  To protect eligible voters who have completed covered transactions and registered to vote at DMV from being deprived of their right to vote in the 2016 General Election, Defendant Strach shall be directed, by separate Order filed simultaneously with this Opinion, to treat as registered for the 2016 General Election:  (1) any otherwise eligible voter who casts a provisional ballot because his or her name is not on the voter rolls; (2) who attests to registering to vote or

---

[42] According to DMV, the physical declination is kept for 90 days in the office.  There is an electronic version of the declination.  (ECF No 104-4 at 48-49; ECF No. 107-3 at 53.)

74

updating her voter registration address in person at DMV after the enactment of the declination policy in 2015; (3) who DMV confirms actually engaged in such a covered in-person transaction; and (4) for whom DMV cannot produce a written declination of that voter declining voter registration during the covered transaction.[43]

The Court notes that Section 5 Defendants have failed to show that it would be unduly burdensome to comply with such injunctive relief or that such relief would disrupt the administration of the 2016 General Election. In fact, such an injunction would appear to have very little, if any, impact on their current process of verifying provisional ballots. Since the county boards of elections already verify every provisional ballot cast, any additional burden they face will be minimal compared to the hardship eligible voters may face if improperly denied the right to vote.

Section 5 Defendants argue that there is no basis for such relief "because it may not be true that they registered at DMV. It could be they were mistaken." (ECF No. 118 at 135.) Defendants further argue that "[i]t could be the DMV records show that they declined registration. And it would be an invitation for someone to commit election fraud." (*Id.* at 135–136.) These arguments are not persuasive. The county board of elections already verifies the voter registration status of anyone who casts a provisional ballot and nothing contained in this Court's order of injunctive relief would alter those procedures. Further, the injunctive

---

[43] This portion of the Court's order of injunctive relief relates to in-person covered transactions. Nothing in this Memorandum and the court Order filed simultaneously should be construed as altering SBE's obligation to continue to direct county boards of elections to verify the voter registration status of all voters who indicate that they were provided voter registration services at DMV.

relief that the Court will impose likely bolsters the integrity of the election process by requiring that DMV, pursuant to its 2015 policy, provide a copy of the written declination, thus shifting to DMV the burden of showing that customers actually declined to register. This is more in line with the mandate of the NVRA that DMV applications for driver's licenses, renewals, and changes of address shall be deemed an application to register to vote. 52 U.S.C. §§ 20504(a)(1), (d). The Court recognizes that North Carolina and the public have an interest in preventing voter fraud, but Section 5 Defendants' argument that the Court's relief would be "an invitation for someone to commit election fraud" is, at best, speculative and likely erroneous. *See League of Women Voters*, 769 F.3d at 246 (explaining that a state cannot burden the right to vote to address dangers that are remote and theoretically imaginable). State law makes it a Class 1 felony to fraudulently or falsely complete a provisional voting application. *See* N.C. Gen. Stat. § 163-90.3. Finally, Section 5 Defendants argue that there is no evidence of systemic failures in the DMV's transmission of voter registration information to SBE because there is "no significant error rate" and "DMV is processing voter registration applications at historically high rates." (ECF No. 104 at 17; ECF No. 105 at 5.) However, as this Court and many other courts have recognized, "even one disenfranchised voter . . . is too many[.]" *League of Women Voters*, 769 F.3d at 244. Section 5 Defendants have thus failed to show that they face hardship in complying with this Court's order for injunctive relief.

The Court has taken into consideration the impact of judicial intervention on the General Election given that it is less than two weeks away. *See Purcell*, 549 U.S. at 4. In doing so, the Court finds that granting injunctive relief will require only that DMV honor its current policy that declinations will be in writing. If there is no written declination, the voter shall be

76

deemed registered under the NVRA if they are otherwise qualified. The injunctive relief related to the provisional ballots would only affect the procedures for determining whether a voter is properly registered to vote. This would occur after the election is over, diminishing any risk that the injunctive relief would interfere with the administration of the election on Election Day.[44]

Finally, the Court notes that the public interest factor weighs heavily in favor of the injunctive relief described herein and filed as a separate Order simultaneously with this Opinion. Congress passed the NVRA for the specific purpose of "establish[ing] procedures that will increase the number of eligible citizens to register to vote" and "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501. Voter enfranchisement cannot be sacrificed when a citizen provides the state the necessary information to register to vote but the state turns its own procedures into a vehicle to burden that right. It does not matter whether it is done intentionally or through human or technological errors in processing a completed voter registration application. Either scenario could lead to a voter's exclusion from the voter rolls on Election Day. "[F]avoring

---

[44] Relief mandating an action to be taken before an impending election, though extraordinary, is not unique. *See Doe v. Walker*, 746 F. Supp. 2d 667, 682–84 (D. Md. 2010) (granting injunction four days before federal election forcing state to extend deadline for receipt of absentee ballots from overseas' voters); *Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1083 (N.D. Fla. 2004) (granting injunction two weeks before federal election forcing state to allow voters to cast provisional ballots if they showed up to vote in the wrong polling place).

enfranchisement and ensuring that qualified voters' exercise their right to vote" is always in the public interest.[45]

## VII.   CONCLUSION

Based on the foregoing, the Court concludes that Defendants' Motions to Dismiss must be denied and Plaintiffs' Motion for Preliminary Injunction should be, in this Court's discretion, granted in part and denied in part.  Orders granting and/or denying this relief will be filed simultaneously.

This, the 27th day of October, 2016.


        /s/ Loretta C. Biggs
United States District Judge

---

[45] *Fish v. Kobach*, --- F. Supp. 3d ----, 2016 WL 2866195, at *31 (D. Kan. May 17, 2016) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012)).